IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :

   v.       :   CRIMINAL NO. 13-622

JEREL JACKSON      :
  a/k/a "JINX"

### GOVERNMENT'S SENTENCING MEMORANDUM

For nearly 18 months in Philadelphia and surrounding areas, the defendant used physical violence and threats to coerce five different females, two of whom were only 16 years old, to sell their bodies for his sole financial benefit.  The instant abhorrent crimes follow on the heels of a lifetime of unlawful conduct, through which the defendant, in his 29 short years on this earth, has amassed 11 convictions and 13 additional arrests; he has never held a legitimate job, funding his existence entirely through crime. In sum, the defendant is a menace to society. Given his extremely violent conduct in the instant case, his extensive criminal history involving multiple firearms convictions, the clear danger he poses to the public, and the need for adequate punishment and deterrence, the government asks the Court to sentence Jerel Jackson to a Guidelines sentence of life in prison.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in United States v. Booker, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker.

> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing United States v. King, 454 F.3d 187, 194, 196 (3d Cir. 2006); United States v. Cooper, 437 F.3d 324, 329-30 (3d Cir. 2006)).  See also United States v. Smalley, 2008 WL 540253, *2 (3d Cir. Feb. 29, 2008) (stating that the Gunter directive is consistent with later Supreme Court decisions).  In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the Booker decision.  United States v. Grier, 475 F.3d 556 (3d Cir. 2007) (en banc).  The failure to properly calculate the advisory guideline range will rarely be harmless error.  United States v. Langford, 2008 WL 466158, *8-11 (3d Cir. Feb. 22, 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it."  Cooper, 437 F.3d at 329.  See also Rita v. United States, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority.");  United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006).

The government explains below its view that the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors should result in a sentence of life in prison.

## I.    BACKGROUND

Among the many illicit schemes in which Jerel Jackson involved himself, beating, coercing and intimidating three young women and two 16-year-old girls into prostitution was his latest venture.  Between May 1, 2012 and October 31, 2013, the defendant recruited, enticed, harbored, provided, obtained, maintained, and transported five victims into the sex trade.  PSR ¶ 5.  He also financially benefitted from pimping out these young women, taking in 100% of the profits from their sexual exploitation.  Id. at ¶ 9.  Jackson drummed up business by advertising pictures of the victims on prostitution websites like Backpage, My Provider Guide, and Erotic Mug Shots.  Id. ¶ 14.  Interested clients then called the victims on celluar phones provided by Jackson, arranged "dates" with the victims, and were told the price and the location.  Id. at ¶ 10, 14.  In order to facilitate the "dates," the defendant transported the victims to, and harbored them in, Philadelphia hotels, such as the Days Inn, Roosevelt Inn, and Red Roof Inn-Philadelphia Airport, and occasionally to the Sleep Inn in Dover, Delaware.  Id. at ¶ 10.  To ensure the success of his illegal venture, the defendant even went so far as to make payments to the security guard at the Days Inn[1] to be a lookout for any law enforcement or other potential threats to his operation.

The defendant frequently resorted to violence if he believed that any of the females withheld money or were reluctant to work.  To verify that the young women gave all their

---

1 This security guard, Adrian Palmer, was prosecuted separately in Criminal Case No. 13-562, and sentenced by this Court. Palmer knew that the defendant prostituted minors in the hotel, but he nonetheless agreed to assist the defendant.  PSR at ¶ 13.

earnings to him, he would make them strip down, squat, and cough for internal inspection, sometimes even manually searching their vaginas for money.  Id. at ¶ 12.  The defendant had a belligerent and explosive temper, which frequently resulted in him punching, slapping, choking, and kicking the victims.  Id.  To mandate compliance with his "rules," the defendant on several occasions threatened victims with a gun and used a TASER weapon on some young women, and he once burned a victim on the face with a hair straightening iron.  Id.  Additionally, Jackson "numbed" the victims to their tragic circumstances by plying them with PCP, marijuana, and prescription painkillers.  Id. at ¶ 11.  The defendant also required the victims to have sex with him, and impregnated one of the victims, Minor 1. Id. ¶ 101.

After his arrest in October 2013, Jerel Jackson admitted to authorities that he transported the victims to perform commercial sex, and that he violently coerced these victims into working as prostitutes for his sole financial benefit. Id. at ¶ 15-16.

While in custody awaiting trial on these offenses, the defendant deceptively used another inmate's calling privileges to speak with Person 4 and Person 5, who happened to be together at the time of his call to Person 5.  The next day he called Person 5 again, and tried to elicit favorable testimony from her.  He told her to corroborate his statements that he did not force anyone into prostitution.   He also attempted to reach her from prison through electronic mail. Id. ¶ 19-21.

## II.     SENTENCING CALCULATION

### A.     Statutory Maximum and Minimum Sentence.

Counts One through Five each carry a mandatory minimum term of 15 years in prison, a maximum term of life in prison, a 5-year minimum period of supervised release, a maximum term of lifetime supervised release, a maximum $250,000 fine, and a mandatory $100 special

assessment per count.  The total possible sentence is a mandatory minimum term of 15 years in

prison (75 years if consecutive), a maximum of life in prison, a 5-year minimum period of

supervised release, a lifetime maximum term of supervised release, a maximum $1,250,000 fine,

and a $500 special assessment.

**B.      Sentencing Guidelines Calculation.**

The Probation Office calculated the Guidelines range as follows:

*Count One*: a base offense level of 34; plus 2 points for person under defendant's custody

under § 2G1.3(b)(1)(B); plus 2 points for using a computer and the internet to solicit customers

to engage in sex with minors under § 2G1.3(b)(3)(B); plus 2 points for commission of a sex act

under § 2G1.3(b)(4); resulting in a total adjusted offense level of 40.

*Counts Two and Three*: a base offense level of 34; plus 2 points for commission of sex

act under § 2G1.3(b)(4); total adjusted offense level of 36 points per Count.

*Count Four*: a base offense level of 34; plus 2 points for commission of sex act under

§ 2G1.3(b)(4); plus 2 points for attempting to obstruct testimony under § 3C1.1; total adjusted

offense level of 38.

*Count Five*: same calculations as Count 1, but with an additional 2 points for attempted

obstruction of testimony under § 3C1.1, resulting in total adjusted offense level of 42.

Taking the greatest adjusted offense level of 42 and adding 4 points for multiple count

adjustment results in a total of 46 points.  A reduction of 2 points for acceptance of responsibility

applies under § 3E1.1(a), resulting in a total of 44.  However pursuant to Chapter 5, section A,

comment 2 of the Guidelines, the defendant's points surpass 43, thus his overall total adjusted

offense level will be treated as 43.  With a criminal history Category V, the defendant's

Guidelines range is life in prison.

The defendant objects to the additional 2 points for Persons 1 and 5 being in the custody and control of the defendant.  The government submits that these additional points are appropriate for the reasons raised by the Probation Officer and additional reasons that will be offered at sentencing. However, if the Court agrees with the defendant on this issue, this results in 2 points being deducted from Count One and Count Five, leading to offense levels of 38 and 40, respectively. This would change the grouping calculation in Paragraph 60 as follows:

| Group # | Adjusted Offense Levels | Units |
|---------|-------------------------|-------|
| 1 | 38 | 1 |
| 2 | 36 | 1 |
| 3 | 36 | 1 |
| 4 | 38 | 1 |
| 5 | 40 | 1 |

Thus, the highest offense level would be 40, and the total number of groups would be 5, resulting in a total adjusted offense level of 45. Subtracting 2 for acceptance of responsibility would yield a final offense level of 43.  Thus, the final calculation would not change.

The defendant also objects to the 2-point enhancement for Persons 4 and 5 for obstruction of justice. The Court previously deemed the evidence of defendant's phone calls and email attempts to the victims to be admissible at trial given its coercive nature and possible adverse impact upon the victims' testimony.  The government submits that the implication of the defendant's words on the phone calls is clear, and the additional points are appropriate.

III.   **ANALYSIS**

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that this Court should consider the calculation of the advisory guidelines as set forth in the Presentence Investigation Report, the calculation set forth in the plea agreement, review all

other factors, and impose a sentence of life in prison.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). As will be discussed later, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The depravity of the crimes in the instant case cannot be overstated. Jerel Jackson directed atrocious physical abuse towards his victims, demonstrating the hazard he presents to society. While pimping out his victims, he collected all the proceeds the young women made from their sex work. If he suspected the victims withheld money, he forced them to strip off their clothes, squat, and cough. He frequently resorted to hitting, slapping, kicking, and choking his victims. He threatened them with guns, used a TASER weapon on some of them, and even

burned one young woman with an iron.  On top of all this, Jackson coerced them with illegal

drugs like PCP, marijuana, and prescription painkillers, which served to "numb" the victims to

the atrocities of their daily lives as forced prostitutes.

His egregious disregard for these women stepped beyond mere pimping for quick cash  -

- repugnant in and of itself - -  into the realm of the insidious and frivolous abuse of vulnerable

women and girls.  Forcefully prostituting, beating, drugging, and coercing three young women

and two girls to have sex with numerous men requires a unique form of maliciousness—so too

does burning someone with an iron as punishment, using a TASER weapon on another person as

a form of torture, or impregnating a 16-year-old girl.  The defendant's particular brand of cruelty

has indelibly scarred his victims mentally, emotionally, and in some cases, physically.  His

volatile nature and aggressive behavior forced these victims to live in a state of fear, and they

suffered irreparable damage to their psychological and emotional wellbeing by having sex with

numerous strangers under duress.  Undoubtedly, this traumatic time with the defendant left their

self-worth and dignity in tatters and will encumber in their psyches forever.

As for the history and characteristics of the defendant, simply put, Jerel Jackson is a

poster child for recidivism.  The defendant is a 29-year-old man who has never held a legitimate

job and has relied on a life of violent crime to finance his existence. Since the young age of

twelve, the defendant clashed with the law, and at the age of only fourteen, he received his first

of eleven criminal convictions.[2]  PSR at ¶ 68-78.  The severity of his acts grew more dangerous

to the public as he became older, culminating in the recruitment, harboring, transportation, and

coercion of five young females into prostitution, two of whom were only sixteen years old when

prostituted.  On the road to the instant offenses, he accumulated five adult convictions,

---

[2] Jackson received six juvenile convictions and five adult convictions.  PSR at ¶ 68-78.

comprised of two for unlawful possession of firearms, one for drug dealing, and two for theft, one of which involved a forged check-cashing scheme. During the arrest for one of the firearms offenses, the defendant punched and kicked the arresting officer, was later sentenced to his longest term to date of 2-4 years in jail, and went on to violate his parole twice. The defendant's repeated encounters with the criminal justice system make abundantly clear that his propensity to commit crime will only resume after a finite term in prison. The greatest social benefit will come from him serving a life sentence, away from the temptations of the streets. Although a life sentence is no light punishment, such pervasive,  repeated, violent, and ever-worsening conduct calls for sequestration from the public through imprisonment.  Thus, the government respectfully asks this Court to administer a full life sentence to ensure just punishment, adequate deterrence, and the protection of society.

## IV.    RESTITUTION

Title 18, United States Code, Section 1593 requires mandatory restitution to victims of sex trafficking for "the full amount of the victim's losses."  Section 1593(b)(3) states that "the victim's losses" are defined by Section 2259(b)(3), and shall additionally include the value of the victim's services to the defendant or the value of the victim's labor under the Fair Labor Standard Act, whichever is greater.  18 U.S.C. § 1593(b)(3).  Section 2259(b)(3) delineates that the victim's losses include costs incurred for medical, psychiatric, or psychological care, physical therapy or rehabilitation, transportation, housing, and/or childcare expenses, lost income, attorneys' fees, and any other losses.  18 U.S.C. § 2259(b)(3).  A court may include in this amount the estimated costs of future treatment.  United States v. Pearson, 570 F.3d 480, 486 (2d Cir. 2009); United States v. Danser, 270 F.3d 451, 455 (7th Cir. 2001); United States v. Julian, 242 F.2d 1245, 1247 (10th Cir. 2001).  Section 1593 is to be applied in accordance with

Section 3664, in the same manner as an order under Section 3663A. 18 U.S.C. § 1591(b)(2).

In view of the undoubted severe psychological impact of this crime on the fragile psyches of the victims involved, restitution should include payment to those victims who have received or wish to receive counseling.  Given the average estimated current cost of psychotherapy in the Philadelphia area of $100 per hour,[3] and contemplating weekly psychotherapy for two years for each victim, this would result in an award of $10,400 each for Persons 1-5 for a total of $52,000.

In addition, as previously stated, Section 1593 requires the restitution award to account for the value of the victims' services to the defendant. The government will submit a short supplemental sentencing memorandum prior to sentencing containing the calculations for the estimated number of "dates" engaged in by each victim multiplied by the average dollar amount charged per date, leading to the total estimated value of victims' services that the defendant secured.

## V.   CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court impose a Guidelines sentence of life in prison.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


   /s/Michelle L. Morgan
MICHELLE L. MORGAN
Assistant United States Attorney

---

[3] This figure is based on an informal survey of local psychological providers and on anecdotal experience in seeking counseling for various victims in sex crimes cases in this District.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of the foregoing

government's sentencing memorandum to be served by electronic filing and electronic mail upon

the following:

Thomas F. Burke, Esq.
Borum Burke & Didonato LLC
Two Penn Center Plaza
1500 JFK Boulevard, Suite 900
Philadelphia, PA  19102


<u>/s/ Michelle L. Morgan</u>
MICHELLE L. MORGAN
Assistant United States Attorney


Dated: September 25, 2015

12