UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,    )  13-cr-00622-CDJ-1
    )
    )
    )
    vs.    )
    )
    )
JEREL JACKSON, a/k/a JINX,    )
    )  Philadelphia, PA
    )  March 16, 2015
    Defendant.    )  2:19 p.m.


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DARNELL JONES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:    MICHELLE MORGAN, ESQUIRE
    U.S. ATTORNEY'S OFFICE
    615 Chestnut Street, Ste. 1250
    Philadelphia, PA  19106


For the Defendant:    THOMAS F. BURKE, ESQUIRE
    BORUM BURKE & DIDONATO, LLC
    Two Penn Center Plaza
    1500 John F. Kennedy Blvd., Ste. 900
    Philadelphia, PA  19102


Audio Operator:    A. EL-SHABAZZ


Transcribed by:    DIANA DOMAN TRANSCRIBING, LLC
    P.O. Box 129
    Gibbsboro, New Jersey  08026
    Office:  (856) 435-7172
    Fax:     (856) 435-7124
    E-mail:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                    I N D E X

2   PROCEEDINGS:

3   WITNESS:                    DIRECT   CROSS   REDIRECT   RECROSS

4   FOR THE GOVERNMENT:

5   Sgt. James Young Simpkins      33      41       57        60

6   Spec. Agent Amy Chandler       62      68       72        72

7   Spec. Agent Michael Goodhue    73      78

8   Spec. Agent Jennifer Batish    85      96, 114

9

10  ARGUMENT:                                              PAGE

11  By Ms. Morgan 4, 13, 16, 25, 30, 32, 104, 108, 118, 138, 148

12  By Mr. Burke           9, 13, 19, 28, 107, 109, 122, 146

13

14  EXHIBITS MARKED:                             IDENT.   EVID.

15  G-1  (Unidentified)                                    37

16  (Unidentified)                                         92

17  (Unidentified)                                         96

18

19  THE COURT:                                           PAGE

20  Ruling                               27, 31, 124, 150

21

22

23

24

25

 1          (The following was heard in open court at 2:19 p.m.

 2               THE COURT:  You may be seated.  I'm sorry.

 3          (Pause)

 4               THE COURT:  All right.  This is the matter of United

 5     States of America v. Jerel Jackson, criminal number 13-622.

 6     Counsel, would you identify yourselves for the record, please.

 7               MS. MORGAN:  Good afternoon, Your Honor.  Michelle

 8     Morgan for the United States.  And with me is Special Agent

 9     Jennifer Batish from the FBI.

10               THE COURT:  Good afternoon.  Good afternoon.

11               MS. MORGAN:  Good morning.  Good afternoon.

12               MR. BURKE:  Good afternoon, Your Honor.  Thomas

13     Burke on behalf of Jerel Jackson.

14               THE COURT:  Good afternoon.

15               MR. BURKE:  Good afternoon, sir.

16               THE COURT:  And good afternoon, Mr. Jackson.

17               THE DEFENDANT:  Good afternoon, Your Honor.

18               THE COURT:  All right.  There are various motions to

19     be addressed this afternoon.  Preliminarily, Mr. Burke, have

20     you received the motions that were filed this past Friday, I

21     believe?  Or Thursday, I'm sorry.

22               MS. MORGAN:  I believe it was Wednesday, Your Honor.

23               THE COURT:  Wednesday?  Okay.  Fine.  Wednesday?

24               MR. BURKE:  They are the -- yes, I -- I received

25     them and filed a response.

1                THE COURT:  All right.

2                MR. BURKE:  I didn't know if there was additional

3        ones.  I know I filed a response to two.  I didn't know if

4        there was any additional ones the Court was referencing.

5                THE COURT:  No, that's it.

6                MR. BURKE:  Okay.

7                THE COURT:  All right.  Let's take those, Ms.

8        Morgan, as the movant --

9                MS. MORGAN:  Yes, Your Honor.

10               THE COURT:  -- beginning with the witness tampering.

11               MS. MORGAN:  Certainly, Your Honor.  Your Honor, it

12       has come to the Government's attention over the last couple of

13       weeks that the defendant has taken it upon himself to contact

14       what turns out to be two witnesses in this case.  He did so by

15       using the telephone privileges of another inmate at the

16       prison.  And we went about subpoenaing those calls, and did

17       obtain the calls and listen to them, and as of today now have

18       transcripts of those calls.

19               The defendant, in particular, telephoned person

20       number five, and person number four happened to be with her at

21       the same time.  And so he ended up speaking on the phone with

22       both of them.  And I provided the Court in footnote number 2

23       of the Government's motion with a flavor of the types of

24       things that the defendant was saying on the phone to these two

25       young ladies.  And it's the Government's position --

1                    THE COURT:  Could I just inquire, at page 2 --

2                    MS. MORGAN:  Yes, Your Honor.

3                    THE COURT:  -- footnote -- one second, please.  At

4     page 2 of the Government's filings -- and this is document 68?

5                    MS. MORGAN:  I believe so, Your Honor.

6                    THE COURT:  At the beginning of the footnote on page

7     2 in pertinent part reads in parentheses, "The audio

8     recordings have been produced to the defense"?  You with me?

9                    MS. MORGAN:  That's correct.

10                    THE COURT:  All right.  Then the next sentence

11    states, "By way of example, on March 3, 2015, Jackson calls

12    person five and tells her that he tried to email her.  He says

13    that he has court on March 18th.  That there are allegations

14    in his indictment and discovery about her and says, quote

15    within quote, "'They are trying to say that you was working

16    for me or whatever the situation was, and, of course, that's

17    not true.  And I already told them that's not true.'"

18                    The defendant then mentions person five, and person

19    four says she is with person five.  Now, that sentence, is

20    that a misprint?

21                    MS. MORGAN:  No, it's not a misprint, Your Honor.

22                    THE COURT:  Person five gets on the phone?  I

23    thought the call was to person five?

24                    MS. MORGAN:  The call was to person four.

25                    THE COURT:  Well, see the second sentence says --

1      MS. MORGAN:  Oh, I'm sorry, the call was to person

2  five.  It is -- I did get the numbers inverted, Your Honor.

3  The defendant then mentions person four.  Person five says she

4  is with person four.  So I just inverted the numbers.

5      THE COURT:  All right.  That's what I wanted to make

6  sure.  Five says -- all right.  Now, you may continue.

7      MS. MORGAN:  Thank you, Your Honor.  So I tried to

8  give a bit of the flavor of the nature of the discussions.

9  And it's the Government's view that this information is

10  admissible against the defendant.  I know that the defense

11  makes much of the fact that it may or may not fit the statute

12  for witness tampering, but the Government's not attempting to

13  supercede or to charge the defendant with anything.

14      The Government's view is that the defendant is

15  trying to adversely influence the testimony of these witnesses

16  by contacting them, and that is directly relevant to their

17  testimony at trial, directly relevant to their experience in

18  interacting with him, and the fact that he was coercive with

19  them in the past, and is, in essence, an admission by him

20  because he's trying to contact these witnesses and suggest to

21  them what their testimony should be, which would not be

22  necessary if their truthful testimony did not implicate him.

23      It reflects his ability to psychologically coerce

24  the witnesses, which is relevant because that is exactly what

25  he's charged with in this case was exact to these same people.

1    And certainly, if the defendant were to testify, the

2    additional ground would be that this conduct goes directly to

3    his credibility and the fact that he's reaching out to these

4    witnesses and trying to influence their testimony.  So for all

5    of those reasons, we are asking to have this evidence be

6    admissible at trial.

7              THE COURT:  Now, are there certain Rules of Evidence

8    that you're citing in support of your argument?

9              MS. MORGAN:  I am, Your Honor.  In the first

10   instance, it's our position that this is admissible as non-

11   hearsay because it is an admission of the defendant.  I

12   believe that's under Rule 802.  Also, we are offering under

13   Rule 404(b) as evidence of his criminal intent and his state

14   of mind.  And in the event that he testifies, we're offering

15   it under Rule 608(b).

16             THE COURT:  And the cases that you cited in support

17   of this position, they were not Third Circuit cases, but

18   nevertheless you cited.

19             MS. MORGAN:  I cited several, Your Honor.  If you'd

20   like me to provide you with those citations, I can.

21             THE COURT:  I have the citations.  Let me hear what

22   you have to say about the Segal (phonetic) case, Eighth

23   Circuit, 1957, you cited in your memorandum.

24             MS. MORGAN:  Your Honor, I endeavored to find

25   whatever cases I could.  There aren't many.  Unfortunately,

 1    most of the cases there's sort of evidence of witness

 2    tampering in one instance and then the instant trial is a

 3    witness tampering case.  And so the Court is deciding whether

 4    to admit evidence of witness tampering in the context of

 5    witness tampering charges, which is not what we have here.

 6    The Government certainly hasn't had an opportunity to

 7    supercede in the last few days after receiving this

 8    information.

 9              THE COURT:  And I haven't had success over the

10    weekend at home, frankly, trying to research this issue either

11    on cases right on point.

12              MS. MORGAN:  Right.  This was as close as a close

13    that I could find on point, which basically talked about how

14    if a -- if a defendant is trying to tamper with a witness,

15    then that conduct is, essentially, an admission of the

16    defendant.

17              THE COURT:  Well, in Segal, as I read the case,

18    there was, in essence, an admission and an --

19              MS. MORGAN:  Right.

20              THE COURT:  -- attempted perjury.

21              MS. MORGAN:  The defendant said he tried to get

22    someone to perjure themself.

23              THE COURT:  Right.

24              MS. MORGAN:  So that was sort of one step beyond

25    what we have here.  Here --

1          THE COURT:  Right.  What we have -- I'm sorry, but

2     what we have here within the statements themselves, as I read

3     either the paraphrasing of what was said or what is known to

4     the Government as having been said by the defendant, he

5     actually proclaims his innocense --

6          MS. MORGAN:  Uh-huh.

7          THE COURT:  -- as apposed to admitting guilt.  To

8     the extent that that -- that is tampering with the witness,

9     how do you reconcile that?  I think that the actual statement

10    that you attributed to the defendant was, "They trying to say

11    that you was working for me or whatever the situation was,

12    and, of course, that's not true.  And I already told them

13    that's not true."

14         MS. MORGAN:  Right.  Your Honor, there are numerous

15    statements to that effect throughout these phone calls.  And

16    if you listen to them, it's -- it's apparent that the

17    defendant is stating what their position should be and sort of

18    providing information about what his defense is, so that the

19    witnesses are -- know what they can say that will suit him.

20    In other words, it's -- it's coaching of the witnesses.

21         THE COURT:  All right.  I understand your argument.

22    What's on paper is equivocal.  Would then it be best if I

23    heard them?  As you're suggesting, if I heard them, I would

24    understand what they are actually saying?

25         MS. MORGAN:  That's fine, Your Honor.  I think that

1   makes sense.  I think when you listen to them and you take

2   both of the calls in context with the timing and the fact that

3   these are witnesses in this case whom the defendant has -- we

4   allege, has successfully coerced in the past to do things

5   against their own interest, I think that would lend to the

6   Court's evaluation of the evidence.

7              THE COURT:  All right.

8              MS. MORGAN:  So I can certainly provide a disk to

9   the Court with both phone calls, so that the Court can listen

10  to them.

11             THE COURT:  How long are the calls?

12             MS. MORGAN:  They're no more than 15 minutes each.

13             THE COURT:  Do you have them here today?

14             MS. MORGAN:  I do not.  I apologize, Your Honor, but

15  I could -- I could send a note to ask someone to bring them

16  over, and probably they could do that while we're in the midst

17  of this hearing.

18             THE COURT:  All right.  Let me ask Mr. Burke.  Let

19  me hear his position on all this.

20             MR. BURKE:  Your Honor, I -- I've filed -- I timely

21  filed a response per your Court's instructions.  Your Honor,

22  the -- I believe the Court's -- has pointed out what I was

23  going to argue.  I don't believe these statements amount to

24  any sort of intimidation at all.  That's just the Government's

25  take on it.  There's not one word, there's not -- there's no

1    raising of any voices, there is not one threat, there is not

2    one possible future threat such that, you know, if you

3    testify, I'm going to do this, that, or the other thing.

4    There's not one threat psychologically, physically to any of

5    these witnesses or to any family members.  If a person shows

6    up, if a person testifies, there's not one threat at all.

7              The witness tampering charge, as the Federal Court

8    proscribes it, includes with it that there has to be an

9    element of some sort of threat to either refrain from doing

10   something that they're legally responsible to do, such as

11   report the commission of a crime -- of a Federal crime to law

12   enforcement; or to refrain from obeying a Court order, such as

13   a subpoena to appear and testify; or to destroy evidence; or

14   to lie; or to not show up and give testimony in court.  None

15   of these conversations, when you look at them, amount even by

16   a preponderance of the evidence to what the Government -- what

17   Congress has termed witness tampering.

18             The Government in this case says it's witness

19   tampering, and they want it to be witness tampering, but it

20   just doesn't meet the statute.  Whether or not the Government

21   decides to supercede, it doesn't answer the question for here

22   and now.  It's not witness tampering.  So because it's not

23   witness tampering, the question then becomes is, for what

24   reason would it come in?

25             I certainly would agree with the Government that if

1    my client elected to testify and said things that were

2    contrary to these conversations, then they most certainly

3    would be ripe for cross-examination.  I -- I stipulate to

4    that.  Certainly, if my client got on the witness stand and

5    claimed that he never spoke to these girls, that he doesn't

6    know these girls, then, certainly, that would be ripe for

7    cross-examination.  But in terms of -- of it's admissibility,

8    it is not an admission of any sort.

9              They want to say that he's psychologically coercing

10   them, but that's their very tangential theory or their

11   interpretation.  And the Court has to deal, when it rules, on

12   Rules of Evidence of more -- of concreteness.  What is there

13   and what -- what can be admitted.  So I don't believe that the

14   evidence is admissible.  It's not admission.  It's not witness

15   tampering.  And frankly, it's really going to be admitted to

16   -- the Government's going to use it as an argument saying that

17   he's psychologically coercing them, when that evidence -- this

18   proffered evidence doesn't show that.  So, therefore, it's

19   really not relevant.

20             And I cited, you know, Rule 402 and Rule 403.  And

21   it certainly doesn't come in under -- under 404(b).  So for

22   all those reasons I'd ask the Court to deny their motion, with

23   the caveat, of course, that if they -- if the defendant elects

24   to testify and contradicts anything he said on the tapes, then

25   that's certainly ripe for cross-examination.  Otherwise, I ask

1   that the Court deny their motion to admit in their case in

2   chief.

3           MS. MORGAN:  Your Honor, if I could just respond

4   briefly.  The other issue I want to raise with the Court with

5   respect to this evidence is it's quite possible that as a

6   result of Mr. Jackson's phone calls, one or both of these

7   witnesses may be reluctant on the witness stand.  And if they

8   attempt to minimize or recant their testimony, I think the

9   jury is entitled to hear about their bias.  And the fact that

10  the defendant called them within the last two weeks to discuss

11  this trial goes directly to their bias.  And so the Government

12  may need to use the evidence for impeachment purposes to

13  impeach its own witness, which would certainly make it

14  admissible under the Rules of Evidence.

15          THE COURT:  All right.  That one -- let me hear your

16  response, please.

17          MR. BURKE:  Well, that -- that really leads -- I

18  mean, now they're asking the Court to make -- to make a ruling

19  today on something that might happen in the future.

20          THE COURT:  Well, that's what motions in limine are

21  all about, but --

22          MR. BURKE:  Well -- no, they're saying, well, what

23  if this witness -- what if this witness shows up and is

24  suddenly -- doesn't want to testify?  This witness is under

25  the sole control of the Government and her agents.  So when

1   this witness comes to testify, before she testifies she's

2   going to be spoken to by the Government, she's going to be

3   spoken to by the Government's agents regarding their

4   testimony, regarding these phone calls.

5        And frankly, I think it's easily suggestible to

6   these complaining witnesses that -- you know, were you scared?

7   Did you not want to come to court today?  Did you not want to

8   testify?  And these girls are going to say, yeah, yeah, yeah.

9   And I'm going to tell you why.  Because we've read the grand

10  jury testimony.  And frankly, the grand jury testimony of

11  witness four and five appears to me to be heavily directed and

12  somewhat coached by the U.S. Attorney, because the girls, in

13  answering their questions, were often wrong about dates and

14  times and locations.  And much of the answers given by witness

15  four and five in the grand jury were yes and no style answers.

16  Meaning they were leading tremendously.  And then the girls

17  were just saying yes, no, yes, no, to the grand jury, rather

18  than just letting the girls tell their story.

19       So I have a fear that when we come to this unknown

20  bridge that these witnesses are going to be very susceptible

21  to leading questions by the agents and the U.S. Attorney's

22  Office, and then they're going to come up here and say yes,

23  yes, I'm scared, I'm frightened, he made me not testify, or I

24  -- I was thinking about not coming to court, yes, yes.  And,

25  therefore, they're getting in -- it's almost like -- it's

1    almost like the tail wagging the dog.  It otherwise wouldn't

2    come in unless the witness says this, so I'm going to get the

3    witness to say, so, therefore, it comes in.

4              So I'm asking the Court to bar the testimony unless

5    my client takes the stand and -- and contradicts it, and then

6    that clearly would go to his credibility.  But otherwise,

7    there's no evidence that these girls are not going to come in

8    court, there's no evidence that -- and she even -- the

9    Government didn't say we've received a phone call, or the

10   witness is now no longer at that location and we can't find

11   her, or -- or, you know, our agents have information that they

12   fled the jurisdiction.  There's no evidence of that

13   whatsoever.  This is all purely theoretical.  I'd ask the

14   Court not grant the motion based on that, and I ask you to

15   deny the motion based on the rule of law, again, unless my

16   client testifies.

17             THE COURT:  All right.  I am inclined to not rule

18   precipitously or prematurely on the request regarding the

19   potential for impeachment of the Government's own witnesses.

20   That was a bridge that I'll just cross when we come to it.

21   But everything that you need to have in place, you should have

22   in place in event that I rule in the Government's favor.

23             Going back, however, to the initial issue here.

24   Since we do have to litigate the suppression motion and

25   several other motions, if you can get them over here and have

1    something to play them on as well, I will certainly listen to

2    them to make a reasoning decision about it.

3              MS. MORGAN:  Certainly, Your Honor.  And I've asked

4    that someone brink a disk over to the courtroom as soon as

5    they can put them onto the disk.

6              THE COURT:  All right.  Do we have something in here

7    we can play it?  No?

8         (Pause)

9              THE COURT:  Do you have a player that you can bring

10   that would be audible, so that this could happen in the

11   courtroom with the defendant present as well?

12             UNIDENTIFIED SPEAKER:  I mean, we could get a

13   computer.

14             MS. MORGAN:  We -- I could --

15             THE COURT:  Do you have a laptop and you can put

16   the --

17             MS. MORGAN:  I do, but no one else can -- I don't

18   know that anyone can necessarily remove it and bring it here

19   because of my special key card that operates it.

20             THE COURT:  Okay.  All right.

21             MS. MORGAN:  Alternatively, the Court could -- could

22   listen to the recordings at its leisure, since its inclined to

23   rule at another time.

24             THE COURT:  Well, you're asking me how we're going

25   to rule ahead of time regarding --

1          MS. MORGAN:  Just general admissibility.

2          THE COURT:  -- general admissibility?

3          MS. MORGAN:  Uh-huh.

4          THE COURT:  And that's, I think, a decision that I

5    should make prior to trial.

6          MS. MORGAN:  All right.  So I can contact our

7    litigation unit and see if they can bring over a laptop just

8    for that purpose.

9          THE COURT:  All right.

10         MS. MORGAN:  I would like to make the Court aware of

11   one other thing in relation to these calls.  Apparently the

12   calls continued over this past weekend with the defendant

13   trying to contact the same witness on two additional times.

14   I --

15         THE COURT:  Was there any order issued by the

16   Magistrate Judge at arraignment prohibiting contact with the

17   victims?

18         MS. MORGAN:  Your Honor, my experience is that

19   typically the Magistrate only states that on the record when

20   the defendant is being released.  When the defendant is being

21   detained, the Magistrate typically does not say you are to

22   have no contact with witnesses.  But in any event, I want the

23   Court to be aware that the FDC is inclined to place the

24   defendant in the special housing unit as a result of his

25   contacting witnesses.  And I have not asked them to go ahead

1    and do that because then I'm sure the defendant will complain

2    that he cannot prepare for trial, and I would like the case to

3    go forward on Wednesday as planned.   But I would like the

4    defendant to be aware that that is something that the Federal

5    Detention Center is inclined to do should these calls

6    continue.

7              THE COURT:   Well, let me go one better than that.

8              Mr. Jackson --

9              THE DEFENDANT:   Yes, sir?

10             THE COURT:   -- from this point forward do not

11   contact any victim in this case.   Victim meaning anyone named

12   in the indictment as complainants in the case.

13             THE DEFENDANT:   No problem.   I do have --

14             THE COURT:   Don't say anything else.

15             MR. BURKE:   No, no, don't say anything else.

16             THE COURT:   Speak with Mr. Burke.

17             MR. BURKE:   Thank you, Your Honor.

18             THE COURT:   Yes, sir.

19             MS. MORGAN:   And one final thing with respect to

20   these calls, Your Honor.   Should the Court be inclined to

21   admit them, we can take this up at a later time.   But there

22   are a few points in the phone calls where the defendant either

23   references going to jail for life, or the court cases of the

24   two victims, the fact that they've been incarcerated, the fact

25   that they have a court date, all in relation to cases that the

1    Government has suggested are inadmissible against them.  So if

2    the Court is ultimately inclined to admit the calls, there are

3    a couple of places that it may be appropriate to redact things

4    so as not to prejudice the Government or the defendant.

5              THE COURT:  Very well.  Thank you very much.  One

6    last question.  Give me a moment, please.

7         (Pause)

8              THE COURT:  Mr. Burke --

9              MR. BURKE:  Yes, Your Honor?

10             THE COURT:  -- there is one sentence here, at least

11   in the printed footnote that I have, that I believe is

12   arguably admissible at this point, notwithstanding what we've

13   both addressed as far as exculpatory statements are concerned

14   in the phone calls.  And that is about midway through, the

15   defendant is attributed to saying, "My guess is that they're

16   going to subpoena you all.  The prosecutor says she has five

17   witnesses who will say I forced them.  I got superceded.  I

18   already had my case beat till they added you all on."  What's

19   your position on that statement?

20             MR. BURKE:  As to its admissibility?

21             THE COURT:  Yes, sir.

22             MR. BURKE:  It's not a threat, and it's not an

23   admission.

24             THE COURT:  You don't think arguably it's an

25   admission?

1              MR. BURKE:  "My guess is that they're going to

2     subpoena you all.  The prosecutor says she has five witnesses

3     who will say I forced them.  I got superceded.  I already had

4     my case beat till they added you all on."

5              THE COURT:  That's the portion I'm talking about.

6              MR. BURKE:  "I had my case beat" --

7              THE COURT:  -- "till they added you all on."

8              MR. BURKE:  I don't -- I don't really see that as an

9     admission, frankly, sir.  I -- I defer to the Court.  You're

10    the one -- you're the gatekeeper of the evidence.  "I already

11    had my case beat till they added you all on."  He already had

12    his case beat how?  I mean, you got to put the two

13    sentences --

14             THE COURT:  I wasn't the declarant.  I mean --

15             MR. BURKE:  Right.  I mean, you have to put the

16    sentences in context.  You know what I mean, the Court's

17    pulling the last sentence out.

18             THE COURT:  Well, I'm not pulling it out.  I'm

19    looking at it in context of what was written, but in the

20    context of what it was written.  And then it says "...".  Now,

21    I don't know what was said behind that.  I have no idea.  This

22    was just a quote that was extracted by the Government.  But --

23    and I'm going to listen to the entire CD, but I still would

24    want to know what your position is at this point as to that

25    statement?  Because I'm certainly going to hear it again,

1   presumably.

2          MR. BURKE:  Well, again, my position is -- is that

3   it's not a threat.  And, frankly, I don't think that that's

4   really an admission in the context of the sentences.  The

5   first part was, "I already had my case beat," when, in fact,

6   he did not have it beat.  He was going to trial.

7          THE COURT:  Well, that's not in the sentence though.

8          MR. BURKE:  "I already had my case beat till they

9   added you all on."  Frankly, I don't think that's an

10  admission.

11         THE COURT:  All right.

12         MR. BURKE:  I don't think it's an admission.  I

13  don't think it's clear, I don't think it's an admission, and I

14  don't think it's admissible.

15         THE COURT:  And I would surmise that the Government

16  is also going to argue, and has somewhat already argued, that

17  the following sentence -- he then says, "You ain't never

18  worked for me, period."  I believe that's going to be argued

19  by the Government as suggesting how they should testify.

20         MS. MORGAN:  That's correct, Your Honor.

21         THE COURT:  So I'll hear your argument as to that as

22  well.

23         MR. BURKE:  Well, Judge, the -- the Government

24  themselves were saying that these witnesses may -- well, I'm

25  not going to argue that.  The statement that -- I just -- I

1    just had it.  I didn't underline it.  They say you trying to

2    -- I'm sorry, Judge, I'm looking at the -- they say you trying

3    -- "They trying to say that you was working for me, or

4    whatever the situation was.  Of course, that's not true."  And

5    this is to person --

6              THE COURT:  No, no, I'm looking about three-quarters

7    of the way down.

8              MR. BURKE:  All right.

9              THE COURT:  One, two, three, four, five, six, seven,

10   eight, nine -- ten from the bottom.  It starts with "added you

11   all on."

12             MR. BURKE:  All right.

13             THE COURT:  He then says, "You ain't never worked

14   for me, period."  And again, I surmise that the Government's

15   arguing that that's the one that is suggesting to them what to

16   say.  And that's following the sentence, "I already had my

17   case beat till they added you all on."

18             MR. BURKE:  I mean, that's the Government's

19   interpretation.  The conversation -- the person on the other

20   end of the line --

21             THE COURT:  Well, wait a minute.  Wait a minute.

22   Just a second.  You're -- you're arguing that's the

23   Government's interpretation.

24             MR. BURKE:  Correct.

25             THE COURT:  And what I'm asking you is, how do you

1    reconcile that argument with relevancy's definition in terms

2    of having any tendency to make a fact of consequence more or

3    less probable?

4            MR. BURKE:  The statement you ever -- you never --

5    "You ain't never worked for me," which he repeats two more

6    times, my argument is -- is that is not -- that statement --

7    there's no response by the -- by the call -- the person -- or

8    not the callee (sic) -- the person on the other end of the

9    phone.

10           THE COURT:  I don't know what's -- what's on here

11   because all I'm seeing is an excerpt that's written in a

12   footnote that the Government submitted in their memorandum.

13   And that's why I'm saying to you -- I'm going to listen to the

14   whole thing, but at least as I listen to it, it would be nice

15   to know what the arguments of counsel will be, or have -- have

16   already been on these issues.

17           MR. BURKE:  My argument is this.  Is that -- that

18   appears to me to be a declarative statement of his innocense.

19   "You ain't never worked for me, period."

20           THE COURT:  And it could be.

21           MR. BURKE:  Okay.  Then I --

22           THE COURT:  But if the Government's trying to put it

23   in, then the Government -- it's to the Government's peril that

24   the jury decides it's --

25           MR. BURKE:  Well, in an abundance of --

1          THE COURT:  -- exculpatory.

2          MR. BURKE:  In an abundance of caution, as -- as you

3    know my position has to be, because I can't -- I don't -- I'm

4    fearful of interpreting what a jury might think.  It's always

5    easier just to leave it out and they don't have to think about

6    it at all.  You're right, they could all say he -- he told her

7    he didn't work for her and we believe that.  But my reading of

8    that statement is that is not an admission, and I don't

9    believe it should be admissible.  That's a declarative

10   statement of his innocense.

11         THE COURT:  All right.

12         MR. BURKE:  Certainly, if the words attached to it

13   were, you ain't never worked for me, period.  Make sure you

14   say that, yeah, that's a little different.  Make sure -- now

15   he's telling her what to say.  He's saying, I -- "You ain't

16   never worked for me."  And that's a declarative statement of

17   his innocense.  So I -- it's not admissible, and it's not an

18   admission.

19         THE COURT:  All right.  Fair enough.

20         MR. BURKE:  And I also dare say that these

21   recordings -- these recordings are going to come in -- I mean,

22   if they come in, there's also -- there's -- you know, the

23   origins -- the origins of these recordings -- and I don't know

24   if there's going to be a way evidentiary-wise to excise this,

25   but I believe the origins of these -- these phone calls, it's

1    going to be clear from the testimony that they're coming from

2    the Federal Detention Center.

3              So in terms of the probative versus the prejudicial

4    effect on -- on the listener -- on the jury -- having the jury

5    here know that he's in prison awaiting these charges I think

6    tips even more in favor of the Court excluding them, not only

7    because they don't meet the definition of witness tampering,

8    not only because they don't -- they're not admissions of

9    guilt, but in terms of the -- just that alone, the -- the

10   phone calls are not really probative of anything.  And if the

11   jury discerns that, in fact, he's making these phone calls

12   from a correctional facility or a detention facility, then I

13   think the probative value is far outweighed by the -- by the

14   prejudicial effect of the jury knowing that.

15             So as an added argument, I ask the Court to exclude

16   these conversations for that reason as well.

17             THE COURT:  All right.  Thank you.

18             Ms. Morgan.

19             MS. MORGAN:  Your Honor, I think we're getting a bit

20   far afield.  The statement is, "You ain't never worked for me,

21   period."  The Government will be offering that as non-hearsay,

22   as a defendant's own statement being offered against him.

23   Defense counsel can argue if they want that's an -- a

24   statement of his own innocense.  The Government can argue

25   that's him trying to coach these witnesses along.

1           The issue is, is this evidence of him making these

2     phone calls relevant and more probative than unfairly

3     prejudicial?  And when you're considering those issues, Your

4     Honor, I think it's relevant, number one, because it's

5     intrinsic to the experiences of these witnesses dealing with

6     this defendant over the course of time.  And that even if you

7     turn to a 404(b) analysis, it's still relevant.  It goes

8     directly to the defendant's, the Government would argue,

9     guilty state of mind.  And it goes to his criminal intent in

10    this case.

11          But in any event, we will provide the audio

12    recordings.  Hopefully, within the next few minutes they'll be

13    brought to the courtroom.  I, also, now have full transcripts

14    of both of the calls.  So I can provide those to the Court to

15    read along as the Court is listening.  And then you can see

16    what the responses were to these statements that the defendant

17    was making.

18          THE COURT:  All right.  Thank you very much.

19          All right.  Let's move on then.

20          MS. MORGAN:  Your Honor, I think the next issue is

21    the Government's motion to admit various business records.

22    The defense indicated in their response that they would not

23    oppose the motion and have since, this afternoon, signed

24    stipulations with respect to the business records that the

25    Government is seeking to admit.

1          MR. BURKE:  That's correct.

2          THE COURT:  Very well.  I'll execute an order

3    consistent thereto with.

4          Okay.  Now, are there any other preliminary motions

5    before we go forward with the suppression motion?

6          MS. MORGAN:  Your Honor, the Court indicated in the

7    order that it issued on the 11th of March that it would hear

8    the Government's motion in limine to exclude the juvenile

9    adjudications of person five during this hearing.  If the

10   Court would like me to address that, I'm happy to do so.

11         THE COURT:  Yes, please.

12         MS. MORGAN:  Your Honor, person number five in the

13   superceding indictment -- excuse me, the second superceding

14   indictment has two prior adjudications of delinquency for

15   conspiracy to commit robbery, one from February 2010 and one

16   from August 2011.  As the Court is aware, Rule 609 allows the

17   admission of prior convictions in limited circumstances, which

18   include a prior conviction relating to a dishonest act or a

19   false statement and a prior conviction that is punishable by

20   more than one year.

21         THE COURT:  Now, were these as a juvenile or as an

22   adult?

23         MS. MORGAN:  As a juvenile, Your Honor.

24         THE COURT:  All right.

25         MS. MORGAN:  So these are not offenses that involve

1    an act of dishonesty or false statement.

2              THE COURT:  Did you say retail theft?

3              MS. MORGAN:  No, Your Honor.

4              THE COURT:  I'm sorry.

5              MS. MORGAN:  Conspiracy to commit robbery.

6              THE COURT:  Okay.

7              MS. MORGAN:  For both.  Those are -- both the

8    convictions are for the same thing.  One in 2010 and one in

9    2011.  It was not possible for me to determine whether these

10   offenses were punishable by more than one year.

11   Unfortunately, the record does not contain the exact statute

12   that the --

13             THE COURT:  As a juvenile?

14             MS. MORGAN:  Correct.  I'm not sure whether those

15   are felony convictions or not, Your Honor.

16             THE COURT:  Unless -- and I'm calling -- falling

17   back on some significant years ago, but I don't --

18             MR. BURKE:  You and I came up with the C.P. system.

19   That's a felony.

20             THE COURT:  Exactly.  Unless it's a felony.

21             MR. BURKE:  It is a felony.

22             THE COURT:  However, in terms of the period of time,

23   if it's a juvenile adjudication, it can't be beyond the age of

24   majority in terms of incarceration.  I'm really more centering

25   on the issue of conspiracy to commit robbery versus, for

1  example, the robbery itself, which is a crime of theft and

2  dishonesty.

3          MS. MORGAN:  Uh-huh.

4          THE COURT:  Conspiracy to commit a crime of theft

5  and dishonesty, Mr. Burke, let me hear your argument on that.

6          MR. BURKE:  Well --

7          THE COURT:  I guess it could come back and bite you

8  on the next case you have.  Who knows, but --

9          MR. BURKE:  Right.  I mean, I -- when -- right, when

10  I -- when I do sentencings and, you know, my client's

11  Guideline score is going by decades because they come up with

12  these conspiracy charges, there's never a delineation between

13  whether you are the -- you committed the robbery or the

14  conspiracy to commit, as -- under the Pennsylvania law under

15  the doctrine of conspiracy and accomplice liability, one who

16  voluntarily engages in a conspiracy is culpable for all of the

17  acts.  So one who conspires to rob, to commit a dishonest act,

18  to steal from somebody, whether that person acts as a lookout,

19  whether that person is the one who actually goes into the

20  store and robs or steals a lady's purse on the bus, has

21  committed a crime of dishonesty.

22          And the fact that -- you know, as -- as the District

23  Attorney's Office in Philadelphia charges, they will charge

24  the underlying offense of whatever the underlying offense is.

25  This one being robbery.  And they will also charge conspiracy

1    to commit.  So under an accomplice liability theory, that is,

2    in fact, a crime of dishonesty, along with all the other

3    Pennsylvania recognized -- theft -- all the theft charges:

4    Robbery, perjury, car-jacking, burglary, criminal trespass;

5    they are all crimes of dishonesty, they are all crimes of

6    crimen falsi.  And, you know, it is in within -- it is within

7    ten years.

8            She was adjudicated delinquent, as the Court knows.

9    That means that there was a finding of guilt by a Judge of the

10   Court of Common Pleas and a determination that this witness at

11   the time was in need of treatment, rehabilitation, and

12   supervision as a result of her conviction for this crime of

13   dishonesty.  So, frankly, I don't see how this does not come

14   in.  This clearly goes to the content of her character and her

15   testimony.

16           As she testifies, she's obviously espousing to her

17   honesty.  And this kind of criminal conviction certainly

18   questions her honesty, given that she has been adjudicated --

19   found guilty of a crime of dishonesty by a Court of the Common

20   Pleas.  So I would ask that that Government's motion be

21   denied.

22           MS. MORGAN:  Your Honor, whether or not it's

23   considered as a crime of dishonesty, Rule 609 is still subject

24   to Rule 403.  And I think the bigger issue here is whether --

25   the probative nature of this evidence and whether it would

1    result in unfair prejudice to the Government.  We believe that

2    it is.  These are offenses wholly unrelated to the notion of

3    prostitution or sex trafficking.  They were committed when the

4    victim was age 13 and age 14, respectively.  And we believe

5    that the evidence would be confusing to the jury and lead to

6    unfair prejudice toward the Government.  So we are asking that

7    they be excluded.

8            THE COURT:  All right.  The Court is certainly

9    guided by Federal Rule of Evidence 609(d) regarding juvenile

10   adjudications.  And let me begin by saying that if this was a

11   witness offered by the defendant, under the circumstances, the

12   chips would fall the same way.  And that is, it's an

13   adjudication of robbery, conspiracy to commit robbery.  And I

14   do believe, therefore, it is admissible.

15           Now, the Court can certainly give and will give an

16   instruction to the jury regarding the effect of the

17   application of this Rule of Evidence regarding impeachment.

18   So you have an exception, but I'm going to go ahead and allow

19   it to be admitted.

20           MS. MORGAN:  Thank you, Your Honor.

21           THE COURT:  Yes, ma'am.

22           So that motion by the Government's denied.

23           MS. MORGAN:  I believe that just leaves the motion

24   to suppress, Your Honor.

25           THE COURT:  All right.  Is your AV person here for

1      the other thing?

2              MS. MORGAN:  We have the laptop set up.  We're just

3      waiting on the disk.

4              THE COURT:  Oh, okay.

5              MS. MORGAN:  Oh, we have the calls, actually, Your

6      Honor.  So I don't know if the Court would prefer for us to

7      call the witnesses on the suppression matter, or to listen to

8      the calls first?

9              THE COURT:  Whatever is convenient for you is fine

10     with me.

11             MS. MORGAN:  We have several witnesses waiting,

12     so --

13             THE COURT:  Fine.

14             MS. MORGAN:  -- if we could go ahead and call those

15     witnesses?

16             THE COURT:  That's fine.

17             MS. MORGAN:  Okay.

18          (Pause)

19             MS. MORGAN:  Your Honor, we're just going to test

20     this out to make sure it's working --

21             THE COURT:  Sure.

22             MS. MORGAN:  -- so that she can go back to the

23     office.

24             THE COURT:  Certainly.

25          (Pause)

 1              MS. MORGAN:  Your Honor, the Government calls

 2   Sergeant James Simpkins.

 3              Good afternoon.

 4              THE WITNESS:  Good afternoon.

 5              Good afternoon, Judge.

 6              THE COURT:  Good afternoon, sir.

 7              COURTROOM DEPUTY:  Can I ask you to state your full

 8   name and provide the spelling of the last name for the record.

 9              THE WITNESS:  James Young Simpkins, Jr., S-I-M-P-K-

10   I-N-S.

11              COURTROOM DEPUTY:  Can I have your badge number,

12   please?

13              THE WITNESS:  409.

14              JAMES YOUNG SIMPKINS, JR., GOVERNMENT'S WITNESS,

15   SWORN

16              COURTROOM DEPUTY:  Thank you, sir.  You may be

17   seated.

18              THE WITNESS:  Thank you.

19                        DIRECT EXAMINATION

20   BY MS. MORGAN:

21   Q    Good afternoon.

22   A    Good afternoon.

23   Q    Could you please tell the Court where you work?

24   A    Tinicum Township Police Department in Delaware County,

25   Pennsylvania.

1    Q    And what is your position there?

2    A    I am a sergeant and criminal investigator.

3    Q    And how long have you worked for the Tinicum Township

4    Police Department?

5    A    Twenty-five-and-a-half years.

6    Q    And were your officers called to a domestic disturbance

7    at the Red Roof Inn in Tinicum Township on July 17, 2013?

8    A    They were.

9    Q    Okay.  Were you involved in what happened on location

10   there at the Red Roof Inn?

11   A    I was not involved until -- at the Red Roof Inn, no.

12   Q    All right.  Were two people brought back from the Red

13   Roof Inn to the police station?

14   A    They were.

15   Q    And who were those two people?

16   A    One of them was Claribel Abreu.  And I apologize, but I'd

17   have to look in my report there.  I could tell you the name of

18   the other person.

19   Q    Was the -- was the other person Marquita Robinson?

20   A    That is correct.

21   Q    Okay.  And when they were brought back to the police

22   station, did you have an opportunity to interact with Ms.

23   Abreu?

24   A    I did.

25   Q    And did you determine that she was a juvenile?

1    A    Yes.

2    Q    And were you involved in interviewing either of these two

3    females when they were brought back to the police station?

4    A    I did.  I spoke with both of them.

5    Q    And could you tell the Court what the nature of the

6    dispute was between the two of them?

7    A    Yes.  Ms. Robinson had claimed that and informed me that

8    both were involved in prostitution, and that some of the money

9    that was earned, she had -- Ms. Claribel had taken her money

10   from her and actually had it on her person.

11   Q    And while you were questioning these two witnesses, did

12   you ask the FBI to respond and assist you?

13   A    I did.

14   Q    And after speaking with the two witnesses, did you and an

15   FBI agent take Ms. Abreu anywhere?

16   A    Yes, we took her to Philadelphia.  I think it was Darien

17   Street.

18   Q    And why did you take her there?

19   A    That was where her father was.

20   Q    All right.  When you arrived there in Philadelphia, did

21   you know whether she had a cellular telephone?

22   A    Yes.

23   Q    And did you ask for permission to look in that phone?

24   A    Yes.

25              MS. MORGAN:  All right.  Your Honor, may I approach

1    the witness?

2            THE COURT:  Yes.

3    BY MS. MORGAN:

4    Q    I'm showing you what I've marked as Government's Exhibit

5    1.  Do you recognize that document?

6    A    I do.

7    Q    And what is that?

8    A    That is a consent form for a search of a cell phone

9    related to -- that Ms. Abreu had on her person.

10   Q    All right.  And I see it's redacted, but this was for the

11   telephone that -- that was on her at the time, correct?

12   A    That is correct.

13   Q    Okay.  And is some of the writing on this form your

14   writing?

15   A    The only writing on that form that is my writing is the

16   police incidence number up top and the part where it says

17   "Telephone make was unknown."  And then it says, "Color?"  And

18   I put "Blk," for black.  And the only other writing is where I

19   have "Detective Simpkins."

20   Q    All right.  And this form is dated July 17, 2013; is that

21   correct?

22   A    That is correct.

23           MS. MORGAN:  Move for the admission of Government's

24   Exhibit 1.

25           THE COURT:  Any --

1            MR. BURKE:  No objection.

2            THE COURT:  All right.  Admitted.

3    BY MS. MORGAN:

4    Q    So did you have the juvenile sign this form?

5    A    I did.

6    Q    And can you indicate what parts of this form are her

7    writing?

8    A    Yes, the part of the form that is her writing, where it

9    says "I," and it says, "Claribel Abreu."  And then the

10   signature, it says "Claribel," also.  And then the date and

11   the time.

12   Q    And did you know exactly what her age is when you had her

13   complete this form?

14   A    I did.

15   Q    And what was it?

16   A    Seventeen.

17   Q    Did she hesitate at all in signing this form?

18   A    She did not.

19   Q    And did you read it to her?

20   A    I did.

21   Q    And at any point before signing this form did she say it

22   was not her telephone?

23   A    No.

24   Q    Did she say that the phone, in fact, belonged to the

25   defendant at any point in time?

1    A    She did not.

2    Q    Okay.  And given the fact that she was 17 years old, did

3    you also speak to her father about consent to sign this form?

4    A    When we went to the residence, her father was there, and

5    he was read the form, also.

6    Q    Who read --

7             MR. BURKE:  I'm going to object.  That's non-

8    responsive.

9             THE COURT:  Sustained.

10   BY MS. MORGAN:

11   Q    Did you speak to him about it?

12   A    I attempted to speak to him but he did not speak English.

13   Q    All right.  Was there anyone available to translate?

14   A    Yes, there was a young lady there, who was a friend, plus

15   Claribel was also right there, okay, that assisted in

16   explaining the form and reading the form to him.

17   Q    So did you explain what you wanted to do?

18   A    Yes.

19   Q    And what did you say you wanted to do?

20   A    I explained that, you know, we wanted to search -- to

21   conduct a search of this phone that was on her person and, you

22   know, that she was 17 years old.  And obviously, he was the

23   parent and he did sign this form, also.

24   Q    And did you read the form again in his presence?

25   A    The form was read again in his presence.  I read it and

1  it was translated.

2          MR. BURKE:  Well, I object to that.  He doesn't -- I

3  object.  He doesn't speak Spanish.

4          THE COURT:  The objection -- the objection is

5  sustained.  You may lay a foundation for what he observed

6  being done.

7  BY MS. MORGAN:

8  Q    Did you ask the translator to assist you when you were

9  reading the form?

10 A    I did.

11 Q    And as you were reading the form, did the person appear

12 to be translating?

13 A    She did.

14 Q    Okay.  Do you happen to speak Spanish?

15 A    I do not.

16 Q    So you don't know exactly what was being translated?

17 A    I do not.

18 Q    Okay.  Did the father then sign the form?

19 A    He did.

20 Q    And can you tell the Court where his signature is on this

21 document?

22 A    It's where it says "Witness," right underneath Claribel's

23 name.

24 Q    That "Juan Abreu"?

25 A    Juan Abreu, yeah.

Simpkins - Direct                                                40

1    Q    Okay.  At any point when you were talking to him with the

2    assistance of Claribel and this other person, did he convey to

3    you that it was not his daughter's telephone?

4    A    No, he did not.

5    Q    Did he convey to you that the phone belonged to someone

6    else?

7    A    No.

8    Q    Did he convey to you that the phone belonged to the

9    defendant?

10   A    No.

11   Q    Okay.  And this person who was translating, do you know

12   who they were?

13   A    I do have her name.  Off the top of my head, I do not

14   know if -- you actually said her name.  I apologize again.  I

15   could tell you what her name was.

16   Q    Was this someone at the house when you got there?

17   A    This was, yes, a family friend out there.  And I do have

18   it in my notes.

19   Q    Okay.

20              MS. MORGAN:  No additional questions, Your Honor.

21              THE COURT:  You may cross-examine.

22              MR. BURKE:  May I?

23              THE COURT:  Yes, sir.

24                            CROSS-EXAMINATION

25   BY MR. BURKE:

1    Q    Hi.  Good afternoon, Sergeant.

2    A    Good afternoon, sir.

3    Q    Sergeant, the incident at the Red Roof Inn, that happened

4    on July 17th, correct?

5    A    That is correct.

6    Q    Okay.  So when -- and did you, yourself, go to the Red

7    Roof Inn?  Or was this incident brought to your attention by

8    other officers?

9    A    It was brought to my attention by other officers.

10   Q    Okay.  And then those officers came back, I assume, to

11   the Tinicum Township Police Station?

12   A    That is correct.

13   Q    And do you recall around what time that was?

14   A    The call came in at 0839 hours, so I would say within a

15   -- probably a half an hour of that time.

16   Q    So by nine o'clock at night?

17   A    No, I'm sorry, 0839 hours.

18   Q    Okay.

19   A    That's -- that's in the morning, sir, 0839.

20   Q    Oh, I apologize, I'm looking at the top, 2118.

21   A    Oh, I'm sorry.  That's okay.

22   Q    Okay.  So this is somewhere -- it was at 8:30, nine

23   o'clock in the morning?

24   A    Uh-huh.

25   Q    Okay.  And so when these -- when Ms. Abreu and Ms.

Simpkins - Cross                                      42

1    Marquita Robinson -- they come back to your police station,

2    correct?

3    A    Yes.

4    Q    They are in handcuffs, correct?

5    A    I do not know.

6    Q    Okay.  Well, when you saw them, where did you see them

7    physically?

8    A    I saw them in the front office of our police station.

9    Q    Okay.  Were they in handcuffs then?

10   A    I just said I do not know.  No, I -- oh, when I saw them?

11   Q    Yeah.

12   A    I don't believe so.

13   Q    Okay.  And who did you talk to first?

14   A    I actually believe I talked to Marquita first.

15   Q    Okay.  And Marquita Robinson -- you said you believe that

16   they were involved in prostitution, correct?

17   A    Yes.

18   Q    And that was told to you by the other officers?  Or did

19   you draw your own conclusion based on what you saw?

20   A    After speaking with them and speaking to the other

21   officers and the current -- some of the current problems that

22   we're having with prostitution down at our various hotels, we

23   believed that possibly they were involved in prostitution.

24   Q    This is the Red Roof Inn down by the airport?

25   A    Yes.

1   Q     Okay.  So did the girls admit to you to being

2   prostitutes?

3   A     Yes.

4   Q     Okay.  And prior to speaking to these girls, did you warn

5   them of their rights?

6   A     No.

7   Q     You didn't tell them they had a right to remain silent,

8   they didn't have to admit to any crimes without a lawyer being

9   present?

10  A     No.

11  Q     Did you say anything else?  Did you say they were going

12  to be charged?

13  A     No.

14  Q     Do you charge -- do you charge women or men engaged in

15  prostitution when they're arrested down there?

16  A     Yes.

17  Q     Okay.  So why were these girls getting a pass?

18  A     They didn't get a pass.  We were actually investigating

19  an actual theft is what we were investigating.

20  Q     And you were also investigating prostitution because you

21  just testified that, you know, there's a lot of prostitution

22  down there, right?

23  A     That's correct.

24  Q     So as a police officer, you want to make sure -- you

25  don't want prostitution in your neighborhood, correct?

1   A    Sometimes -- I mean, every incident is different.  I

2   mean, sometimes you would arrest for prostitution.  If we're

3   doing an operation where we're actually out there, you know,

4   doing prostitution arrests.  This was a result of an

5   investigation of a theft.

6   Q    Okay.

7   A    And during the course of that incident, the girls

8   admitted that they were involved in  prostitution.

9   Q    Okay.  So Marquita Robinson was accusing Claribel Abreu

10  of committing a theft, correct?

11  A    That is correct.

12  Q    And Claribel Abreu denied it, correct?

13  A    At first she denied it.

14  Q    Right.  So at first glance you have two girls, one of

15  them is accusing the other of being a thief, and the other

16  girl is accusing the first girl of being a liar, right?

17  A    Correct.

18  Q    So you got a thief and a liar, right?  That's what we

19  have right now, a thief, a liar, and two prostitutes?

20            MS. MORGAN:  Objection.

21            THE COURT:  Sustained.

22            MR. BURKE:  Okay.

23  BY MR. BURKE:

24  Q    And when you spoke to Claribel Abreu, what was your

25  conversation?

Simpkins - Cross                                                45

1    A    I didn't speak to her all that long.  When I first saw

2    her, I did -- you know, obviously, I was concerned about her

3    age, okay, because she was only 17 years old.  And I noticed

4    that she had a tattoo of "Jinx" on her.

5    Q    Any other tattoos?

6    A    I can't recall, but the --

7    Q    Just that one, right?

8    A    That one.  And I do know through, you know, dealing with

9    some young ladies who are being trafficked, that they will put

10   the tattoo of their pimp on their arm.

11   Q    Did you check for any other tattoos?

12   A    At that point?

13   Q    At any point?

14   A    Of Claribel?

15   Q    Yeah.

16   A    No.

17   Q    Okay.

18   A    I had --

19   Q    And what about Marquita Robinson?

20   A    What about her?

21   Q    Did you check for her tattoos?

22   A    I did not.

23   Q    Well, you just said you were concerned about girls being

24   trafficked, and you -- they oftentimes put tattoos of their

25   pimps -- did you check for that on Marquita Robinson?

1    A    I did not.

2    Q    Okay.  Were there any visual tattoos on Marquita

3    Robinson?

4    A    I don't recall.

5    Q    Okay.  Did Marquita Robinson have a cell phone?

6    A    I don't recall.

7    Q    Did you document anything that was going on in terms of

8    your conversation with these two ladies?

9    A    I did document with my police report.

10   Q    Right, that's -- that's this Incident Report, correct?

11   A    Uh-huh.  Yes.

12   Q    Did you -- did you take a formal statement from any of

13   these ladies?

14   A    There was a statement, I believe, the patrol officer

15   originally took, in reference to the theft, from Marquita.

16   Q    Okay.  And after you spoke with Claribel Abreu, where did

17   you recover the phone from her?

18   A    She had the phone with her.  She was actually using it

19   when she was actually with us.

20   Q    Okay.  And did you take a look at it when you -- she was

21   with you?

22   A    No, I did not.

23   Q    Okay.  Well, you know -- she told you she was 17, right?

24   A    Yes.

25   Q    So you know as a 17-year-old, she can't sign her own

1    plan, right?

2              MS. MORGAN:  Objection.

3              THE COURT:  Overruled.

4    BY MR. BURKE:

5    Q    You know as a 17-year-old, she can't -- she can't get her

6    own mobile phone plan, right?  She has to have an adult do it.

7    A    Okay.

8    Q    You know that, right, as an officer?

9    A    As an officer, yes.

10   Q    Right, so you know, as a 17-year-old, that Claribel Abreu

11   cannot have her own cellular service, correct?  Has to have an

12   adult sign for it, just like --

13   A    I -- I imagine.

14   Q    Yeah.  So when you spoke to her, did she say it was her

15   phone?  Or you just assumed it was?

16   A    Did I ask her if it was her phone?

17   Q    Yeah.

18   A    I did not ask her if it was her phone.

19   Q    You just assumed that it was?

20   A    Yes.

21   Q    Okay.  And then how was it that you got to the Tinicum

22   Township Police Department up to Ms. Abreu's house in

23   Philadelphia?

24   A    In a car.

25   Q    Right.  No, but how -- like, what did you say to her?

1    Did you say, we're going to talk to your dad or your mom?

2    A    I believe throughout the day we were -- because she was

3    17 years old --

4    Q    Right.

5    A    -- okay, we had to release her to an adult.

6    Q    Right.

7    A    And through --

8    Q    But you couldn't find an interested adult over the phone,

9    could you?

10   A    No.  Claribel was actually trying to find, you know,

11   somebody to get her.  And through that course -- I'm not

12   positive how it wound up, but it was that her father lived up

13   there, so, as we would do, we didn't want to release her --

14   you know, a young girl that's being trafficked to -- just on a

15   street, obviously, so we took her up and turned her over to

16   the custody of her father.

17   Q    Right, but -- did -- what efforts did you make to call

18   the father?  I mean -- in other words, I'm impressed by the

19   door-to-door service, but what efforts did you make to call

20   somebody at her house, saying, hey, I have your daughter down

21   her, you need to pick her up?

22   A    I don't understand the question.

23   Q    In other words, you drove out of your jurisdiction and

24   you dropped somebody who was accused of a crime off at their

25   house, correct?

1   A    At that point --

2   Q    Yes, that's what happened, right?

3   A    -- it was actually -- that's not what happened.  You said

4   "accused of a crime."  We didn't accuse her of a crime.

5   Q    Did Marquita Robinson?

6   A    Yes, she did.

7   Q    Well, oftentimes as a police officer, a person -- a

8   civilian person will come in or report to the police that a

9   crime has been committed, correct?

10  A    That is correct.

11  Q    And then the police will go and investigate?

12  A    And which we did.  And we realized that there was more --

13  something more pertinent as a young girl possibly being

14  trafficked, that she was not a -- she was not -- in our

15  opinion at that point through the investigation, okay, she was

16  not a criminal, she was a victim, and we wanted to turn over

17  that victim to her parent.

18  Q    Right.  Did you speak to anybody at the house before you

19  drove up there?

20  A    At the -- her father's house?

21  Q    Yeah.

22  A    I don't recall.

23  Q    Well, then how would you know if somebody would even be

24  there before you drove all the way up there?

25  A    We may have drove her --

1    Q    I don't want we, just you officer.

2    A    Okay.  Okay.

3    Q    Sergeant.  Sorry, I don't mean to demote you.

4    A    I did drive her all the way up there.  And if I would

5    have drove up there and there was not a father, okay, or

6    somebody like that to turn her over to -- as a police officer

7    for almost 26 years, there's been numerous times where I've

8    taken juveniles, okay, to a house, because I could not contact

9    anybody, and knocked up on the door and said, I have your son

10   or daughter, you know, and this is what happened and here they

11   are.  I've done that probably -- I don't -- I couldn't tell

12   you.  I probably have done that at least 30, 40 times.

13   Q    But when was it that you -- that you spoke to the FBI?

14   Prior to taking her up there, or afterwards?

15   A    I spoke to the FBI probably about 10 or 15 minutes into

16   my investigation.

17   Q    And what was the content of that conversation?

18   A    That I had a possible -- that I had a juvenile that is

19   possibly being trafficked.

20   Q    Okay.  And then what was their response?

21   A    They came down to the police station.

22   Q    So who was there with you?

23   A    What's that?

24   Q    Who was there from the FBI with you?

25   A    That came down there?

1  Q      Yeah.

2  A      Agent Batish and Agent Veshy (phonetic).

3  Q      Did either of the FBI agents speak to Claribel Abreu

4  there?

5  A      Yes.

6  Q      Did either of the FBI agents contact someone from her

7  home to say we have your daughter down here, we'd like an

8  interested adult to come down, we believe she's being

9  trafficked?

10  A      I believe that you probably could ask them that question.

11  I do not recall what they actually -- what you're asking me --

12  I don't know if they did or not.

13  Q      When you went to Ms. Abreu's house, did the FBI go with

14  you?

15  A      Yes, there was an FBI agent that went with me.

16  Q      Okay.  Did either of the FBI agents speak Spanish?

17  A      No.

18  Q      And the other girl that was there, was her name Tanya

19  Alvarez?

20  A      Yes.

21  Q      She's also a person mentioned in this case, correct?

22  A      Right now, as far as I know, okay, is the person who I

23  turned her over to as far the mentioning of her case.

24  Q      Right, and Tanya Alvarez is not a family member?

25  A      I don't know if she is a family member.

1    Q    Tanya Alvarez is a -- a person who engages in

2    prostitution, correct?

3    A    I cannot testify to that.  You'd have to ask, you know,

4    one of the agents who were --

5    Q    Well -- okay.  Well, let me ask you this question.  When

6    you -- you got a young girl down there, and you believe she

7    was -- she was being -- she was -- I think your words were,

8    she was a victim, right?

9    A    Yes.

10   Q    So you called the FBI.  Did anybody call Child Services?

11   Did anybody?

12   A    I did not.

13   Q    Did you direct the FBI to say, hey, well, let's call

14   Child Services here?  I mean, let's get somebody down here who

15   can, like, get this girl out of this hour, or whatever maybe

16   physical or medical appointments she may need?  Did anybody do

17   that?

18   A    I did not.

19   Q    Did you see the FBI do that?

20   A    I do not know if they did.

21   Q    Did you and the FBI discuss that that should be done and

22   that should be a priority?

23   A    I don't remember any type of discussion like that.

24   Q    When you went to Claribel Abreu's house, her father is

25   there, he doesn't speak a word of English, correct?

1   A    That is correct.

2   Q    Do you ask anybody in the Philadelphia Police Department

3   or does anybody call somebody from the Philadelphia Police

4   Department to come by a Spanish-speaking officer to translate?

5   A    At this time -- like I said, we drove up there, okay, to

6   try to find a responsible adult.  When we got --

7   Q    To do --

8   A    -- to the scene, okay, we had no idea whether he spoke --

9   you know, we were just trying to turn over his daughter to

10  him.  You know --

11  Q    I know, turn her over, but when you got there -- I mean

12  -- just as you're -- like, you're kind of walking up the door,

13  aren't you concerned, Sergeant, that this girl is -- clearly

14  has troubles, she's working as a prostitute at the age of 17,

15  and maybe this house is not the best place for her, that we

16  need to get somebody else involved other than the Federal

17  Bureau of Investigation?  You were just going to leave her

18  there and take off?

19  A    We were going to turn her over to her father.

20  Q    But you wanted to get the consent to search the phone?

21  A    I'm sorry?

22  Q    You wanted to get the consent to search the phone?

23  A    I was taking her up there to go ahead and turn her over

24  to her father.

25  Q    Okay.  And get the consent?  You brought the consent form

1    with you?

2    A    We had the consent form with her, but, I mean, we went up

3    there to turn her over to her father.

4    Q    And -- and when you realized you couldn't have a

5    conversation with the father -- well, let me ask you, what did

6    the house look like?  What did the interior of the house look

7    like?

8    A    Never went inside the house.

9    Q    It was all done what?

10   A    I'm sorry?

11   Q    It was all done, like, what, on the front porch?

12   A    It was done outside, yes.

13   Q    Well, you didn't want to go in --

14            THE COURT:  What was the address?

15            THE WITNESS:  I apologize, Judge, it's in my report,

16   but it's on Darien Street.

17            THE COURT:  North Darien or South Darien?

18            THE WITNESS:  North Darien.  I'd have to go ahead

19   and look at my report and I could tell you.  And I'm not as

20   familiar with that part of the city, but it was Darien Street.

21   I know it was a hot summer day and we spoke to him out front

22   of the house.

23   BY MR. BURKE:

24   Q    Right.  And -- and what did you say to Ms. Alvarez to

25   translate?  What was it that you said to her that you told

1    Tanya Alvarez to translate to the father?

2    A     What did we --

3    Q     Yeah.

4    A     -- tell her to translate to him?

5    Q     Yeah.

6    A     We went up, we told him we had his daughter.

7    Q     Right.

8    A     And we talked to Tanya.  And then Tanya, you know,

9    explained, you know, why we had him.  And then we also did

10   have the consent form.  And, you know, we asked Tanya to

11   assist us because we could tell he couldn't speak English.

12   And --

13   Q     To assist you doing what?

14   A     You know, we told him the circumstances as best as we

15   could.  We told Tanya, and she relayed, you know --

16   Q     No, I'm asking you, what were your words to Tanya?  Don't

17   generalize for me.

18   A     Okay.

19   Q     What were your -- to the best of your recollection, what

20   were your words to Tanya Alvarez?

21   A     To the best of my -- my recollection back then was, you

22   know, we said that we had contact with her and we think she's

23   involved, you know, in prostitution.  And I remember the

24   father was actually upset.  So I actually do remember that.

25   And then we did actually -- you know, Claribel was there.  The

1    first part was -- I apologize, Claribel actually went in after

2    the phone part.  The first part was we explained who we were,

3    showed identification, and then what we did was we explained

4    to him about the phone.  We asked him to sign a consent of the

5    phone.  And, you know, Tanya read it to him as I read it.  And

6    he signed the consent.  After that, Claribel walked inside the

7    house.

8    Q    And then what did you do?

9    A    We continued to talk to Ms. Alvarez, myself and the FBI

10   agent.  Okay?

11   Q    Did you -- did you determine what her relationship was to

12   Ms. Abreu?

13   A    She told us they were friends.

14   Q    Okay.  And you later found out that she was also a

15   prostitute?

16   A    Later found out that that's a possibility.  I can't

17   confirm that, but I mean, just discussions.  I've never had

18   any other contact with Mrs. Alvarez.

19   Q    Okay.  You never specifically asked the father whether or

20   not the phone that you had belonged to his daughter, correct?

21   A    I just explained to him as best as we could through Mrs.

22   Alvarez that this was the phone that she had and that we were

23   asking permission to search the phone.

24   Q    Did you also say, we're going to release her back to you?

25   A    Yes, that's why we brought her up there.

1   Q    Okay.  Did you ask to see -- did you ask him if he ever

2   saw that phone before?

3   A    I did not ask him.

4   Q    Did you ask him for a phone bill?

5   A    I did not.

6   Q    Did you tell Claribel Abreu that if her father signed the

7   consent to search that she would be released and not be

8   charged with any crime?

9   A    No.

10  Q    And, in fact, was any crimes later followed up?  Was she

11  later charged with theft from -- from Marquita Robinson?

12  A    No.  If you actually read my report, when some of the

13  money was retrieved, Marquita Robinson stated that she no

14  longer wanted to pursue the theft.

15  Q    Okay.  Well, considering that they both admitted to you

16  that they were working as prostitutes in Tinicum Township,

17  were either of them charged?

18  A    For prostitution or --

19  Q    Sure.

20  A    No.

21              MR. BURKE:  I have -- I have no further questions.

22              THE COURT:  Is there redirect?

23                      REDIRECT EXAMINATION

24  BY MS. MORGAN:

25  Q    Sergeant Simpkins, when you encounter a juvenile in

1    circumstances like these, in terms of turning over the

2    juvenile, if you will, what is your first order of business?

3    What -- to whom do you try to turn over the juvenile in the

4    first instance?

5    A    You always try to turn them over to a parent.

6    Q    And if you can't identify a parent, then what do you do?

7    A    If we can't identify a parent, then we would have to

8    reach out to our Children and Youth Services, which would ask

9    us if we found a parent.

10   Q    And if not, do you then have to turn the child over to

11   Children and Youth Services?

12   A    If we cannot find somebody besides a parent or a relative

13   that they -- you know, then they would say -- then they would

14   get involved, come down to our police department and take

15   custody of that juvenile.

16   Q    This agent that went with you up to Philadelphia to take

17   Ms. Abreu to her father, was that Special Agent Amy Chandler?

18   A    Yes.

19   Q    And during -- if you take a look at Government's Exhibit

20   1, that was signed at about 4:30 in the afternoon, correct?

21   A    Yes.  Yep.

22   Q    So during these several hours, from the time of the

23   initial incident at 8:30 in the morning until 4:30 in the

24   afternoon, during the time that you were speaking with

25   Claribel, was she speaking English to you?

1    A    Yes.

2    Q    And when you arrived at the location where her father

3    was, did you hear her speaking a different language?

4    A    No, I can't remember her speaking a different -- to her

5    father?

6    Q    Yes.

7    A    Yeah, not to us, but to her father she spoke another

8    language.

9    Q    Okay.  So did she appear to be communicating with her

10   father in a language other than English?

11   A    In Spanish, yes.

12   Q    Okay.  And you said she was outside with you while you

13   were explaining this form to the father?

14   A    Yes.

15   Q    Was she participating in that discussion with the father?

16   A    She never objected or said anything like that.  I can't

17   -- but she speaking back and forth to the father in Spanish.

18   Q    Okay.  And then after the discussion about the phone, you

19   said she went inside the house?

20   A    She went inside the house.

21   Q    Okay.

22   A    She came back out, but she never really interacted again

23   with us.

24          MS. MORGAN:  No additional questions, Your Honor.

25          THE COURT:  Yes, sir?

1                        RECROSS-EXAMINATION

2   BY MR. BURKE:

3   Q    Right, Sergeant, so you have a 17-year-old girl.  She's

4   -- she's engaged in prostitution, correct?  Yes?

5   A    We have a 17-year-old girl that's being trafficked,

6   correct.

7   Q    Right.  Okay.  And engaging in prostitution?

8   A    Uh-huh.

9   Q    Okay.  And you don't call Children and Youth Services,

10  correct?

11  A    No, because we were able to locate -- you know, attempt

12  to locate a parent was our first thing.

13  Q    Yeah, but let me ask you, did you -- did you -- the mere

14  fact that the guy's 17-year-old daughter is engaged in

15  prostitution, doesn't that send to you, not only as a police

16  officer, but as ordinary man, that this guy is not doing a

17  good job of taking care of his daughter?

18             MS. MORGAN:  Objection.  I think we've covered this,

19  Your Honor.

20             THE COURT:  Sustained.

21             MR. BURKE:  Okay.

22  BY MR. BURKE:

23  Q    Well, when Claribel Abreu -- she was -- just been at the

24  police station for how long?  When you took her up to dad's

25  house, how long has she been in police custody?

1    A    Probably around since nine o'clock in the morning, and at

2    1635 hours is when the consent is signed up there in

3    Philadelphia.

4    Q    So you're talking about six, seven hours?

5    A    Yes, sir.

6    Q    Okay.  How do you know that she didn't say to her dad in

7    Spanish, Dad, just sign this and they're going to let me go?

8    A    How do I know?

9    Q    Yeah.

10   A    I don't know.  I don't speak Spanish.

11   Q    Well, that's why I'm -- why didn't you follow up and say,

12   I would like to see a phone bill to verify that this phone is

13   being paid for out of this house by you, Mr. Claribel's dad?

14              MS. MORGAN:  Objection.

15              THE COURT:  Sustained.

16              MR. BURKE:  Okay.

17   BY MR. BURKE:

18   Q    And after you left -- after you left, did you call

19   Philadelphia Children and Youth Services to check up on that

20   child?

21   A    I did not.

22              MR. BURKE:  Thank you.  No further questions.

23              THE COURT:  Anything further?

24              MS. MORGAN:  No.  Thank you, Judge.

25              THE COURT:  Thank you, sir.  You may step down.

1                    THE WITNESS:  Thank you, Your Honor.  Thank you.

2                    THE COURT:  Watch your step, please.

3                    MS. MORGAN:  Government calls Special Agent Amy

4      Chandler.

5           (Pause)

6                    COURTROOM DEPUTY:  Good afternoon, ma'am.

7                    THE WITNESS:  Good afternoon.

8                    COURTROOM DEPUTY:  Can I ask you to state your full

9      name and provide the spelling of your last name for the

10     record?

11                   THE WITNESS:  Amy Chandler.  Last name is C-H-A-N-D-

12     L-E-R.

13                   COURTROOM DEPUTY:  Do you have a badge number?

14                   THE WITNESS:  No.

15                   COURTROOM DEPUTY:  Can you raise you right hand?

16                   THE WITNESS:  Yes, ma'am.

17                   AMY CHANDLER, GOVERNMENT'S WITNESS, SWORN

18                   COURTROOM DEPUTY:  Thank you.  You may be seated.

19                   THE COURT:  You may proceed.

20                   MS. MORGAN:  Thank you, Your Honor.

21                             DIRECT EXAMINATION

22     BY MS. MORGAN:

23     Q    Could you please tell the Court where you work?

24     A    I work for the FBI at the Philadelphia Division.

25     Q    And what is your position there?

1    A    I am a special agent.

2    Q    And how long have you been a special agent with the FBI?

3    A    Five years next month.

4    Q    And were you asked to respond to Tinicum -- excuse me --

5    Township Police Station on July 17, 2013?

6    A    Yes, ma'am.

7    Q    And why were you asked to go down there?

8    A    There were -- there was an incident involving two females

9    that had come in under a theft allegation, and through the

10   investigation it was learned that they were on backpage.com.

11   Q    And what is backpage.com?

12   A    It's somewhat like how Craigslist was in the beginning,

13   but there's a section on there that is for prostitution.

14   Q    Okay.  So this is an internet website, correct?

15   A    Yes, ma'am.

16   Q    And persons can advertise themselves as available for

17   prostitution on that website?

18   A    Yes, ma'am.

19   Q    And when you got down to Tinicum, did you meet with

20   either of the two females that you mentioned earlier?

21   A    Claribel Abreu.

22   Q    All right.  There was another female there as well?

23   A    Yes, ma'am.

24   Q    Did you talk with her at all?

25   A    No, ma'am.

1    Q    All right.  And did you determine that Claribel Abreu was

2    a juvenile?

3              THE COURT:  I think that's actually Abreu.

4              MS. MORGAN:  Abreu.

5              MR. BURKE:  Abreu.

6              MS. MORGAN:  My apologies.

7    BY MS. MORGAN:

8    Q    Did you --

9    A    Yes.

10   Q    -- determine that she was a juvenile?

11   A    Yes, ma'am.

12   Q    And do you know how old she was at the time?

13   A    She was 17 years old at the time, ma'am.

14   Q    Were you involved in interviewing her?

15   A    Yes, ma'am.

16   Q    And did you, along with Sergeant Simpkins from Tinicum,

17   transport her back to her father?

18   A    Yes, ma'am.

19   Q    If you take a look at Government's Exhibit 1 in front of

20   you -- do you see that?

21   A    Yes, ma'am.

22   Q    You see there's a time of 4:35 or 1635 p.m. on there?

23   A    Yes, ma'am.

24   Q    Okay.  Do you know approximately how much time you spent

25   with Ms. Abreu that day?

1   A    It was several hours.

2   Q    And were you involved in obtaining the signatures on this

3   consent form that is Government's Exhibit 1?

4   A    Yes, ma'am.

5   Q    All right.  What happened when you took Ms. Abreu back to

6   her father's house?

7   A    Her father was outside the residence, as someone we later

8   learned was -- Claribel described her as her half sister.  And

9   Claribel signed this form, and then we had her father sign it

10  as well.

11  Q    Okay.  And where was this residence located?

12  A    I don't remember the exact address, but it was near

13  Huntington Park.

14  Q    Okay.

15  A    Huntingdon Park.

16  Q    And was this form read to Claribel?

17  A    Yes --

18  Q    And --

19  A    -- I believe she read it as well.

20  Q    Okay.  And were you speaking English with her during the

21  time that you spent with her?

22  A    Yeah, she speaks fluently.

23  Q    And did she sign this form in your presence?

24  A    Yes, she did.

25  Q    Is that her signature down on the signature line there

1   toward the bottom?

2   A    Yes, ma'am.

3   Q    Did she hesitate in signing this form at all?

4   A    No, ma'am.

5   Q    And at any point when you were talking with her about

6   consenting to search the phone, did she say this is not my

7   phone?

8   A    No, ma'am.

9   Q    Or words to that effect?

10  A    No, ma'am.

11  Q    Did she ever indicate that the phone belonged to the

12  defendant?

13  A    No, ma'am.

14  Q    Did she ever indicate that the phone belonged to anyone

15  other than herself?

16  A    No, ma'am.

17  Q    And did Ms. Abreu's father also sign this form in your

18  presence?

19  A    Yes, ma'am.

20  Q    And is that his signature down at the bottom where it

21  says "Witness"?

22  A    Yes, ma'am.

23  Q    Was the father able to speak English?

24  A    No, ma'am.

25  Q    And how were you able to communicate with him, if at all?

1   A    The other female that was there did most of the

2   translating.

3   Q    This is the person Claribel described as her half sister?

4   A    Yes, ma'am.

5   Q    Okay.  Did you or Sergeant Simpkins read this form again

6   to the father?

7   A    I don't recall.  I believe -- I know the other female

8   translated it to him and explained it to him.

9   Q    Okay.  How do you know that?

10  A    She was in front of us and we explained it to her and it

11  was conveyed to him, and then he signed it.

12  Q    Okay.  Did he hesitate at all in signing the form?

13  A    No, ma'am.

14  Q    And did he convey back through this translator at any

15  point, this is not my daughter's phone?

16  A    No, ma'am.

17  Q    Did he convey back at any point --

18          MR. BURKE:  Well, Judge, I'm going to object,

19  because we don't know what was really being asked of him.

20          THE COURT:  Sustained.

21  BY MS. MORGAN:

22  Q    Did the translator ever translate words to you to the

23  effect of, this is not my daughter's phone?

24  A    No, ma'am.

25  Q    Okay.  Did the translator ever translate words to the

1    effect of, this phone belongs to someone else?

2    A    No, ma'am.

3    Q    Or this phone belongs to Jerel Jackson?

4    A    No, ma'am.

5    Q    Okay.

6          MS. MORGAN:  All right.  I have no additional

7    questions, Your Honor.

8          THE COURT:  Very well.  Mr. Burke.

9                    CROSS-EXAMINATION

10   BY MR. BURKE:

11   Q    Agent, when you were called down to the Tinicum Township

12   Police Department, you went down there sometime in the morning

13   hours before lunch?

14   A    I don't recall what time I showed up, sir.

15   Q    Okay.  And you were called because there was a -- you

16   know, you were tipped off by Tinicum Township that there was

17   an underage girl engaged in prostitution, correct?

18   A    I was called by other female agents, and they needed

19   another female to wait with this female.

20   Q    With -- with Ms. Abreu?

21   A    Yes, sir.

22   Q    Did you talk to Ms. Abreu?

23   A    Yes, sir.

24   Q    Okay.  Did she tell you she was a prostitute?

25   A    I don't recall if we talked about that, sir.

1    Q    What did you talk about?

2    A    We talked about little stuff all day long.  It wasn't a

3    formal interview as we normally engage in, so -- she talked

4    about coming from the Dominican Republic, about immigrating to

5    the United States, that her mom abandoned them when they were

6    young, that she initially came to live in -- somewhere in

7    Illinois and then had moved to Philadelphia a couple years

8    prior to me meeting her.

9    Q    Did you ask her if she needed any help?

10   A    I'm sure it came up at some point.  We usually offer --

11   Q    Well, you didn't --

12   A    -- some assistance.

13   Q    Well, she's 17.  Didn't you say, you're going to get

14   help?  Did you insist that she get some help?

15   A    No, sir.

16   Q    Did you insist that Child Services be called?

17   A    No, sir.

18   Q    When you left her at the Philadelphia house, you never

19   went and inspected the house to make sure it was safe and

20   clean and livable for a 17-year-old girl?

21   A    No, sir.

22   Q    Did you ever call Child Services after you left and said,

23   look, we just dropped off a 17-year-old prostitute at her

24   dad's house, you may want to check it out?

25   A    No, sir.

1    Q    So when went up there to drop her off, you wanted to --

2    you guys had the consent form, right?

3    A    Yes, sir.

4    Q    You -- did you have any other forms?

5    A    Not that I'm aware of, but I --

6    Q    Well, you're familiar -- you work on child prostitution

7    cases?

8    A    Yes, sir.

9    Q    Okay.  You're -- you're familiar with the practice of

10   having the underage girls use phones provided to them by their

11   pimps, or the men who run them, correct?

12   A    It does happen.

13   Q    It does happen.  So in this particular case you have a

14   17-year-old girl, she has a tattoo on her arm with the name of

15   Jinx, right?

16   A    Yes, sir.

17   Q    Did you ask her who Jinx is?

18   A    We talked about it, yes, sir.

19   Q    Okay.  She never said the phone was her, correct?  It was

20   just on her?  She never said, this is my phone, right?

21   A    I don't recall if she made that exact statement, sir.

22   Q    And you know as a 17-year-old, she can't get her own

23   phone service?  You have to be at least 18 years old to get

24   phone service, correct?

25   A    Yes, sir.

1   Q    So you have a 17-year-old girl who doesn't specifically

2   admit to owning the phone, and you're familiar with the fact

3   that the men who run them -- the pimps who run them oftentimes

4   give them or pay the phones, correct?

5   A    Yes, sir.

6   Q    When you went up to the house, you see this father.  He

7   doesn't speak an English, correct?

8   A    Correct.

9   Q    You have this girl that you don't know, Tanya Alvarez,

10  correct?

11  A    That is Skittles?

12  Q    Right.  You later find out she's also engaged in the

13  practice of prostitution, correct?

14  A    After the fact, yes, sir.

15  Q    Okay.  Do you ask dad for a phone bill?

16  A    No, sir.

17  Q    Do you show him the phone and say, you know, maybe

18  through sign language, is this -- is this the daughter's

19  phone?  Or nothing like that is done?

20  A    No, sir.

21  Q    You have no idea what Tanya Alvarez was saying to this

22  man purportedly to be Claribel's father, correct?

23  A    Correct, sir.

24  Q    Okay.  And then he signs her phone and you guys searched

25  it?

1   A    I didn't search it, sir.

2              MR. BURKE:  That's all I have.  Thank you, Agent.

3              THE COURT:  All right.  Anything further?

4              MS. MORGAN:  Just one question, Your Honor.

5                        REDIRECT EXAMINATION

6   BY MS. MORGAN:

7   Q    So just to be clear, Special Agent Chandler, were you the

8   lead agent on this case?  Or were you just there to assist

9   with transporting this juvenile?

10  A    I was just there to assist, ma'am.

11  Q    Okay.  So you didn't conduct any interviews?

12  A    Nothing formal, ma'am, no.

13  Q    This conversation that you're talking about with this

14  juvenile was just passing the time as you were waiting; is

15  that --

16  A    Correct.  It was --

17  Q    -- a fair assessment?

18  A    It was just a conversation.

19  Q    Thank you.

20             MS. MORGAN:  No additional questions.

21             THE COURT:  Yes, sir.

22             MR. BURKE:  One follow-up.

23                       RECROSS-EXAMINATION

24  BY MR. BURKE:

25  Q    Did you pass on what had transpired between you and Ms.

1    Abreu to any other agents in the FBI or the Philadelphia

2    Police Department or Child Services saying there's a 17-year-

3    old girl that we just dropped off working as a prostitute,

4    somebody needs to help her?  Did you do that to anybody?

5    A    I wrote a report.  I wrote my 302.

6    Q    Oh.  Thank you.

7              THE COURT:  Anything further?

8              MR. BURKE:  No.

9              THE COURT:  Thank you.  You may step down.  And

10   watch your step, please.

11             THE WITNESS:  Thank you, sir.

12             MS. MORGAN:  Government calls Special Agent Michael

13   Goodhue.

14        (Pause)

15             COURTROOM DEPUTY:  Good afternoon, sir.

16             THE WITNESS:  Good afternoon.

17             COURTROOM DEPUTY:  Can you state your full name and

18   provide the spelling of your last name for the record?

19             THE WITNESS:  Goodhue, G-O-O-D-H-U-E.  And that's

20   Michael.

21             COURTROOM DEPUTY:  Raise your right hand.

22             MICHAEL GOODHUE, GOVERNMENT'S WITNESS, SWORN

23             COURTROOM DEPUTY:  Thank you.  You may be seated.

24             THE COURT:  You may proceed.

25             MS. MORGAN:  Thank you, Your Honor.

```
 1                     DIRECT EXAMINATION
 2   BY MS. MORGAN:
 3   Q    Can you please tell the Court where you're employed?
 4   A    The FBI here in Philadelphia.
 5   Q    And what's your position there?
 6   A    Special agent.
 7   Q    And how long have you worked there?
 8   A    About six years.
 9   Q    Were you involved in the arrest of Jerel Jackson on
10   October 24, 2013?
11   A    Yes.
12   Q    And could you tell the Court what your involvement was?
13   A    I was part of an arrest team, working with the case
14   agent, trying to locate Mr. Jackson.  We arrested him at his
15   residence on Paschall Avenue in Philadelphia.
16   Q    And when you say the case agent, who are you referring
17   to?
18   A    Jennifer Batish.
19   Q    And were you involved in transporting Mr. Jackson back to
20   headquarters?  Or did someone else do that?
21   A    Yes, we transported him back to headquarters.
22   Q    You personally?
23   A    Me and Jennifer Batish.
24   Q    And were you present at the FBI headquarters when Mr.
25   Jackson was interviewed?
```

1   A     Yes.

2                MS. MORGAN:  Your Honor, may I approach the witness?

3                THE COURT:  Yes.

4                MR. BURKE:  I have this.

5                THE COURT:  Where was he transported to?

6                THE WITNESS:  The Federal building.

7                THE COURT:  Where was he transported?  My mother was

8   an English teacher.  She'd roll over in her grave if I put

9   that preposition at the end of the word in that sentence.

10               MR. BURKE:  I wasn't going to say anything, Your

11  Honor.

12               MS. MORGAN:  You've been in Philadelphia too long,

13  Your Honor.

14               THE COURT:  I think so.

15  BY MS. MORGAN:

16  Q     So you're referring to the headquarters building at 600

17  Arch Street?

18  A     Correct.

19  Q     All right.  And I've handed you what I've marked as

20  Government's Exhibit 2.  Do you recognize that document?

21  A     I do.

22  Q     And what is that?

23  A     That's the standard Advice of Rights form that we read to

24  the defendants that we lock up.

25  Q     And was that Advice of Rights form read to Jerel Jackson?

1    A    Yes, it was.

2    Q    And did he sign it in your presence?

3    A    He did.

4    Q    Is your signature also on this document?

5    A    Yes, it's on the top line.

6    Q    Top witness line?

7    A    Correct.

8    Q    Okay.  How much time did you spend with the defendant

9    that day from the time of his arrest until you last saw him?

10   A    I would say a few hours.  I'm not sure of the exact time

11   frame.

12   Q    Did he appear to you to be altered in any way?

13   A    No.

14   Q    Did he appear to be under the influence of alcohol or

15   drugs?

16   A    No.

17   Q    Did he say he was under the influence of alcohol or

18   drugs?

19   A    No.

20   Q    Did he appear lucent and -- and coherent to you?

21   A    He did.

22   Q    And did you have any reason to believe that he could not

23   voluntarily waive his Miranda rights?

24   A    No.

25   Q    During the interview, did the defendant make any

1    admissions to you in relation to sex trafficking?

2    A     He did.

3    Q     And could you just summarize those for the Court?

4    A     He said that he was -- basically, he got "hyped up," I

5    think was his words, on the pimp game.  And him and his friend

6    Will Coit were pimps.  And they were also involved in robbing

7    Johns and setting up Johns.  He also knew a lot of the other

8    Philadelphia area pimps in the city and associated with them,

9    hung out in hotel rooms, things of that nature.

10   Q     Did you talk to him about a minor named Claribel Abreu?

11   A     Yes.

12   Q     And did he make any admissions in regard to her?

13   A     He did.  I think he referred to her as his young boul.

14   He did acknowledge that she was a minor.  He did know that she

15   was a prostitute and that he transported her sometimes.

16   Q     Transported her where?

17   A     On -- to hotels and to other dates for prostitution.

18   Q     Did he admit to any activities relating to narcotics and

19   prostitution?

20   A     Yes.  I think at one point he said that he was more of a

21   drug dealer than a pimp.  But he did say that other guys

22   acknowledged that he was a pimp and he kind of liked that, or

23   he said he ate it up or something like -- to that nature.

24   Q     And did he admit to selling drugs to prostitutes?

25   A     Yes.

1    Q    And did he also admit to acts of violence toward women?

2    A    Yes, he did.  I do remember he said that he's gotten

3    physical with women in the past.

4              MS. MORGAN:  All right.  I have no additional

5    questions at this time.

6              THE COURT:  You may proceed.

7                        CROSS-EXAMINATION

8    BY MR. BURKE:

9    Q    Good afternoon, Agent.

10   A    Good afternoon, sir.

11   Q    Agent, when you went to arrest my client at his property,

12   what time of the morning was that, or evening?

13   A    I don't know offhand.  I would have to refer to the

14   arrest log.  I want to say, if we got him back to Philadelphia

15   by 11:49, it was probably about an hour before that.

16   Q    All right.  So at sometime in the morning hours?  I'm

17   not --

18   A    Yes.

19   Q    I'm not asking you to -- I know you don't --

20   A    Okay.

21   Q    -- look at your watch all day long.

22   A    Right.

23   Q    When you got to his home, was he asleep, or was he still

24   up?

25   A    He was actually located by somebody else on the first

 1    floor.  I was on the second floor.

 2    Q    Okay.

 3    A    So to my knowledge, he was on the first floor.  I don't

 4    know where he was.  Because by the time I came down from the

 5    second floor, they had already loaded him in our car, and then

 6    we were ready to take him out of there.

 7    Q    Did he seem like he was sleeping, or did he seem like he

 8    had been up for some time?

 9    A    I think he was -- he was pretty awake.  He wasn't like

10    nodding off in our car or anything.

11    Q    Well, you know what a person looks like when they first

12    wake up?

13    A    Right.  Right, right, yes.

14    Q    You slept your whole life, right?  You know what you look

15    like --

16    A    Yeah, yeah, yeah.

17    Q    -- in the morning?

18    A    Correct.

19    Q    So does this person -- did my client appear -- at

20    sometime in the morning hours when you went to his home, did

21    he appear as though he had just been woken up, or did it

22    appear that he had been up for some time?

23    A    I couldn't make that determination.  He seemed awake at

24    the time.

25    Q    I'll take that as -- I'll take that answer.  I appreciate

1    that.

2    A    Okay.

3    Q    Now, when you were in the car with him, how many other

4    agents were there?

5    A    Just me and Special Agent Batish.

6    Q    Okay.  And he's placed in the car.  Are you in the back

7    of the car with him, or is he back in the car by himself?

8    A    I think he was -- I was driving, I think.  So he must

9    have been in the back by himself.

10   Q    Okay.  And you got back -- it says you got back to --

11   according to Government's Exhibit 2, you got back to the --

12   11:49 is when you got back to 600 Arch Street?

13   A    Roughly.  There's another form that we do as far as like

14   the time line of the arrest.

15   Q    Right.

16   A    This is when I read the rights to him, which was probably

17   right around -- maybe five or ten minutes after we got there.

18   I'm not exactly sure of the times, but this is pretty close to

19   when we got there.

20   Q    Okay.  Now, prior to this day did you have any

21   interactions with my client?

22   A    No.

23   Q    Because you don't know him, he doesn't know you?

24   A    Correct.

25   Q    Okay.  In the car, how long was the car ride over from --

1              MR. BURKE:  Excuse me, Your Honor.

2    BY MR. BURKE:

3    Q    -- from where you arrested him to the time you got down

4    to 6th and Arch?

5    A    It probably was anywhere -- depending on traffic,

6    anywhere between a half an hour and an hour.

7    Q    Okay.  And during that time you were speaking to my

8    client, correct?

9    A    Correct.

10   Q    And this was prior to warning him of his rights, correct?

11   A    That's correct.

12   Q    And during that time you were telling him, you know, that

13   he's looking at a lot of time in jail, correct?

14   A    I don't -- usually we try to keep it informal, say, look,

15   we don't want to talk about the case, you know, and talk about

16   the Phillies or sports or something, just to buy the time

17   until we get to the room where actually we do the interview

18   and then give him Miranda rights.

19   Q    Did you talk to him -- you talked to my client about him

20   being able to help himself regarding the murder of a young

21   girl down in Atlantic City, correct?

22   A    That was probably during the interview.  I don't recall

23   talking about that in the car.

24   Q    I mean, that's certainly information that you wanted from

25   my client, correct?

1   A      Absolutely.

2   Q      Okay.

3   A      Yes.

4   Q      When you were going out to arrest him, you were hoping he

5   was going to give you information on that unsolved murder of a

6   prostitute in Atlantic City, correct?

7   A      We were hoping that it would eventually come out, yes.

8   Q      All right.  So when you arrested him and you were driving

9   him in the car, you're -- you're having this kind of off-the-

10  record discussion with my client, correct?

11  A      You could call it that, I guess, yeah.

12  Q      Is your fellow agent who's in the front seat -- is that

13  person kind of writing anything down?

14  A      No.  Like I said, that's usually an informal discussion.

15  We try to keep it to sports or family or something, just to

16  keep his mind occupied until we get to our interview room

17  where we can officially sit down and have an interview.

18  Q      Well, you got to ask him for an interview.  You're not

19  going to definitely have one, correct?

20  A      Correct.

21  Q      Okay.  So when you're in the car with him, are you kind

22  of like enticing him to give up his rights to remain silent by

23  saying, you know, I can really help you if you tell us about

24  this Atlantic City thing?  You're looking at 30 years.  You

25  better talk to us.  You're going to get hurt if you don't.

1    Did you have a conversation with him like that?

2    A    No, I don't remember that conversation.

3    Q    So you're talking about the Phillies, the Flyers,

4    whomever?

5    A    Whatever, correct.

6    Q    Right.  Your agent -- your brother agent isn't prepared

7    to write anything down, correct?

8    A    Correct.

9    Q    Then, Agent, let me ask you something.  If by chance my

10   client -- or maybe just in the course of your career as an FBI

11   agent, a person in the backseat blurts out some important

12   information --

13   A    Uh-huh.

14   Q    -- an admission of some sort, neither you or your brother

15   agent are prepared to record that in any fashion, are you?

16   A    Correct.

17   Q    So you're just going to let that important information

18   just fly away?

19   A    Well, I mean, if the car trip is going to be long, we'll

20   read the rights to him in the car and have him sign the form

21   in the car.  But if it's going to be, you know, a half an

22   hour, we'll get him back to the office and talk to him at the

23   office, to be honest with you.

24   Q    So when you were in the car, did you discuss with him

25   that we're going to get down to 6th and Arch and we're going

1    to have a little conversation?

2    A    Probably.

3    Q    Okay.

4    A    I don't specifically remember, but most likely.

5    Q    Okay.  And then did you tell him, by the way, when you

6    get down there, you don't have to have a conversation if you

7    don't want to?

8    A    That was all on this form.

9    Q    Okay.

10   A    I mean, we read -- I remember sitting next to him reading

11   this line-by-line with him, explaining to him his rights and

12   then saying, you -- you know, "Here's your rights.  Do you

13   want to read it?"  And then he just signed it.

14              MR. BURKE:  All right.  I have no further questions

15   of the agent.

16              THE COURT:  Anything further?

17              MS. MORGAN:  No, Your Honor.

18              THE COURT:  Thank you, sir.  You may step down.

19   Watch your step, please.

20              THE WITNESS:  Okay.

21              MS. MORGAN:  Government calls Special Agent Jennifer

22   Batish.

23              MR. BURKE:  Offer of proof.  An offer of proof.

24              MS. MORGAN:  She's going to testify about

25   transporting and interviewing the defendant.

1          MR. BURKE:  Oh, okay.

2      (Pause)

3          COURTROOM DEPUTY:  Good afternoon.

4          THE WITNESS:  Good afternoon.

5          COURTROOM DEPUTY:  Can I ask you to state your full

6  name and provide the spelling of your last name for the

7  record?

8          THE WITNESS:  Jennifer Batish, B-A-T-I-S-H.

9          COURTROOM DEPUTY:  Is your first name with one N or

10 two?

11         THE WITNESS:  Two N's.

12         JENNIFER BATISH, GOVERNMENT'S WITNESS, SWORN

13         COURTROOM DEPUTY:  Thank you, ma'am.  You may be

14 seated.

15         THE WITNESS:  Thank you.

16                    DIRECT EXAMINATION

17 BY MS. MORGAN:

18 Q    Good afternoon.

19 A    Good afternoon.

20 Q    Where do you work?

21 A    At the FBI.

22 Q    And what is your position there?

23 A    Special agent.

24 Q    And how long have you been a special agent?

25 A    About six years.

1    Q     And were you the case agent in the investigation of Jerel

2    Jackson?

3    A     Yes, I am.

4    Q     And were you also involved in the arrest of Jerel Jackson

5    on October 24, 2013?

6    A     Yes, I was.

7    Q     And what was the extent of your involvement?

8    A     We had sat outside.  We thought he was at a house.  He

9    had been on the run for about two weeks, so we were trying to

10   track him down.  And we were able to call an arrest team I

11   think around 11:00 in the morning, and then we went into the

12   house.  Myself and Mike went upstairs, and then the other

13   teammates went downstairs.  And they found him in the bathroom

14   down there, is what I heard.

15   Q     Okay.  Were you also involved in transporting him back to

16   the FBI headquarters at 600 Arch Street?

17   A     Yes, I was.

18   Q     And were you also involved in interviewing him when he

19   got back here?

20   A     Yes, I was.

21   Q     And you can see in front of you Government's Exhibit 2.

22   Do you recognize that document?

23   A     Yes, it's a FD-395, which is our Advice of Rights form.

24   Q     Did you and Special Agent Goodhue read that form to him?

25   A     Yes, we did.

Batish - Direct                                          87

1    Q    And did he sign the form in your presence?

2    A    Yes, he did.

3    Q    And did you also sign it?

4    A    Yes, I did.

5    Q    And where is your signature on this form?

6    A    It's on the second line for witness.

7    Q    So from the time of the arrest when you first saw the

8    defendant until you finished with interviewing and processing

9    him, about how much time would you say you spent with him?

10   A    I would say about two hours.  I'd have to look at the

11   arrest log, but approximately.

12   Q    And during that two hours, did the defendant appear

13   altered to you in any way?

14   A    No.

15   Q    Did he appear to be under the influence of alcohol or

16   drugs?

17   A    No.

18   Q    Did he say he was under the influence of any type of

19   drug?

20   A    No.

21   Q    Did he appear lucent and coherent?

22   A    He did.  He seemed alert.

23   Q    Any reason -- did you have any reason to believe that he

24   was not capable of voluntarily waiving his Miranda rights?

25   A    No.

1    Q     And after having him sign this form and after it was read

2    to him, did you then conduct an interview of him?

3    A     Yes, we did.

4    Q     And did you reduce that interview to what's known as an

5    FBI-302?

6    A     Yes, I did.

7             MS. MORGAN:  May I approach, Your Honor?

8             THE COURT:  Yes.

9             MR. BURKE:  And for the record, I've had this.

10            THE COURT:  All right.

11            MR. BURKE:  I've had all of the Government exhibits.

12            THE COURT:  Very well.  Thank you.

13            MS. MORGAN:  You're welcome.

14   BY MS. MORGAN:

15   Q     I've handed you what's been marked as Government's

16   Exhibit 3.  Do you recognize that?

17   A     Yes, I do.

18   Q     And what is that?

19   A     It's a 302 documenting the interview that we did with the

20   defendant.

21   Q     And did you prepare this report?

22   A     Yes, I wrote it.

23   Q     And that's your name and Special Agent Goodhue at the

24   bottom, correct?

25   A     Correct.

1    Q     This is a four-page document?

2    A     Yes, four pages.

3    Q     All right.  During your interview of the defendant, did

4    he make any admissions in relation to sex trafficking?

5    A     He made some.  He talked about the minor, minor one, and

6    how he knew she was underage, but he loved her, and she was

7    his young boul, and she wanted to work as a prostitute.  He

8    would drive her.  He would take her from the hotel to drop off

9    money so she wouldn't get robbed in the hotel.  He said she

10   would buy the cars, but he would drive them.  He did talk

11   about being hyped up in the pimp game.  We asked him when he

12   was turned on to pimping, about what time, and he said he and

13   his buddy came into it about a year prior.  L

14           et me see if there's any other major points.  He

15   looked up to other pimps that -- you know, he -- he mentioned

16   a couple other local pimps that he looked up to and he liked.

17   He was -- he liked the recognition he was getting this summer

18   for being a pimp.  I don't see any other -- we did ask one --

19   one point we asked what would happen if one of his girls stole

20   his money, and he said, "I would get them fucked up."

21   Q     And did he also admit to providing security to the girls

22   who were working as prostitutes?

23   A     Yes.

24   Q     Did he also say that he sold drugs to them to keep them

25   awake?

1   A      Yes.

2   Q      All right.  I want to turn your attention to July 17,

3   2013.  Were you aware on that day that a juvenile was brought

4   into the Tinicum Township Police Department?

5   A      Yes, I came down that day.

6   Q      Were you called down by Sergeant Simpkins?

7   A      I was, yes.

8   Q      And what was your involvement in interacting with her, if

9   any, that day?

10  A      I spent most of the time talking to Marquita Robinson,

11  but I did spend some time with Special Agent Chandler and

12  Claribel.

13  Q      And were you aware that ultimately a Consent to Search

14  form was obtained and her cellular phone was seized?

15  A      Yes.

16  Q      And were you also aware that on that same day she was

17  returned to her father's custody?

18  A      Yes, that's correct.

19  Q      After speaking with her at the police department, did you

20  make any subsequent steps to try to reach out to her or assist

21  her in any way?

22  A      Yes, we did on several occasions and just were not able

23  to meet up with her until later to give her the phone.  But

24  typical, if we find a juvenile, this -- one of the missions is

25  to get these girls out of these situations if they're underage

1    and they're being trafficked.  So in her case, she didn't want

2    to meet up with us, and we kept trying to contact her.

3    Q    And are you saying she was uncooperative?

4    A    Yes.

5    Q    Did you have the opportunity subsequently to search the

6    contents of the phone?

7    A    Yes.

8    Q    And did you find anything of evidentiary value on the

9    phone?

10   A    Yes, I did.  A lot of pictures of girls in lingerie;

11   pictures of at least three of the victims in this case that

12   were later found in ads on backpage; a few videos of him

13   flashing money, the defendant; things of that nature.

14   Q    And were you also to determine -- I'm sorry, were you

15   also able to determine the dates that various photographs on

16   the phone were taken?

17   A    Yes.

18   Q    Okay.

19            MS. MORGAN:  Your Honor, may I approach again?

20            THE COURT:  Yes.

21            MR. BURKE:  Judge, I'm going to object.  This is the

22   content of the phone.  So I object to the contents of the

23   phone being shown or testified to at this time.  It's really

24   irrelevant what's there.

25            THE COURT:  Sustained.

1          MR. BURKE:  Thank you.

2          MS. MORGAN:  Your Honor, one of the issues that the

3    Court has to consider is whether the juvenile had actual

4    authority to consent to the search of the phone, and I'm

5    enclosing an exhibit that shows the contact list of the phone,

6    which goes directly to whether or not the juvenile had

7    authority.

8          THE COURT:  I'll allow that exhibit.

9          MR. BURKE:  Judge, that was found after they

10   searched the phone.  The contact list was found after they

11   searched the phone.

12         THE COURT:  And the motion is to suppress based on

13   the lack of probable cause to search, or lack of consent to

14   search?

15         MR. BURKE:  Lack of consent.  So they -- this

16   exhibit, they're bootstrapping it, saying, well, once we

17   searched the phone, then we realized we had consent.

18         MS. MORGAN:  That's -- that's not the issue legally,

19   Your Honor.  There are two different kinds of authority to

20   consent to a search.  One is actual authority consent, and

21   that -- that issue is whether or not the person who's

22   consenting has control over the item or use of the item.  So

23   we are arguing both, that she had actual authority to consent

24   because she controlled -- she used the item, she had ownership

25   of the item, and also apparent authority to consent, which is

Batish - Direct                                                93

1    based on the observations of Sergeant Simpkins and Sergeant --

2    I'm sorry, Special Agent Chandler at the time.  So they're two

3    separate --

4              THE COURT:  Apparent authority to consent to it

5    being searched.

6              MS. MORGAN:  Correct.

7              THE COURT:  And counsel's argument is that's after

8    the fact.

9              MS. MORGAN:  But that's a separate issue.  That's

10   apparent authority.  We're offering this under the actual

11   authority to consent.  That she had joint ownership, control

12   over, and use of this phone.  And what's stored in the phone

13   goes directly to that issue.

14             THE COURT:  To actual authority?

15             MS. MORGAN:  Correct.

16             THE COURT:  How so?

17             MS. MORGAN:  Because it shows what her contact lists

18   were, referring to the defendant.  There's a contact for the

19   defendant in here called "Babe Jinx."  That shows that this is

20   actually her phone, and that she did in fact have the

21   authority to consent because she's using the phone, has power

22   over it, has custody of it.

23             THE COURT:  Mr. Burke?

24             MS. MORGAN:  Just -- just as if the law enforcement

25   were searching an apartment, who leased the apartment would be

1    relevant to whether or not that person had actual authority.

2              THE COURT:  I understand.  I understand.

3              MR. BURKE:  Judge, the Government agents have

4    already admitted that they -- they know that a 17-year-old

5    cannot, by virtue of her age, have a cell phone plan.  They've

6    already admitted that.  So they already knew she was a minor.

7    They already knew that she could not have a cell phone plan by

8    virtue of the fact she's a minor.  Ergo, it had to have been

9    paid for and belonged to someone else.  And --

10             THE COURT:  Who could have given her the authority

11   to consent if they chose to do so.  Or given her the --

12             MR. BURKE:  And that's why this photograph is

13   irrelevant.

14             THE COURT:  Or given the phone altogether.

15             MR. BURKE:  And that's why this is irrelevant.

16             THE COURT:  Well, what about the Government's

17   argument that -- for example, if you are going to search a

18   house, you look in drawers to demonstrate ownership or lack

19   thereof?

20             MR. BURKE:  Is the Court talking about probable

21   cause with a warrant?  You mean, does it -- and I don't --

22   because I want to make sure you answer correctly, you're

23   saying that in a warrant to search a home -- once a warrant --

24   once there's a warrant to search a home, you don't need

25   anybody's consent, juvenile or adult.  But clearly, if agents

1    of the Government showed up at a house and there was a -- only

2    a juvenile there, then I think the Government would be hard-

3    pressed to say that this juvenile could -- could give consent

4    to search the property of an older sibling or a mother or

5    father.  Like, if they knocked on the door and the kid

6    answered and they said, who are you?  I'm Claribel.  How old

7    are you?  I'm 17.  We're here to search the house, will you

8    let us search the house?  It's exactly -- it's the same thing.

9

10             THE COURT:  Not quite.

11             MS. MORGAN:  Your Honor, I don't think that's the

12   same thing.  I don't think that goes to the admissibility of

13   this particular piece of evidence.  This piece of evidence is

14   being offered in support of an argument that she had actual

15   authority because of her use of and control over the phone.

16   If the cops knocked on the door of an apartment and a juvenile

17   answered and her name is actually on the lease of the

18   apartment, that would go to whether or not she had actual

19   authority to consent versus apparent authority to consent, the

20   Government's second argument.

21             THE COURT:  I understand the difference.

22             MS. MORGAN:  And so this is basically the functional

23   equivalent of a lease to an apartment.

24             THE COURT:  I will -- I will allow that exhibit,

25   that one.

1              MS. MORGAN:  Thank you.  That's the only one I'm

2     offering.

3              THE COURT:  All right.

4     BY MS. MORGAN:

5     Q    All right.  I've handed you what's been marked as

6     Government's Exhibit 4.  Do you recognize that photograph?

7     A    Yes, it's a screen shot of the phone that Claribel had.

8     Q    Okay.  And is -- can you just read what that second

9     contact is there?

10    A    It says, "Babe Jinx."

11    Q    And do you recognize the small photograph that's next to

12    it?

13    A    Yes.  That's actually a smaller version of a picture that

14    was on the phone.  But the larger version shows that it's the

15    defendant.

16    Q    Okay.  And then there's a contact below that.  What's

17    that one say?

18    A    "Babe's Dad."

19    Q    And what about the one beneath that?

20    A    "Babe's Mom" with a heart.

21    Q    All right.

22             MS. MORGAN:  No additional questions, Your Honor.

23             THE COURT:  You may cross-examine.

24                        CROSS-EXAMINATION

25    BY MR. BURKE:

1    Q    Agent, did you ever call DHS?

2    A    No.  When we figured out that she was with her dad, or in

3    the custody of her dad, we didn't -- that would have been our

4    step though if --

5    Q    Well, you -- you said -- you testified on direct

6    examination, you said it's often -- you know, when you work

7    with these girls, you want to try to help them.  You know,

8    obviously, you don't want to leave them in a situation where

9    they're living as prostitutes, right?  Nobody wants that,

10   correct?

11   A    No.

12   Q    Did you --

13   A    That's correct.

14   Q    Did you call DHS?

15   A    Not at that point, no.

16   Q    I mean, she didn't want help from you, right?

17   A    No.

18   Q    She's 17 years old?

19   A    She is, yes.

20   Q    Okay.  You know, you're -- you know, you said you were

21   always trying to help them, but you never called DHS, you

22   never called any City authorities to say we have a 17-year-old

23   girl, a minor, who's engaged in prostitution, get DHS out

24   there to investigate what's going on, take her out of the

25   house if necessary; you' never did that?

1  A     No, later -- she was put into a juvenile trafficking

2  court later.

3  Q     But not through anything you did?

4  A     Not initially, no.

5  Q     Not anything that you did, not the FBI at all, correct?

6  So you're --

7  A     Not at the beginning, no.

8  Q     Okay.  And --

9  A     I mean, those next -- those -- you had, say, four months

10 or so --

11 Q     So for four months you allowed her to live --

12             MS. MORGAN:  Objection.  Your Honor, counsel --

13             THE COURT:  Counsel, let her answer.

14             MR. BURKE:  I apologize.  I apologize.  I apologize.

15 I'm sorry, I get a little excited.

16 BY MR. BURKE:

17 Q     And when did you find out that Tanya Alvarez, the half

18 sister, was also engaged in prostitution?

19 A     Probably around the time we arrested the defendant,

20 because we knew that Claribel and Tanya were often together,

21 and they were seen in ads together.  So I -- once I saw Tanya

22 on backpage, I realized, oh, Tanya is also working as a

23 prostitute.

24 Q     Okay.  So now -- the incident in Tinicum happened, I

25 think, in July, correct?

1    A     Correct.

2    Q     And he's arrested in November?

3    A     Correct.

4    Q     July --

5            MS. MORGAN:   Objection.

6            THE WITNESS:   October.

7    BY MR. BURKE:

8    Q     October.   Three months -- three or four months, right?

9    A     Uh-huh.

10   Q     And during that time is when you found out that the other

11   girl who translated for you is also working as a prostitute?

12   A     Yes.

13   Q     All right.   And then when you -- when that bell went off

14   in your head, did you call anybody from Social Services in the

15   City of Philadelphia saying we got to get this girl out of

16   here?

17   A     At that -- at that point, look, we -- she -- Claribel --

18   Q     It's a yes or no question.

19   A     Well, I'd like to explain.

20   Q     It's -- you can explain on direct.   On

21   cross-examination --

22   A     Okay.

23   Q     Did you call somebody from DHS saying this girl is

24   clearly in a very perilous situation in that house?

25   A     No, we made sure that the defendant was arrested though,

1    so he could no longer traffic her her.

2    Q    Okay.

3    A    That's our job, so --

4    Q    Yeah.  Okay.  When did you find out that Tanya Alvarez

5    was working as a prostitute?

6    A    Right around the time we saw her on backpage, when he was

7    -- when the defendant was arrested.

8    Q    When was that?  July?  August?  September?

9    A    September, October --

10   Q    Okay.

11   A    -- is when I saw her ads.

12   Q    When -- after my client was arrested, you -- you engaged

13   -- you had some proffer sessions with my client, correct?

14   A    Correct.

15   Q    You were there for them?

16   A    Yes.

17   Q    And at one of those proffer sessions you talked about --

18   well, let me ask you this question.  When he's -- when he's

19   brought in and he's charged, as he was in October, correct?

20   A    Correct?

21   Q    You gave -- he's -- you and the other agent took a

22   statement from my client, correct?

23   A    When we arrested him, yes.

24   Q    Right.  And then he's charged -- he's formally charged

25   over here, and then he's brought to Pretrial Services, where

1    he submits a urine test, correct?

2    A    Correct, after we interviewed him, he submits a urine

3    test.

4    Q    Right.  And you later found out that the -- the results

5    of that urine test, correct?

6    A    Later, yes.

7    Q    And what were the results of that urine test?

8    A    I'd have to see it.  I -- I know he tested positive for

9    drugs, but I don't -- you know, I haven't actually seen the

10   report.

11   Q    Okay.  What --

12   A    They don't usually give it to us directly.  So if --

13   Q    Well, you spoke to him at the proffer about the results

14   of his urine test, and --

15   A    Okay.  By that point I knew then.

16   Q    Right.  And you said that -- that he was pretty high on

17   the day that he was arrested?  High on cocaine, correct?

18   A    I mean, can I see the -- did I write that on the 302?

19   Q    Nope, I'm just asking you.  You said --

20   A    So I don't -- I don't remember that then.

21   Q    Well, you tell me -- you've already testified that you

22   got a drug result back from the urine test that said he was on

23   intoxicants.  What intoxicants was he on when you guys were

24   questioning him?

25   A    I'd have to see the report.  I just knew that -- later,

1    that he was -- he tested positive.  So -- I mean, do you have

2    the report?  Then I could read it.

3    Q    I don't have it.

4    A    Okay.

5    Q    They won't give it to me.

6    A    Okay.

7    Q    So --

8    A    I don't have it either.  I called over to get it and they

9    said that it had to go through the attorney's office.  So --

10   Q    The U.S. Attorney's Office?

11   A    Yes.

12            MR. BURKE:  Well, I -- I would ask if the Government

13   has that document?

14            MS. MORGAN:  Your Honor, as indicated in the

15   footnote of my submission, Pretrial Services said that they

16   would not provide the report absent a Court order for anything

17   other than to do with bail.  And this does not have to do with

18   bail.  I know that I represented in my Pretrial detention

19   motion, based on having read the Pretrial Services' report,

20   that he was high on particular substances, which I believe

21   included marijuana and Ecstasy, as referenced in the footnote.

22   But Pretrial Services will not provide that report --

23            THE COURT:  Counsel, just --

24            MR. BURKE:  My apologies.  My big head's in the way.

25   I'm sorry.  I'm sorry.

1          MS. MORGAN:  Pretrial Services will not provide that

2    report outside of the bail context absent a Court order.

3          THE COURT:  All right.  Special Agent, you've

4    testified that you interviewed the defendant?

5          THE WITNESS:  Yes.

6          THE COURT:  Then took him to Pretrial Services?

7          THE WITNESS:  The come over.  So as soon as we're

8    done, we call them to come to our office, and they do a urine

9    test and do their standard questioning before he gets intake

10   to the prison.

11         THE COURT:  All right.  Now, one, is there going to

12   be any evidence from the -- for as to the time Pretrial

13   Services picked him up and conducted the drug test?

14         MS. MORGAN:  Again, Your Honor, they won't release

15   that information to me.

16         THE COURT:  And two, does the defendant wish to have

17   that information?

18         MR. BURKE:  I -- I do, because --

19         THE COURT:  Then I will order it turned over to the

20   defense forthwith.

21         MR. BURKE:  Okay.

22         THE COURT:  This hearing is going to be continued

23   until the production of that information, so that the defense

24   can look at it, the Government can look at it, and proceed as

25   counsel chooses.

Morgan - Argument                                      104

1            MS. MORGAN:  Your Honor, if you'd like, I can submit

2     a proposed order to the Court later today ordering Pretrial to

3     turn it over?

4            THE COURT:  That would be just grand.  Thank you so

5     much.

6            MS. MORGAN:  Sure.

7            MR. BURKE:  That -- that was going to be my last

8     questions for the agent.  I have nothing further at this

9     juncture.

10           THE COURT:  All right.  You may step down.  Thank

11    you.

12           THE WITNESS:  Okay.

13           THE COURT:  Any idea as to when we can get our hands

14    on that?  Or you can get your hands on it?

15           MS. MORGAN:  Your Honor, I'm under the impression

16    that it's readily accessible to Pretrial Services.  They

17    simply won't release it.  So --

18           THE COURT:  I got you.  Okay.

19           MS. MORGAN:  I would imagine they might even accept

20    a phone call from Your Honor.

21           THE COURT:  My court deputy has just informed me

22    she'll make the call and let them know that the order is

23    forthcoming.  And what I'm looking at now is schedule, since

24    this matter is listed for jury selection on Wednesday.

25           MS. MORGAN:  Your Honor, if it helps the Court, I

Morgan - Argument                                                105

1    think that the agent testified that they met with the

2    defendant at the time indicated in the Miranda form, which was

3    11:53.

4              THE COURT:  What date is this now?

5              MS. MORGAN:  This is on October 24, 2013.  So they

6    talked with him at 11:53.  The agent can testify as to

7    approximately how long that conversation was, and then we can

8    stipulate that as of that time the defendant was sent to

9    Pretrial Services and that's when the drug testing occurred.

10   So it's looking like it probably occurred between noon and

11   1:00 p.m. on that same day.  And we would certainly be willing

12   to stipulate to that to expedite matters.

13             THE COURT:  That the -- the test was performed

14   between noon and 1:00 p.m.?

15             MS. MORGAN:  Correct.  Okay.  In fact, Your Honor,

16   if I have the opportunity to look at discovery, there is an

17   arrest 302, which sort of provides a time line that Special

18   Goodhue testified about.  I don't know if defense counsel has

19   it with him or not.  I don't happen to have that document with

20   me, but that would say the time that the defendant was sent to

21   Pretrial Services.

22             THE COURT:  Mr. Burke?

23             MR. BURKE:  Let me take a peek if I have that

24   document, Your Honor.

25             MS. MORGAN:  And I do indicate in our motion that

1    when he went to Pretrial Services, at the bottom of page 3, he

2    tested positive for amphetamines, marijuana, and Ecstasy.  And

3    I got that information from the Pretrial Services report when

4    I filed my motion for detention.  So --

5              MR. BURKE:  1:40, 1:50, it says interview -- he's

6    interviewed --

7              MS. MORGAN:  He began his Pretrial Services

8    interview at 2:20 p.m., according to the FBI-302, which is

9    Bate's number 368, dated October 24, 2013.  So that's about --

10             MR. BURKE:  Somewhere around 2 -- between 2:20 and

11   2:45.

12             MS. MORGAN:  So about six hours after he was

13   arrested, Your Honor.  And we know that the interview began

14   at --

15             MR. BURKE:  11:10.

16             MS. MORGAN:  -- 11:53.  So around noon that day,

17   which was about three-and-a-half -- I'm sorry, what time was

18   he arrested?

19             UNIDENTIFIED SPEAKER:  I have to -- it should be on

20   the paper of that time.  Does he have the log?

21             MR. BURKE:  Yeah, you can use my log.

22             UNIDENTIFIED SPEAKER:  So 11:20.

23             MS. MORGAN:  He was taken into custody at 11:20 a.m.

24   So it appears he was interviewed about an hour -- the

25   interview began a little less than an hour after that, Your

Burke - Argument                                          107

1    Honor.  So I believe that can resolve the issue of timing as

2    far as whatever the defendant may have ingested.

3         THE COURT:  Well, the -- I'm not going to try

4    anybody's case.  However, if the defense receives the test

5    results from Pretrial Services, I have, first of all, no idea

6    in what form that test results is.  I don't know whether it

7    talks about quantity.  I don't know whether it talks about

8    weight of the defendant.  I don't know what it talks about in

9    any way in that regard.  I don't know whether there is any

10   anticipation of presenting any expert witnesses in this case,

11   but under the circumstances -- Mr. Burke?

12        MR. BURKE:  Your Honor, you -- you struck the nail

13   right on the head.  I would need to look at it and speak to --

14   you know, somebody who is familiar with drug quantities -- and

15   I keep blocking the Government, I apologize.  -- who's

16   familiar with drug quantities, particularly Ecstasy and the

17   effects on the human body, especially in their quantities.  I

18   mean, an expert may say I've examined the metabolites in the

19   blood and the urine and it is de minimi.  No -- I have no more

20   questions of the agent.  You know what I mean?  Then the agent

21   who said he looked all right to me, then -- then my questions

22   are -- you know, the proof is going to be in the pudding and

23   the -- the blood results or the urine results did not help

24   very much.

25        On the other hand, if it says -- if he had a very

1   high concentration of THC or Mdm2, which I think was the drug

2   in Ecstasy or the combinations thereof -- if an expert said

3   this person would clearly be under the heavy influence, I

4   think the Court would want to hear that in terms of his

5   voluntariness of his statement.

6           THE COURT:  Frankly, even if the motion is denied,

7   hypothetically, in terms of voluntariness, if counsel chose to

8   litigate that at trial, they'd be entitled to have that

9   anyway.

10          MS. MORGAN:  Yes, Your Honor.  And they've been

11  aware of this fact from the inception of the case.  The

12  Government moved to detain the defendant.  This was one of the

13  bases for that motion.  Defense counsel certainly had that

14  motion at his disposal.  Moreover, he is the person who filed

15  this motion to suppress several weeks ago, and his basis for

16  that was the defendant's drug use.  So he could have sought an

17  order from the Court at that point.

18          This is nothing more than an attempt to further

19  postpone these proceedings so that the defendant can continue

20  to attempt to influence witnesses.  And the Government has

21  also provided the Court with a plethora of cases in which the

22  fact of a defendant's alcohol use or drug use -- despite the

23  fact of that use, the defendant could still provide a

24  voluntary waiver of his Miranda rights.  And the key issue,

25  Your Honor, is the observations of the agents.

1        Both of these agents came in here and testified that

2   he appeared lucid.  They had no reason to believe he was under

3   the influence of alcohol or drugs.  He did not say he was

4   under the influence of alcohol or drugs.  There was nothing to

5   lead them to believe that he could not voluntarily consent.

6        So it's the Government's position that this is just

7   an attempt to derail the proceedings at the 11th hour, when

8   the Government has fully prepared the case and is prepared to

9   present the evidence to the jury and not delay matters, so

10  that the defendant, who now has all the Jencks material and

11  now has the witness list, can continue to try to influence

12  these witnesses to prevent their testimony or to alter their

13  testimony.

14        THE COURT:  Mr. Burke?

15        MR. BURKE:  Judge, I'm not -- this is not a last-

16  minute effort to delay.  I somewhat object to that.  I mean,

17  the -- the blood results or the urine results, you know,

18  frankly, I was just told I couldn't get them.  I was unaware

19  that they told the Government something different.  They said

20  you could have it with a Court order.  They just said, "You

21  can't have them."  And I said, "Well, if my client signs a

22  release, can I still have them?"  And they said, "No, you

23  can't have them."  So the -- the information that -- that came

24  out from this motion that you can get them with a Court order

25  I was unaware of.  But be that as it may, I'm not deliberately

 1    trying to delay the proceedings.  No, that wasn't my

 2    intention.

 3         (Pause)

 4              THE COURT:  Do either of you have a name of someone

 5    we can contact?

 6              MR. BURKE:  I -- I don't, Your Honor, frankly.  I --

 7    at my office, I -- I have a -- I have several numbers to,

 8    like --

 9              THE COURT:  Ms. Morgan may have --

10              MR. BURKE:  I have the Federal book and I just

11    call --

12              THE COURT:  Ms. Morgan may have one.

13              MS. MORGAN:  Your Honor, I'm going to try to look

14    for the name, but I would simply add that in the Government's

15    response to the motion, I stated that Pretrial would not

16    provide this information after a Court order.  At which point

17    defense counsel knew that he had the option to request a Court

18    order, that he had the option to request that an expert come

19    here today and testify, instead of delaying these proceedings.

20              THE COURT:  All right.  Thank you.

21         (Pause)

22              THE COURT:  Counsel, are you available tomorrow

23    morning?

24              MS. MORGAN:  I am, Your Honor.

25              THE COURT:  Mr. Burke?

1          MR. BURKE:  I -- I don't know.  But obviously, this

2     is -- I will make myself available.  I will -- I will -- this

3     is Federal Court.  I will -- whatever I have to do, I'll send

4     letters this evening and let the other Judges know that this

5     is an ongoing trial and, therefore, it takes precedence.

6          THE COURT:  Just one second.  Thank you.

7       (Pause)

8          MS. MORGAN:  I believe his first name is Mark.  I

9     just can't think of his last name.

10         THE COURT:  She's actually on line with someone in

11    the office now.  He's gone for the day, but she's speaking

12    with someone else in the office.

13         MS. MORGAN:  Thank you.

14      (Pause)

15         THE COURT:  All right.  Thank you very much.

16         It's forthcoming to my iPad.

17         MR. BURKE:  My client has asked if he could have a

18    five-minute break to use the men's room?

19         THE COURT:  Sure.

20         MR. BURKE:  Thank you, Marshal.

21         Your Honor, may --

22      (Recess taken, 4:29 p.m. to 4:35 p.m.)

23         THE COURT:  I have received a -- an email

24    communication from one Kim, K-I-M, Diefendorf, D-I-E-F-E-N-D-

25    O-R-F, captioned, "Jerel Jackson," with the message as

Colloquy                                112

1   follows. "Drug test result as requested.  See attached file."

2   And it gives a series of numbers, indicating a pdf file.  I am

3   -- and Kim E. Diefendorf is Deputy Chief, United States

4   Pretrial Services Office, Eastern District of Pennsylvania.  I

5   am tapping on the pdf file, which is page 1 of -- it says

6   "Page 1 of 2."

7           It reads as follows.  "Drug test results summary.

8   Jerel Jackson, 324388, general is a preprinted topic, change

9   log preprinted, and then summary."  Underneath that,

10  "Collection information."  Collection date, October 24, 2013;

11  collection status, collected; collection site/account, a

12  series of numbers, and the letters PTS site lab; assigned

13  officer, Baker, Michael, D.; where collected, Custody.  Test

14  details, local specimen number.  It gives a number.  Local

15  test device, Advia, A-D-V-I-A.  And then there appears to be a

16  series of standardized titles and -- titles, actually, and

17  categories.  None of them are filled in until we get to

18  "Admitted use?"  "No admission."  "Test results.  Drug class:

19  Amphetamines, local result, positive.  Benzodiazepines, local

20  result, negative.  Cannabinoids, local result, positive.

21  Cocaine, local result, negative.  MD3, local result, positive.

22  Opiates, local result, negative.  Oxycodone, local result,

23  negative.  Phencyclidine, local result, negative."  And there

24  is nothing after that.  Now, it does say at the very

25  beginning, "Page 1 of 2."  But there really is not a -- that I

1    can discern, a page 2.

2           If the categories under local result bear nothing

3    more than positive, negative, positive, negative, it speaks

4    for itself.  And that addresses, quite honestly, the concern

5    that the Court had.  I don't know if there is a page 2 or what

6    it says there is.  I guess we should call over and find out if

7    there is a further breakdown, or if this is it.  And I'll

8    certainly make sure each counsel gets this.

9           MS. MORGAN:  Thank you, Your Honor.

10          MR. BURKE:  Thank you, Your Honor.

11       (Pause)

12          THE COURT:  I just received a second email.  This is

13   -- it's a clearer copy.  And this one says, "Final copy."  And

14   it's exactly the same as I read.

15       (Pause)

16          THE COURT:  All right.  The representative indicated

17   that as long as there is something sufficient to read, that's

18   what they provide, but they don't provide levels.  So -- and

19   this, again, says "Final copy."  And this can be marked as --

20   hopefully, as an exhibit in this -- in this suppression

21   motion.

22          All right.  If you wish, you can retake the witness

23   stand.

24          Do you want to continue?

25          MS. MORGAN:  Is there something else into which the

1    Court wishes to inquire?

2              THE COURT:  No.

3              MR. BURKE:  I do.  I have --

4              THE COURT:  I just thought we were in the middle of

5    his examination and I stopped things.  So, Mr. Burke.

6              MR. BURKE:  I do have a few more questions.

7              THE COURT:  All right.  Could you resume, please.

8                          CROSS-EXAMINATION

9    BY MR. BURKE:

10   Q    Hi.  Good afternoon again, Agent.

11   A    Good afternoon.

12   Q    Agent, when you went to the property where you arrested

13   my client, were you one of the agents that went in and

14   actually arrested him?  Or did you go to another area of the

15   house?

16   A    I went upstairs.

17   Q    Okay.  Which agent -- which person do you know arrested

18   -- physically, like, went to him and grabbed him?

19   A    I'd have to ask, because I had gone upstairs.  There were

20   two girls upstairs that I was talking to.  But he was hiding

21   in the bathroom, so I know a couple of the -- the agents that

22   were there, and then he walked out and then we took --

23   Q    Of the bathroom?

24   A    No, he walked out in handcuffs, but we met him on the

25   street and then put him in the car.

1   Q    Okay.  So from what you could see, he wasn't woken out of

2   bed, he was in the bathroom hiding?

3   A    He was in the bathroom, yes, hiding.

4   Q    Right.  It didn't appear like he had just woken up or

5   anything?

6   A    No.

7   Q    Okay.  And your testimony was he seemed clear and lucent

8   and cooperative and all that, correct?

9   A    My testimony was he was alert.

10  Q    Well, did he appear clear and lucent?

11  A    I -- I mean, to me, yes.  I don't know if I used lucent,

12  but yeah, he -- he was alert, he was talkative.  That's --

13  that's what I could say about it.

14  Q    Well, you heard --

15       MR. BURKE:  And by reference, Your Honor, I -- and I

16  don't know if I'm formally or properly doing this, I would

17  like to incorporate by reference the result of the Pretrial

18  urine test that the Court announced that was delivered that

19  the defendant was -- had amphetamines, THC, and Ecstasy in

20  this system.  Otherwise, I would need the document and I would

21  need somebody from Pretrial Services -- unless your willing to

22  stipulate that that was the results?

23       MS. MORGAN:  I stipulate those were the results.

24       THE COURT:  Okay.  I'm just asking for a

25  stipulation, that's all.

1              MS. MORGAN:   The Court already said that the -- that

2    the test results would be admitted as an exhibit.

3    BY MR. BURKE:

4    Q    Are you familiar with Ecstasy?

5    A    A little, not much.

6    Q    Okay.  How about marijuana?

7    A    A little bit.

8    Q    Amphetamines?

9    A    A little bit.

10   Q    So --

11   A    They give us a little bit of training, but, you know, I

12   haven't worked specifically with drugs.

13   Q    You know that Ecstasy is an hallucinogen?

14   A    I believe so, yes.

15   Q    Right.  So you heard the test results that my client was

16   -- had Ecstasy, marijuana, and amphetamines all in his system,

17   correct?

18   A    That's what it said, yes.

19   Q    Right.  And your testimony is -- is that despite this, he

20   -- did he seem lucent?  Did he seem like he understood what

21   was going on?

22   A    He did, yes.

23   Q    Did he seem overly suggestible to you?

24   A    I don't believe so.  I wouldn't use those terms, no.

25   Q    So he seemed perfectly fine and -- and gave voluntarily

1   and clear answers?  Especially questions about whether he

2   wanted to give up his right to remain silent?

3   A    Yes, and we spent a lot of time on that.  And we did tell

4   him not to talk.  I remember Mike specifically saying, "Don't

5   say anything that will get you in trouble.  We'll sit down and

6   read your rights to you."

7   Q    That was in the car?

8   A    In the car, yes.  So we didn't any notes at that point,

9   and we actually spent a good amount of time going over his

10  rights and talking to him about it.

11  Q    Back here at 6th and --

12  A    Yes.

13  Q    -- Market?  Or 6th and Arch?

14  A    Yes, that's correct.

15  Q    Okay.  And the entire time that you interacted with him,

16  what time did you get him at the house, roughly?

17  A    We just looked at it -- 1:00.

18  Q    Okay.

19  A    11:00ish.

20  Q    And then within an hour you were back here, and I think

21  the document -- the warnings page is filled out, like, ten of

22  12:00 -- 11:50?

23  A    If that's what it says, yes.

24  Q    All right.  So you interacted with him for about an hour,

25  correct?

1    A    Yes.

2    Q    And how long did it take for him to go over the warnings

3    page?

4    A    Couple minutes.

5    Q    Okay.  And -- so in this hour that you interact with him,

6    at no time, is it your testimony, Agent, that you suspected

7    that he may be under the influence of some sort of substance

8    at all?

9    A    I didn't, no, at that point.

10              MR. BURKE:  Okay.  I have no further questions.

11              MS. MORGAN:  Nothing, Your Honor.

12              THE COURT:  Thank you.  You may step down.

13              THE WITNESS:  Thank you.

14              THE COURT:  Watch your step, please.

15         Okay.

16              MS. MORGAN:  So, Your Honor, I don't know if you

17    want to hear argument now on the suppression issue, or if

18    you'd like to hear the phone calls which we now have

19    available?

20              THE COURT:  Phone calls.

21              MS. MORGAN:  All right.

22              THE COURT:  Please.

23              MS. MORGAN:  And if I may, Your Honor, I can hand

24    out transcripts --

25              THE COURT:  Thank you very much.

1           MS. MORGAN:  -- to read along.  Your Honor, I'm

2    handing up two transcripts for you.  These are actually

3    already marked for trial, in the event that they're admitted,

4    as Exhibit 38B, which is a phone call on March 3, 2015, which

5    we'll play first; and Exhibit 39B, which is the phone call

6    from March 4, 2015, which we'll play as the second call.

7           (Audio being played at this time, 4:46 p.m. to 5:18 p.m.)

8           THE COURT:  All right.  Anything final that counsel

9    wants to argue on this -- the motion to admit the defendant's

10   acts of witness tampering?

11          MR. BURKE:  No, Your Honor.

12          MS. MORGAN:  Your Honor, I just want to be clear on

13   -- on the context of these phone calls.  This -- in the first

14   call the defendant is speaking initially with Kyra Reaves, who

15   was a minor at the time that she was trafficked by the

16   defendant.  She's person number five in the indictment.  And

17   then he asked to put Amanda Green the phone.  That's person

18   number four.  At the time -- and then the second phone call,

19   Your Honor, which we heard was the phone call between the

20   defendant and again Kyra Reaves.

21          Kyra Reaves was 16 years old at the time that she

22   was trafficked by the defendant.  And the Government alleges

23   in the indictment that the defendant subjected both of these

24   females to various acts of violence in the context of their

25   working for him in prostitution and thereby caused them to

1    engage in a commercial sex act.

2              In particular, as the defendant is now aware because

3    he was provided the Jencks material last Wednesday, which I

4    would note is after these phone calls where he's listing all

5    of the witnesses against him accurately, in the Jencks

6    material it indicates that Kyra Reaves alleges that the

7    defendant on one occasion punched her and knocked her

8    unconscious from punching her in a hotel room.

9              And Amanda Green alleges that the defendant on one

10   occasion used a Taser weapon on her as she was getting out of

11   the shower and was soaking wet.  And as Your Honor undoubtedly

12   knows, that's an electrocution type device.  And that he also

13   burned her on the forehead with a straightening iron.

14             All of these acts in the context of these two very

15   young women -- Amanda was 18 at the time -- working for him as

16   prostitutes in his -- the acts resulted from his

17   dissatisfaction with either how much money they had made that

18   day, or his suspicion that they were hiding money from him

19   from their acts of prostitution.  So I think that's important

20   for the Court to understand the demeanor of the two young

21   ladies on these phone calls in the context of their

22   relationship with the defendant and his violence toward them

23   directly in the past, as well as their having witnessed him be

24   violent toward other females; punching, choking, shoving,

25   pulling hair, grabbing by the throat, grabbing by the face,

1    these types of things they all testified to in the grand jury.

2              THE COURT:  All right.  Counsel, your motion, first

3    page, document 68, Ms. Morgan, second paragraph, "On March 5,

4    2015, the Government was advised by person five and person

5    four, two material witnesses in this case, that the defendant

6    contacted them by telephone in an attempt to corruptly

7    influence their testimony."  Then it goes on in quote, "In

8    addition, person five reported that the defendant attempted to

9    contact her by electronic mail."  The telephone conversations

10   that the Court has just heard, Exhibit 38B and 39B, these were

11   obtained as a result of the witness reaching out to the

12   Government?

13             MS. MORGAN:  The witness informed the Government

14   that the defendant had contacted her on the phone.  The

15   Government then issued a trial subpoena to the Federal

16   Detention Center to obtain these particular calls, which the

17   defendant made using a different inmate's identity, as is

18   clear from the recordings.  The defendant also attempted to

19   email this same witness.  She had on her cell phone -- what

20   happens when an inmate tries to email someone is there's

21   initial automated type email that says, "An inmate at the

22   Federal Detention Center is attempting to email you.  You have

23   to click this button to accept the email correspondence."  And

24   so on her phone was this email that says, the inmate named

25   above, and above it says Jerel Jackson, is attempting to

1    contact you and click this link if you want to accept the

2    email.  So the agent saw that on her phone, and then we issued

3    a trial subpoena to the Federal Detention Center for email

4    contacts from the defendant, which confirmed that he did, in

5    fact, attempt to contact the victim's email address.

6              As I told the Court, he made two additional phone

7    calls over the weekend, and I just learned about five minutes

8    ago that he called this witness again today, apparently before

9    he came to court.  So that's now five phone calls at least in

10   the last two weeks, in addition to at least two email attempts

11   that I'm aware of, which he acknowledges in the phone call, as

12   Your Honor heard.

13             THE COURT:  All right.  Thank you.

14             MS. MORGAN:  Thank you.

15             THE COURT:  Mr. Burke, anything further?

16             MR. BURKE:  Judge, I -- regarding today's phone

17   call, I think he's been here since six o'clock in the morning.

18   So I don't know how he was able to make a phone call.

19   Regarding the Government's assertion that, you know, the

20   Jencks material was provided last week and the phone calls

21   were after infers some sort of factual contextual

22   relationship, the Government is 100 percent wrong.

23             I got the Jencks material.  Tom got Jencks material

24   last week.  I wasn't able to print it and collate it until

25   Friday because I was on trial Wednesday and Thursday of last

1    week, and my client did not review the Jencks material until

2    -- we've been sitting here since two o'clock this afternoon.

3    So any allegation by the Government to say, well, they got the

4    Jencks material last week and then these phone calls were

5    made, there's no -- there's no factual contextual connection

6    between the Jencks material and the phone calls.  And if the

7    Government's relying on that, then I'm telling the Court he

8    didn't look at the Jencks material until right now.  So I'm

9    not really sure what the Government's asking in reference to

10   that.

11              THE COURT:  Ms. Morgan?

12              MS. MORGAN:  That's the opposite of what I'm saying,

13   Your Honor.  I'm saying that the defendant called these young

14   ladies two weeks ago.  He accurately listed all of the

15   witnesses --

16              THE COURT:  Oh, okay.

17              MS. MORGAN:  -- against him before having the Jencks

18   material, despite coming to this court and saying he had no

19   idea who the witnesses were against him.

20              THE COURT:  I understand.  Thank you.

21              MR. BURKE:  Well, I have nothing more on the phone

22   calls.

23              THE COURT:  All right.  Anything further?

24              MR. BURKE:  I have nothing more on the phone calls.

25              THE COURT:  All right.  The Government's motion

1    filed in document 68 to admit defendant's acts of witness

2    tampering, specifically the audio recording reflected in 38B

3    and the audio recording reflected in 39B is granted.  It will

4    be admitted.

5              The suppression motion, I will hear argument if you

6    wish to give it at this time.

7              MR. BURKE:  I do.

8              THE COURT:  Pardon me?

9              MR. BURKE:  I do.

10             THE COURT:  All right.  I'll hear.

11             MR. BURKE:  The Court's indulgence.

12             THE COURT:  Surely.

13             MR. BURKE:  I just want to get my motion -- my

14   response.

15             THE COURT:  Yes, sir.

16             MR. BURKE:  Your Honor, first of all, I want to --

17   during the -- during the testimony regarding -- specifically

18   on what my argument at this juncture is to the telephone.  The

19   Government tried to insinuate through the agent that -- that

20   there was actual authority to -- to grant consent of the

21   phone.  And that -- that assertion is in complete

22   contradiction to the evidence that the Government proffered.

23   The Governments agents and the Tinicum Township Police

24   Department all verified for the Court that they were aware

25   that Ms. Abreu was under the age of 18, and they all testified

1    -- all three said they were aware that -- in their experience,

2    that someone who is a minor cannot contract for cellular phone

3    service.  So if the Government was trying to argue that now

4    she had actual authority because the phone was in her

5    possession, you know, I -- I have not been able to find any

6    case law that -- that said a minor can -- can grant consent --

7    actual consent to something she doesn't actually own.  There's

8    no allegation here that Ms. Abreu owns the phone, that she

9    owns the --

10          THE COURT:  Mr. -- Mr. Burke, you're saying

11   ownership.  What about possession?

12          MR. BURKE:  Possession alone, Your Honor, is not

13   enough, especially given the fact that the agents acknowledged

14   that she could not contract for cellular phone service.  By

15   virtue of the fact that she had a phone, it may be in her

16   possession, but they know she's 17, somebody else had to

17   contract for that service.  Someone -- an adult had to do

18   that.

19          THE COURT:  I guess what I don't -- I'm not

20   understanding in your argument is the common sense and human

21   experience of everyday lives today with people buying cell

22   phones for other people; parents buying them for their

23   children and saying, here.

24          MR. BURKE:  Right.

25          THE COURT:  Or friends buying them because they know

1    that a person's a minor, and the friend abandons any claim or

2    interest in it other than, hey, you pay for it, I got it for

3    you.  I don't know of any, per se, rule that says because you

4    purchased it that you have an irrevocable right to not -- to

5    be contacted if a minor has possession of it before it can be

6    searched.

7              MR. BURKE:  No, no, I understand that, but I think

8    the Court is -- the Court is not focusing on the fact that

9    she's a minor.  Certainly a minor -- a teenager may be in a

10   mall, a girl particularly, who has a purse on her -- a purse,

11   she can certainly consent, I think.  Actually, I don't want to

12   concede that point because can a minor consent to a search of

13   her person without an interested person -- without an

14   interested adult?  I think it goes to the age of the minor.  I

15   mean, if you want to really use -- if you really want to use

16   a --

17             THE COURT:  Totality of the circumstances.

18             MR. BURKE:  Exactly right.  I mean, an 11-year-old

19   and a 17-year-old, there's going to be a difference.  You

20   know, there's going a difference.  And the age really becomes

21   a factor there.  I think the -- you know, the search in and of

22   itself is -- is a serious intrusion of -- of a -- let's use

23   the example of a young girl in a mall, maybe something happens

24   and, you know, police officers are called, and she has a

25   purse.  I have a 17-year-old daughter.  She has a purse.  So,

1   you know, that's her purse.  Those things in that purse belong

2   to her.  So --

3              THE COURT:  If your 17-year-old daughter has a cell

4   phone, it's confiscated and the police want to search, let's

5   say that your law partner gave your daughter that cell phone,

6   the police, notwithstanding that, came to you and said, do you

7   consent, because she's a minor, for us to search, and you say,

8   yes, I consent, you're saying that that's invalid because you

9   didn't buy it?

10             MR. BURKE:  I say, no, my daughter doesn't have a

11  cell phone.  I say, no, my daughter doesn't have a cell phone.

12             THE COURT:  No, I'm talking the legal aspect.

13             MR. BURKE:  Right.  And I'd say whoever provided

14  that phone is going to have.  On behalf of my daughter, she

15  can't consent because she can't have -- she can't purchase

16  cellular service.  She can't purchase it, she's only 17.

17  So --

18             THE COURT:  And this is what Mr. -- presumably his

19  name is Abreu -- Mr. Abreu should have done, the father?

20             MR. BURKE:  Mr. -- well, we have no idea what Mr.

21  Abreu knew or didn't know.  He's not here to testify, and none

22  of the agents speak English or -- I mean, none of the agents

23  speak Spanish.  So the conversation that they had with this

24  person is of no moment.  I have other arguments regarding what

25  the officers really should have known, but --

1          THE COURT:  But the record reflects she gave

2     consent, correct?

3          MR. BURKE:  I believe she -- I believe that's what

4     the agents testified.  But the agents also acknowledged the

5     fact that -- listen, Your Honor, the agents acknowledged the

6     fact that they needed somebody else to consent to the phone.

7     Why else go to the dad?

8          THE COURT:  So the evidence in the case indicates

9     that it believed that Claribel Abreu gave consent.  She in

10    turn talked to her father, as did the other individual, and

11    ultimately the father executed the consent.  Now, if law

12    enforcement gets that from Claribel and they get that written

13    consent form the father, they're supposed to say, this isn't

14    enough, let's get a official court interpreter and show us

15    proof that you're, in fact, her father?  We don't know who you

16    are for real.  She could have been lying about that, too.  And

17    ultimately, once we have all of these things stacked up, then

18    we can say, fine, now we can have this phone searched?  That's

19    what law enforcement has to do?

20         MR. BURKE:  Well, I -- I think -- and I cited it in

21    my brief.  It says, "The existence of apparent authority

22    entails a three-part analysis.  First, did the searching

23    officer believe some untrue fact that was then used to assess

24    the consent giver use and access to or control over the area

25    searched."

1        THE COURT:  Let's assume that answer is yes.

2        MR. BURKE:  I'm sorry?

3        THE COURT:  Let's assume that answer is yes.

4        MR. BURKE:  Correct, he believed the father could

5   give consent.  So the one agent testified that they're --

6   they're very familiar with the pattern of behavior, that

7   prostitutes who use phones, those phones will be provided by

8   their pimps.  They were aware of that fact.  And, in fact, no

9   one -- and I asked the agents, did anybody --

10       THE COURT:  And are you suggesting that if, in fact,

11  a "pimp" supplies a prostitute with a phone and

12  you --

13       MR. BURKE:  A minor.

14       THE COURT:  -- a minor, and he or she goes

15  elsewhere, and but for an argument between two individuals,

16  that phone would still be used, no problems whatsoever with

17  the phone, that's not saying, here, take it and do what you

18  wish with it?

19       MR. BURKE:  It's still that -- it's still that

20  pimp's phone.  It's his phone.  The fact that he's letting

21  somebody else use it doesn't mean that they give consent to

22  it, give to a search to lawful -- to give a consent to the

23  Government.  I mean, allowing somebody to use something --

24       THE COURT:  What if she lost the phone?  What if she

25  set it down?

1          MR. BURKE:  If she set it down and the agents found

2     it, they don't have -- they don't have the right to search.

3     They have to -- they have to find out what the number is, find

4     out who the provider is, then find out who the owner is to the

5     provider, then they go to the defendant and say we found your

6     phone, or they -- put a search warrant aside -- then they

7     could say, well, Mr. Jinx, can we -- can we search your phone.

8          THE COURT:  If under these circumstances she says --

9     she, being Claribel, says, here, search it --

10         MR. BURKE:  The agents -- no, they say, well, I know

11    she can't give consent because she --

12         THE COURT:  And this is my dad.  This is my dad.

13    Dad signs the form, and there's evidence in the record to show

14    he hesitated, he -- there was any issue at all.  He signed it.

15    Now what the agents -- what are the agents supposed to do now?

16         MR. BURKE:  Well, it -- it comes down to -- it comes

17    down to using your brains a little bit.  It comes down to

18    looking at the -- just because the guy says that, you can't

19    look at that at face value and say that's fine, he signed it,

20    we're allowed to do it.  And frankly, that's all they were

21    doing, because all their testimony -- I mean, you have to

22    think of it --

23         THE COURT:  Counsel, let's -- arguably, let's say

24    that's what -- all they were doing, they went there for a

25    reason.

1          MR. BURKE:  Just to get a consent?

2          THE COURT:  All right.  But what is in this record,

3   other than your arguments, that I should just totally distrust

4   all of this and think something else happened?

5          MR. BURKE:  No, I don't think something else

6   happened.  I think it happened exactly the way it did.  I

7   don't want the Court to get that impression.  I mean, clearly,

8   they were there for the sole purpose of getting consent to

9   search the phone.  Their concerns regarding Claribel Abreu are

10  -- that's a falsehood because they did nothing to make sure

11  she was okay.  They didn't call Human Services, DHS.  They

12  went there to make sure that they got a consent to search.

13  And all of the facts and circumstances when they arrived there

14  told them, I don't think this guy can give consent because I

15  don't think this guy is paying the bills for this phone.  We

16  need to know how he's paying the bills for this phone.  And

17  they're using another girl, who is also a prostitute, to

18  translate, and nobody knows what's being said.

19         THE COURT:  That they didn't know.  That they didn't

20  know.

21         MR. BURKE:  Nobody knows what's being said.  They

22  have no idea of what is being said.  So them saying, well,

23  he's nodding along, they have no idea.  They have a 17-year-

24  old girl who's involved in prostitution, may have lied about

25  stealing something, or may have actually stolen something,

1    right, because they had that information, that she was

2    involved in prostitution and thievery and possibly lying about

3    it.  So her word, in and of itself, based on what they knew at

4    that time should have caused them to pause.

5            The fact that she was 17 at the time, they already

6    testified they knew she couldn't have cellular service,

7    somebody else had to provide cellular service.  They never

8    asked -- directly asked him is this your phone?  Do you pay

9    for this phone?  That question was not asked.  She -- the

10   Government said, well, did he ever say it wasn't his phone?

11   That's in the negative.  Did Mr. Abreu say this was his phone?

12   That he paid for it?  Did he have a bill for it?  They could

13   have said, can we see a bill?  Are you aware of this phone?

14   Do you have a bill for this phone?  A Cricket bill or a T-

15   Mobile or whatever the company is?  Nope, that phone bill

16   matches.  That's the dad's name, that's the phone, we'd like

17   to search your phone.  And that's all -- see, all the --

18           THE COURT:  And I suppose that your argument --

19           MR. BURKE:  That's all that was required.

20           THE COURT:  And as per your argument, if Mr. Jackson

21   happened to be deceased at that point in time, the Government

22   could not have searched that phone unless they got a certified

23   copy of the death certificate, showing it's not giving his

24   consent.

25           MR. BURKE:  Well, if Mr. Jackson was deceased at the

1    time, then they could have searched without a warrant because

2    no one would --

3              THE COURT:  Well, let's say they didn't know it.

4              MR. BURKE:  If Mr. Jackson was deceased at the --

5              THE COURT:  And they didn't know it.  They had gone

6    through -- Ms. Claribel Abreu is saying, here, take it, search

7    it.  The father is saying, here, take it, search it, but Mr.

8    Jackson was deceased, you're saying that they still could not

9    have searched that phone until they searched far and wide and

10   ultimately came across the fact that he was deceased and

11   obtained a death certificate to say, hey, we don't need to get

12   that consent now, otherwise you can't search the phone?

13             MR. BURKE:  They always have gotten a warrant.  They

14   could have always gotten a warrant.

15             THE COURT:  That's not the basis of this --

16             MR. BURKE:  That's not the basis.  And -- and him

17   being deceased, they -- I mean, it doesn't change the

18   argument.  They still can't -- the consent is still invalid

19   whether he's dead or alive.

20             THE COURT:  Pause one second.  I think your client

21   wants to speak to you.

22        (Pause)

23             MR. BURKE:  I'm sorry, Your Honor.

24             THE COURT:  That's all right.

25             MR. BURKE:  So, you know, I mean, whether he's alive

1    or dead, frankly, doesn't change whether or not that consent

2    was valid, whether she had actual consent, which she didn't.

3    And the Government conceded that by the fact that they knew

4    that they had to go get consent from an interested adult.

5         Now -- so you come to the second part where they

6    have apparent authority.  Does this person -- does he appear

7    -- apparent seem to have the authority to grant consent of the

8    phone in light of the fact that the guy doesn't speak any

9    English.  And this is a critical piece of information that

10   they need.  Does he have apparent authority to search?  Well,

11   it's really simple.  Is this your phone?  Or do you pay for

12   this phone for your daughter?  I mean, how hard is that?  That

13   took how -- that took five seconds for me to say that.

14        So all of these other questions when they said,

15   well, he didn't say this, he didn't say that, well, he didn't

16   -- he didn't say he believes in Santa Clause either.  That's

17   of no moment.  It's really simple, they needed to find out

18   whether this guy had the authority to search.  And all's he

19   had to say was, is this your phone, or did you pay for this

20   phone for your daughter.  Because the answer would have been

21   no.

22        But they avoided all that.  They deliberately

23   ignored or they deliberately did not ask those questions just

24   to get the consent, because that's all they wanted.  They

25   wanted his signature on the piece of paper.  And clearly,

1   under the law that I've given the Court, he had no apparent

2   authority.  And I've cited several cases here, <u>Reed</u> (phonetic)

3   and <u>Figorelo</u> (phonetic) and <u>Rodriquez</u> (phonetic) that -- even

4   <u>Rodriquez</u> states that even if a person invites law enforcement

5   inside and exclusively asserts that they live there, the

6   surrounding circumstances could be such that a reasonable

7   person would doubt its truth and not act upon it without

8   further inquiry.

9           So, you know, the Circuit Courts even state that,

10  you know, a police officer or an agent has to do a little bit

11  more than just listen to what little birdies are saying.  Does

12  the situation seem to be such that this person who's actually

13  giving the -- the consent -- is this person an authority to do

14  so?  I mean, even <u>Rodriquez</u> states that a person who even

15  says, sure, come on in, I live here, if -- if other

16  circumstances show that maybe you should question that, then

17  they need to step a little bit further.  I mean, the existence

18  of a consent to search is not lightly to be inferred on the

19  Government -- not lightly to be inferred, and the Government

20  always bears the burden of proof to establish the existence of

21  effective consent.

22          Here, the guy's daughter's engaged in prostitution.

23  There should be a grave concern as to whether this girl should

24  still be living in this house.  Who knows if this father is

25  doing all that is necessary to -- I mean, I got to say if a

1    17-year-old is engaged in prostitution, I'd say that, per se,

2    the father is not doing what he needs to do.  He's not taking

3    care of his daughter.  He's not providing the kind of stable,

4    safe home that his daughter is not engaged in that behavior.

5    I mean, if that doesn't send bells off in anybody's head other

6    than mine, I don't know what does.

7              So why were they going and -- and rely on this guy

8    to give consent to a phone that they've acknowledged she can't

9    buy, and that they acknowledge that the know that the pimps

10   use them all the time?  They were just using him to get his

11   signature on that form and that's all.  I mean, and that's

12   exactly what the testimony bore out, and that's where the case

13   law says you got to inquire a little bit further.

14             And I know the Court went to great lengths to have

15   all these extraneous steps that they -- are they required to

16   do this?  Are they required to do that?  I mean, the answer

17   is, probably not in your examples, Your Honor.  A simple

18   question of, Mr. Abreu, see this phone?  Do you pay for this

19   phone?  Yes?  Can I see a bill, please?  Or no, you don't pay

20   for this phone?  Do you know where this phone came from?  And

21   have Tanya Skittles Alvarez interpret that.

22   Instead, they just had her interpret the form, rather than the

23   -- the important of question is, you've read the form or it

24   was translated to you --

25             THE COURT:  You have me hung up on, "Did you pay for

 1     this phone?"

 2               MR. BURKE:  Right.

 3               THE COURT:  Everybody doesn't pay their phone that

 4     they have in their possession, including Mr. Abreu, who could

 5     have said, my uncle gave it to her.

 6               MR. BURKE:  I understand that, but then --

 7               THE COURT:  My uncle gave it to me and I let her use

 8     it.

 9               MR. BURKE:  Then why did they ask the father for his

10     consent?  Why did they go to the father?

11               THE COURT:  But he gave it, did he not?

12               MR. BURKE:  He gave the consent.  The question was,

13     did he have the apparent authority to do so?

14               THE COURT:  I guess the backdrop of nothing else

15     other than the fact that they knew she was a prostitute?

16               MR. BURKE:  Right.

17               THE COURT:  And that she was a minor?

18               MR. BURKE:  Right.

19               THE COURT:  All right.

20               MR. BURKE:  I think they had to inquire further as

21     to -- as to whether he was the proper person to give consent.

22     And they never made any inquiries whatsoever as to whether he

23     would be the proper person at all.

24               THE COURT:  All right.

25               MR. BURKE:  So, I mean, based on the case law, I

1    mean, they -- the consent is invalid.

2          THE COURT:  And the record does not reflect, other

3    than your very fine cross-examination, that the father did not

4    receive the translation from the other person, regardless of

5    whether she was a prostitute, accurately.  So that can go

6    either way, correct?

7          MR. BURKE:  I agree.  And I think I brought that

8    out, you don't know what was being said to the man.

9          THE COURT:  Your client wants to speak to you again.

10        (Pause)

11        MR. BURKE:  That's all I have.  Thank you.

12        THE COURT:  All right.  Thank you.

13        Ms. Morgan.

14        MS. MORGAN:  Your Honor, the -- the first issue here

15   is whether the minor had actual authority to consent to the

16   search.  And as indicated in the two Third Circuit cases that

17   we cited, Givon (phonetic) and Stabile (phonetic), or Stabile,

18   however that's pronounced, there's common authority to consent

19   to a search --

20        THE COURT:  I call it Stabile.

21        MS. MORGAN:  Stabile.  There's common authority to

22   consent to a search where a person has joint access or

23   control.  There's no case law that says the person who pays

24   the bills is the person who can consent.  It's the issue of

25   joint access or control.

1          And Stabile, in particular, says that where a

2     defendant allows for that joint access, he assumes the risk

3     that the other person can consent to the search.  And that

4     appears to be the case that we have here, if this is, in fact,

5     the defendant's phone, because what the officers come upon is

6     a juvenile in a hotel near the airport with no defendant to be

7     found, and she has a phone on her person, and she's using that

8     phone.  Even while she was at the police department,

9     apparently she was using the phone.

10         So she clearly has control over the phone.  It's on

11    her person while she's out in the world functioning by

12    herself.  She clearly has use of the phone, she was using it

13    in their presence.  She clearly has access to the phone.  And

14    even the contacts within the phone show that one of the

15    contacts is the defendant who presumably doesn't need to call

16    himself on the phone.  So that's yet further evidence of the

17    fact that she had custody and control of the phone.  She had

18    his phone number and his picture in the phone.

19         Even if the Court does not believe that she had

20    common authority over the phone, the question then is, did she

21    have apparent authority from the perspective of the officers

22    and agents taking into account the totality of the

23    circumstances.  And I cited to several cases in that regard as

24    well.

25         Here we have a juvenile who has the phone in her

Morgan - Argument                                    140

1    possession at the time that they come upon her.  They come

2    upon two females in -- in this hotel.  They bring the two

3    females back to the police department.  The defendant is

4    nowhere to be found.  At no point does the juvenile say, hey,

5    this isn't my phone, this belongs to my pimp.  At no point

6    does she say this belongs to anyone but her.  And she then

7    gives authority to consent to the search.  And I've cited

8    several cases that showed that juveniles can, in fact, give

9    valid consent to search.  And those are listed on pages 5 and

10   6 of the Government's submission.

11        But then far from doing nothing for this victim, as

12   the defense claims, what the police and agent then did was

13   instead of leaving her at the Red Roof Inn to continue

14   prostituting, instead of charging her with the crime of

15   prostitution, they recognized that she may be a victim of

16   trafficking.  They endeavored to find a family member that

17   they could take her to instead of allowing her to fall into

18   the foster care system and be placed temporarily with

19   strangers until a family member was found.  And they took her

20   to her family member, her father, here in Philadelphia.

21        And as if it weren't enough that she had actual

22   authority to consent because she had common control over this

23   phone, as if it weren't enough that she had apparent authority

24   to consent because she was using it and there was no

25   indication that it was someone else's, as if it weren't enough

1    that she can consent to the phone, despite the fact that she's

2    17 years old, they then go to the father and they give the

3    daughter over to the father, and they then explain to the

4    father that we would like consent to search this phone.

5           There is no case law that says the person that

6    you're talking to has to seem like a good parent before you

7    ask them to consent.  Was he a good parent?  We don't know.

8    Was he aware of his daughter engaging in prostitution?  We

9    don't know.  Does that suggest that maybe he's not supervising

10   well?  Perhaps.  But that's not a requirement for providing

11   valid consent.

12          And the father did not raise any issue about it

13   being someone else's phone.  I know that I -- if someone came

14   to me and said, we got this phone off your 17-year-old

15   daughter, we'd like to search it, I think most parents would

16   say, if, in fact, this were true, I've never seen that phone

17   in my life, and would express shock at their child having a

18   phone that they didn't provide to the child.  I think the fact

19   that the father didn't say anything like that is significant

20   because it indicates apparent authority to consent to this

21   search -- to this search.

22          And the defense is suggesting he was not the proper

23   person to go to given that his daughter was off engaging in

24   prostitution.  Who is a more proper person, from the

25   perspective of a reasonable law enforcement officer, to go to,

1    to return a child and to ask for consent than a mother or a

2    father of that child?  Who -- who has a closer relationship

3    with a child from the perspective of a reasonable agent or

4    officer than a parent?  So the father signed the form, Your

5    Honor; the juvenile signed the form; and the juvenile had both

6    actual authority over this phone and the apparent authority to

7    consent to the search.

8            For all of those reasons, we are asking that the

9    motion to suppress be denied on that issue.

10           THE COURT:  Go ahead and finish with the statement.

11           MS. MORGAN:  As for the statement, Your Honor, the

12   agents arrested the defendant.  They both testified that they

13   were present for him for a couple of hours -- present with

14   him, excuse me, for a couple of hours.  And at no point did

15   they observe anything untoward in his behavior that would give

16   them the faintest hint that he was altered or intoxicated or

17   incapable of giving voluntary consent.  I asked both of them,

18   did he appear lucid and coherent, and they both said that he

19   did, and that they had no reason to believe that he was

20   intoxicated or that he could not voluntarily waive his rights.

21           I have provided the Court with probably eight or

22   nine cases in the Government's brief in which the Courts have

23   found that the fact of drug use, intoxication at the time,

24   being in an emergency room with a morphine drip, etcetera,

25   etcetera, did not invalidate consent.  The issue is what was

1    the reasonable observations of the agents.  And you have two

2    agents, I would submit, very credibly testifying that there

3    was nothing to lead them to believe that the defendant was

4    intoxicated, despite the results of the subsequent drug test.

5           So I believe that based on all of the cases of --

6    offered by the Government indicating various degrees of

7    intoxication, drug use, illness, being on drugs at the time,

8    being in the hospital at the time, that the -- that the Court

9    can easily find, based on what's in the record in this case,

10   that the defendant voluntarily signed the Miranda waiver.

11           THE COURT:  All right.  Thank you.

12           Mr. Burke, as to Miranda.

13           MR. BURKE:  Judge, I know what the agents testified

14   to --

15           THE COURT:  Or the statement, I'm sorry.

16           MR. BURKE:  -- regarding -- regarding the testimony

17   that he was -- he was lucid and he seemed fine, but, you know,

18   the -- the words are easy.  Words are easy.  You know, the

19   proof is in the pudding.  You know, these officers said, yeah,

20   he looked fine; he seemed fine.  But the fact of the matter

21   is, is he has -- he has the hallucinogen Ecstasy and marijuana

22   and the amphetamines coursing through his system.

23           You know, this is -- I think this is one of the

24   reasons we have this debate is why -- you know, why are these

25   -- these confessions simply not videotaped?  It's very simple.

1    I mean, the Government can pull audiotapes out of a prison,

2    but in something as simple as -- as an interview, it's not

3    videotaped, so that the Court can see for itself, does this

4    person seem lucid, does he seem like he understands, does he

5    seem like he's coerced.

6         Instead, you constantly -- you -- and I mean you as

7    a sitting Judge, have to constantly play Monday morning

8    quarterback and sit there and say, well, what really did

9    happen?  I mean, the Government can say, well, that's what

10   they said, that's what they said.  Well, yeah, that's what

11   they said.  The urine test says he looked like he was on a lot

12   of different substances.

13        So, I mean, you know, I think based on that, I mean,

14   I think it becomes a credibility call when two separate agents

15   say he seemed absolutely fine, and yet the urine tests clearly

16   show that he was not.  In fact, those urine tests would be

17   enough to arrest him for DUI.

18        So if -- if he had been stopped in a car and

19   arrested for something and his blood test would have been

20   taken or his urine would have been taken, the City of

21   Philadelphia could have said, well, you were incapable of

22   driving safely on the city streets.  But the Government's

23   going to contend, well, you were maybe -- maybe you weren't

24   safe enough to drive, but you certainly could tell on

25   yourself.

1          I mean, I know it's a totality of the circumstances

2     test, and I think the fact that not only is it THC and

3     amphetamines, but when it's a hallucinogen such as Ecstasy, I

4     think that -- that should give the Court a greater pause as to

5     the veracity of whether my client truly was in a psychological

6     and physiological condition to give a proper consent to -- to

7     waive his Miranda rights.

8               THE COURT:  All right.  Yes, ma'am?

9               MS. MORGAN:  Your Honor, I think it's important to

10    recognize that the Pretrial Services test did not indicate

11    amounts in his system.

12              THE COURT:  I said as much earl on.

13              MS. MORGAN:  I'm sorry?

14              THE COURT:  I said as much early on, which is why I

15    wanted to find out what, in fact, the test said.

16              MS. MORGAN:  Right.

17              THE COURT:  And I also, I think, said before it came

18    back that if it was quantity, that's something that I would

19    think that counsel would want to know and everyone would want

20    to know, obviously.  But if it was just simply the presence of

21    it and nothing more, then the chips will fall where they may.

22    And that's what happened here.

23              MS. MORGAN:  Right.  And -- and so all we know is

24    positive.  We don't know if he took those drugs that day, we

25    don't know if he took them a week before, a month before, six

1    months before.  And certainly some drugs, the Court is

2    undoubtedly aware, remain in the system for quite some time.

3    So the fact that he tested positive for something doesn't mean

4    that he was actually altered on the day that he was tested.

5              THE COURT:  All right.  Thank you very much.

6              MS. MORGAN:  Thank you.

7              THE COURT:  Excuse me one second.

8         (Pause)

9              THE COURT:  All right.  I have taken very copious

10   notes, and I'm, frankly, prepared to go forward with a finding

11   of fact and conclusions of law on both at this point in time.

12   However, I'm one who takes pride in what I produce, and I

13   don't want to sit here and start talking about this, that, and

14   leave something out, so I will render a decision by noon

15   tomorrow on both motions.

16             MR. BURKE:  Your Honor, there's a -- there is

17   another motion that my -- I believe my client filed pro se.

18   it came across this afternoon.

19             THE COURT:  Whatever it was, I think I dismissed it

20   and said he has counsel and -- and there's no hybrid

21   representation.

22             MR. BURKE:  Well, I'll -- I'll apprize the Court of

23   it now.

24             THE COURT:  If that's what -- the same one.

25             MR. BURKE:  I should have looked.

1          THE COURT:  Oh, I did -- I denied it in saying that

2     he had counsel and there's no hybrid representation.  And if

3     it's this letter -- is this what you're referring to?

4          MR. BURKE:  I -- I assume it is.  Your Honor, this

5     was -- my client wanted me to make a motion for it.  My client

6     wants to request a continuance on this case based on the

7     Speedy Trial Rule, Section 3161.  Particularly Section (c)(2).

8     Section (c)(1) is the 70-day rule.  I know the Court's aware

9     of that.  Section (2) states that unless the defendant

10    consents in writing in contrary, the trial shall not commence

11    less than 30 days from the date in which the defendant first

12    appears through counsel.

13         On the superceding indictment, the defendant was

14    arraigned in the Magistrate Court, I believe, February 26th or

15    February 27th.  And on those two counts trial is scheduled for

16    Wednesday.  And that is less than 30 days, pursuant to 3161,

17    Subsection (2).

18         THE COURT:  I think I was expecting something else

19    to come from your mouth.  Would you repeat that, apologize.

20         MR. BURKE:  Under Section 3161, the Speedy Trial --

21         THE COURT:  What is it the defendant is requesting?

22         MR. BURKE:  A continuance, because he's going to

23    trial on the superceding charges in less than 30 days from his

24    arraignment.  And the rule prescribes going to trial in less

25    than 30 days.  He was arraigned on the 26th or the 27th.  It's

1   one of those days, I don't know.  He was arraigned on the 26th

2   or the 27th.  He pled not guilty.  Trial is scheduled of for

3   the 18th.  That is less than 30 days.  And per the rule, he

4   cannot go to trial in less than 30 days.

5              THE COURT:  Unless he consents.

6              MR. BURKE:  Unless he consents.  So my client does

7   not consent.

8              THE COURT:  All right.  Ms. Morgan.

9              MS. MORGAN:  Your Honor, the superceding indictment

10  was filed substantially before the 30 days.  I then requested

11  an arraignment.  The arraignment was scheduled at the

12  convenience of the Court.  I'm not sure of the exact day.  I

13  was actually in trial at the time, but it may have been on the

14  25th or 26th.  I don't have the rule in front of me, so I'm at

15  a bit of a disadvantage.  It says the date on which the

16  defendant first appears through counsel.  Obviously, the

17  defendant first appeared through counsel back in October of

18  2013.

19             MR. BURKE:  Not on the superceding count, sir.

20             MS. MORGAN:  Clearly not.

21             THE COURT:  So by your calculations, Mr. Burke, what

22  would be the earliest possible date for this man to go to

23  trial?

24             MR. BURKE:  If it would be the 26th, 30 days would

25  be -- that was February, so you lose one day, two days, three

1    days.  It would be, like, next Friday.

2               THE COURT:  A week from this coming --

3               MR. BURKE:  That would be 30 days.

4               THE COURT:  This coming Friday?  Or a week from this

5    coming Friday?

6               MR. BURKE:  Next Friday.  Not this Friday, next

7    Friday.

8               MS. MORGAN:  Your Honor, it states, "Unless the

9    defendant consents in writing to the contrary, the trial shall

10   not commence less than 30 days from the date on which the

11   defendant first appears through counsel."

12              THE COURT:  All right.

13              MR. BURKE:  And on the superceding count we first

14   appeared at the arraignment.

15              THE COURT:  All right.

16              MR. BURKE:  They're new counts.

17              THE COURT:  I'm going to rule that it will relate

18   back, because counsel has been uninterrupted in this case.

19              MR. BURKE:  I'm sorry?

20              THE COURT:  Uninterrupted in this case.  There's no

21   new counsel came in as the -- because of the superceding --

22   superceding indictment.

23              MR. BURKE:  No, I -- no, I understand.  I was

24   counsel before the superceding indictment.  The superceding

25   indictment added new -- new complaints.

1              THE COURT:  It added additional.

2              MR. BURKE:  Correct.

3              THE COURT:  Correct?

4              MR. BURKE:  Correct.

5              MS. MORGAN:  It added one additional count, Your

6    Honor.  And --

7              THE COURT:  I thought it was two additional counts.

8              MR. BURKE:  Two additional.

9              MS. MORGAN:  No, I superceded, I believe, on two

10   separate occasions.  Let me just check.  Yes, the second

11   superceding indictment which added Count 5 was filed and

12   docketed on February 5, 2015, while this counsel was already

13   involved in the case.

14             THE COURT:  All right.

15             MS. MORGAN:  Which was much more than 30 days ago.

16             THE COURT:  Mr. Burke, the Court denies the request.

17   Now, I will render a decision on the motions tomorrow by noon.

18   Jury selection is scheduled for Wednesday morning.

19             MS. MORGAN:  Yes, Your Honor.

20             THE COURT:  All right.  Court is adjourned.  Thank

21   you.

22             MS. MORGAN:  Thank you, Your Honor.

23        (Proceedings concluded at 6:02 p.m.)

24                        *  *  *  *  *

25

C E R T I F I C A T I O N

     I, Brenda Boulden, the court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


_____    _____

BRENDA BOULDEN              DATE

DIANA DOMAN TRANSCRIBING, LLC