IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 13-CR-622-1 |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| JEREL JACKSON, | ) | Philadelphia, PA |
| | ) | September 10, 2019 |
| Defendant. | ) | 3:10 p.m. |


TRANSCRIPT OF RESENTENCING HEARING
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:          MICHELLE L. MORGAN, ESQUIRE
                            ASSISTANT UNITED STATES ATTORNEY
                            UNITED STATES ATTORNEY'S OFFICE
                            615 Chestnut Street
                            Suite 1250
                            Philadelphia, PA  19106-4476


For the Defendant:          MARK T. WILSON, ESQUIRE
                            FEDERAL COMMUNITY DEFENDERS OFFICE
                            Eastern District of Pennsylvania
                            601 Walnut Street
                            Suite 540-W
                            Philadelphia, PA   19106


Audio Operator:             A'iSHAH EL-SHABAZZ


Transcribed by:             DIANA DOMAN TRANSCRIBING, LLC
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-0129
                            Office:  (856) 435-7172
                            Fax:     (856) 435-7124
                            Email:   dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                            I N D E X

2

3    SUMMARY OF THE CASE:                              PAGE

4      By Judge Jones                                    5

5

6    ARGUMENT:                                         PAGE

7    Re:  Objections to Presentence Report

8          By Mr. Wilson                       8, 12, 14

9          By Ms. Morgan                          9, 13

10   Re:  Sentencing

11         By Mr. Wilson                            20

12

13   WITNESS STATEMENT:                               PAGE

14         By Ms. DeVaughn                          18

15

16   STATEMENT OF THE DEFENDANT:                      PAGE

17         By Jerel Jackson                         25

18

19   SENTENCE OF THE COURT:                           PAGE

20         By Judge Jones                           30

21

22

23

24

25

Colloquy                                                 3

1          (The following was heard in open court at 3:10 p.m.)

2          THE COURT:  This is the resentencing in the matter

3   of the United States of America versus Jerel Jackson, a/k/a

4   "Jinx", Criminal Number 13-622.

5          Counsel, would you identify yourselves for the

6   record, please?

7          MS. MORGAN:  Good afternoon, Your Honor.  Michelle

8   Morgan for the United States and with me at counsel table is

9   Glenn Booth, Special Agent from the FBI.

10         THE COURT:  Good afternoon to you both.

11         MR. WILSON:  Your Honor, Mark Wilson for the Federal

12  Defenders on behalf of Mr. Jerel Jackson.

13         THE COURT:  Good afternoon -- excuse me.  And good

14  afternoon, Mr. Jackson.

15         THE DEFENDANT:  Good afternoon.

16         THE COURT:  Ma'am, would you identify yourself for

17  the record, please.

18         MS. SANTELLA:  Talia Santella for the U.S. Probation

19  Office on behalf of Leslie Maxwell.

20         THE COURT:  Thank you.  I would ask that the oath be

21  administered to those who will testify.

22         COURTROOM DEPUTY:  Mr. Jackson, will you stand for

23  me, please.  Can you raise your right hand.

24         JEREL JACKSON, DEFENDANT, SWORN

25         COURTROOM DEPUTY:  Thank you, sir.  You may be

1   seated.

2            THE DEFENDANT:  Thank you.

3            COURTROOM DEPUTY:  Ms. Santella, could you stand,

4   please.  Raise your right hand.

5            TALIA SANTELLA, PROBATION OFFICER, SWORN

6            COURTROOM DEPUTY:  Thank you.  You may be seated.

7            THE COURT:  For the record, on February 5th of 2015,

8   a Federal Grand Jury seated in the Eastern District of

9   Pennsylvania, returned a five-count second superseding

10  indictment charging the defendant, Jerel Jackson, with sex

11  trafficking of a minor or by force in violation of Title 18 of

12  the United States Code, Sections 1591 and 1594(a), that being

13  Counts 1 through 5; and sex trafficking by force in violation

14  of Title 18 of the United States Code, Sections 1591 and

15  1594(a), Counts 2, 3 and 4.

16           On March 18th of 2015, the defendant appeared before

17  this Court at which time he entered an open plea of guilty to

18  Counts 1 through 5 of the second superseding indictment.

19           On June 2nd of 2016, Mr. Jackson was sentenced by

20  this Court after a lengthy sentencing hearing.  This Court in

21  imposing sentence took into consideration all factors required

22  in fashioning an appropriate sentence consistent with the

23  relevant statutory sentencing scheme, including Section

24  3553(a) factors, the United States Sentencing Guidelines,

25  sentencing memoranda of counsel and all statements of record

1   including the allocution statement of the defendant.

2          At the conclusion of the sentencing hearing, this

3   Court imposed a sentence as follows:

4          Count 1, 180 months incarceration; Counts 2, 3 and

5   4, 180 months incarceration to run concurrently, one with the

6   other, and concurrently with the sentence imposed on Count 1;

7   Count 5, 180 months incarceration to run consecutively to the

8   sentence imposed on Counts 1 through 4 for a total period of

9   360 months or 30 years incarceration.

10         Now, regarding the Sentencing Guidelines

11   calculations, the United States Probation Department and this

12   Court originally determined that the offenses did not group

13   and calculated the adjusted offense level for each count and

14   determined a total of four units would be added to the highest

15   adjusted offense level of 42.

16         This resulted in a total offense level of 43 and at

17   the applicable Criminal History Category of V, a Guideline

18   range of life in prison was appropriate -- appropriate in the

19   sense that that was what was reflected in the United States

20   Sentencing Guideline schematic.

21         At sentencing on June 1st of 2016, this Court

22   sustained certain objections to some of the enhancements in

23   the individual groups which lowered the highest adjusted

24   offense level to 40.  This resulted in the assessment of one

25   unit for each group for a total of five units, and Section

1  3D1.4 of the Guidelines directed where a multiple-count

2  adjustment generates a total of five units, four levels are

3  added to the highest offense level.  The Court instead applied

4  a five-level increase which resulted in a total offense level

5  of 43 and a Guideline range of life.  The Court, for the

6  record, did not impose a sentence of life in prison.

7       As was Mr. Jackson's right, he filed an appeal of

8  this Court's decisions.  In a decision of the Court of Appeals

9  in October of 2017, it was ordered that this Court resentence

10  Mr. Jackson because the Appellate Court agreed with Mr.

11  Jackson in pertinent part as follows:

12       "That his sentencing range was erroneously

13  calculated in applying United States Sentencing Guideline,

14  Section 3D1.4 to obtain the combined offense level.  Here,

15  although the District Court correctly determined that five

16  units were present, it incorrectly increased the combined

17  level offense adjust to five levels rather than the proper

18  four levels.  The Government concedes that Mr. Jackson's

19  Guideline range was erroneously calculated and that this

20  miscalculation affected his substantial rights."

21       The Court opinion goes on to state, "Accordingly, we

22  will vacate the sentence and will remand the case to the

23  District Court for resentencing."

24       Within that, they cite, "United States vs. Mateo-

25  Medina," and state, "We generally vacate a procedurally

1    deficient sentence and remand for resentencing."

2            Now, this Court, meaning me, acknowledge -- and I

3    humbly acknowledge my error consistent with the findings of

4    the Court of Appeals.  Therefore, acknowledging the correct

5    four-level increase, the total offense level was 42, not 43.

6    The defendant's Guideline range, therefore, is 360 months to

7    life in prison.  So, essentially, the numbers were never

8    affected.  It was procedurally deficient and nothing more.

9            The instant offense occurred from November 12th --

10   2012, excuse me -- through October of 2013.  Therefore, both

11   the Sentencing Reform Act of 1984 and the Anti-Terrorism and

12   Effective Death Penalty Act of 1996 apply, including the

13   Mandatory Victims Restitution Act of 1996.

14           As there are no ex post facto issues, the addition

15   of the Sentencing Guidelines Manual used to calculate the

16   Guidelines in the report, is that incorporating amendments

17   effective through November 1st of 2014, is that correct, or

18   '16?

19           MS. MORGAN:  2014.

20           THE COURT:  All right.  There is a Presentence

21   Investigation Report which was prepared by Senior United

22   States Probation Officer, Ms. Leslie Maxwell, on June 10th of

23   2015, and revised on June 24th of 2015.

24           Mr. Wilson, have you discussed that report with your

25   client?

1          MR. WILSON:  Yes, Your Honor.

2          THE COURT:  And, Mr. Jackson, have you read the

3    report or was it read to you, sir?

4          THE DEFENDANT:  We was waiting on the revised

5    report, so we -- yes, the one from 2015, yes.

6          THE COURT:  All right.  Now, are there any

7    objections to the Presentence Report?

8          MR. WILSON:  There are, Your Honor, objections that

9    I submitted December 28, 2018, by letter, I think it was

10   addressed to Your Honor and copied to the Government and Ms.

11   Maxwell, in which I raised certain objections to the version

12   of the report that's dated June 24, 2015.

13          I noted first in that letter that it was my

14   understanding that Your Honor had previously ruled at the

15   initial sentencing on June 2nd of 2016, that a defense

16   objection to the application of two enhancements in the June

17   24, 2015, report be sustained.  The report has not been

18   changed to reflect that.

19          However, with those enhancements removed, and those

20   would be the enhancements in paragraphs 28 and 54, with those

21   enhancements removed, the adjusted offense levels in paragraph

22   34 and in paragraph -- and I think I put 56 and I meant 59 --

23   would be reduced to 38 and 40 respectively.  And I think Your

24   Honor based your calculation of the Guidelines the last time

25   based on those, but just so it's clear, I am renewing that

1  objection that was sustained previously and has not -- there

2  has been no amended report as of yet.

3          Your Honor, I also objected to the two-level

4  enhancements in paragraphs 34, 42 and 48, and they're all

5  related to the same particular enhancement.  And I -- I

6  apologize, 34 is incorrect.  It should be in paragraphs -- I'm

7  trying to think of what report -- there are enhancements on

8  three of the counts, Your Honor, with respect to 2G1.3(b)(4).

9          MS. MORGAN:  36, 42 and 48.

10          MR. WILSON:  Yes, 36, 42 and 48.

11          THE COURT:  Counsel, I think we might simplify this

12  somewhat if I allow counsel for the Government to address

13  these, because as I recall, the Government agreed to certain

14  modifications proposed by the defendant, and we might be able

15  to address that without any further complication.

16          MR. WILSON:  If that's the case, Your Honor, I would

17  defer.

18          MS. MORGAN:  Your Honor, there was some agreement as

19  to certain enhancements not applying to certain groups.  The

20  Court did rule at the last hearing that the obstruction

21  enhancement did apply to certain groups, and the Government

22  asserts the same reasons in this hearing, that it should

23  continue to apply.

24          If we look at the groups individually, it is the

25  Government's position with respect to Group 1 which relates to

 1    Person 1, that the defense is correct that the two-point

 2    enhancement for custody and control does not apply, and the

 3    resultant offense level for that group is 38.

 4             With respect to Person 2, Group 2, I believe the

 5    parties are in agreement that 36 is the appropriate level.

 6             THE COURT:  Now, do you agree with that, Mr. Wilson?

 7    Because I had originally listed that as 34.

 8             MR. WILSON:  I believe that should be 34, Your

 9    Honor, because I believe the enhancement in paragraph 42, that

10    the offense involved the commission of a sex act pursuant to

11    2G1.3(b)(4) should not apply because the individual in that

12    case was not a minor.

13             MS. MORGAN:  That's correct, Your Honor.

14             THE COURT:  All right.  Group 3?

15             MR. WILSON:  So that -- that should be 34 in

16    paragraph 46.

17             MS. MORGAN:  So it should be 34 for Group 2, Your

18    Honor.  With regard to Group 3, we have the same issue.  That

19    enhancement should not apply, so the ultimate level should be

20    34.

21             With regard to Group 4, the same issue, the two-

22    point enhancement for commission of a sex act should not

23    apply.  And so that group would be a 36.  And Group 5, without

24    the custody and control enhancement, that group is 40.

25             So what that means, Your Honor, is that Group 1 gets

1   one unit; Group 2 gets a half unit; Group 3 gets a half unit;

2   Group 4 gets one unit, and Group 5 gets one unit for a total

3   of four units, which means adding to the highest offense level

4   of 40 results, with a plus-four of 44, minus two for

5   acceptance of responsibility yields an ultimate total offense

6   level of 42.

7           THE COURT:  Counsel, that's what I have as well,

8   exactly that.  Do you disagree, Mr. Wilson?

9           MR. WILSON:  No, Your Honor.

10          THE COURT:  All right.

11          MR. WILSON:  I do renew, Your Honor, the objections

12  as I did in my letter of December 28th, 2018, I renew the

13  objections to the application of the obstruction of justice

14  enhancements that Ms. Morgan had just talked about, and those

15  are with respect to Count 4 and Count 5 or Group 4 and Group 5

16  as they were referred to.

17          If those enhancements were removed, the total

18  offense level would drop down to 40 rather than 42.

19          MS. MORGAN:  I would note, Your Honor, I maintain

20  the position that the obstruction enhancement applies.  Your

21  Honor will recall that in the pretrial motions hearing, Your

22  Honor heard recordings from the FDC of the defendant

23  contacting Victims 4 and 5 in this case --

24          THE COURT:  Which is why I originally overruled the

25  objection that was made.

 1              MS. MORGAN:   Correct.   So the Government maintains

 2       its position that the obstruction enhancement applies.

 3       However, even if it were not to apply, the Guideline range is

 4       still 360 months to life.

 5              THE COURT:   Indeed.   Nevertheless, the Court does

 6       believe it applies, counsel, so the objection is overruled.

 7              MR. WILSON:   And not -- I raise those for the -- for

 8       the record, Your Honor.

 9              THE COURT:   Surely.

10              MR. WILSON:   Your Honor, the last issue that I had

11       objected to that I don't think has been ruled on, because I

12       think Your Honor had indicated previously that you were taking

13       into account that he had gotten a GED at -- at St. Gabe's, and

14       -- but there is an issue with respect to paragraph 77 of the

15       report prepared on June 24th of 2015.

16              It indicates in that -- in the report that the

17       conviction was for carrying a firearm without a license and

18       institutional vandalism.   It shows a Municipal Court number.

19       It says that the arrest was November 19th of 2011, but it

20       shows a Municipal Court number that has a 2006 date on it.

21       However, when you plug in to the computer, the 49-246-2011

22       number, it's a case actually involving an arrest for

23       possession of marijuana for which there was a guilty plea with

24       no penalty.

25              And if there's no penalty, then there's no sentence

1   for which a point should be awarded.  And if no point is

2   awarded, his total point level drops down to nine, not ten,

3   and would put him at Criminal History Category IV and not

4   Criminal History Category V.

5              THE COURT:  And the Guideline range, assuming that

6   that was accurate, would be still 360 months to life, correct?

7              MR. WILSON:  It -- it would not change the Guideline

8   range, Your Honor.  It is significant for purposes of

9   determination of his security level at the -- within the

10  Bureau of Prisons.  And it's also -- it should be -- he

11  doesn't have an additional conviction for a firearm.  It was

12  for possession of marijuana.

13             THE COURT:  Let me hear from the Government on that

14  one.

15             MS. MORGAN:  Your Honor, as indicated in the

16  Government's letter of January 4th, 2019, to the Court, it is

17  not accurate to say that the Guidelines award no points.  It

18  is accurate to say that the Guidelines do not address the

19  issue of a conviction without a penalty, because such an

20  outcome I would suggest to the Court seems highly unlikely,

21  and I'm not sure what the documentation is to support that

22  actual outcome.

23             But in any event, what the Guidelines do speak to in

24  Application Note 3 to Section 4A1.1 as well as Section

25  4A1.2(f), is that a diversionary disposition, in other words,

1    resulting in no actual term of incarceration or probation, is

2    counted where it results from a conviction.

3             And in light of the fact that a diversionary

4    disposition would result in a point being awarded, the

5    Government submits that a conviction with "no penalty" should

6    also result in a point being awarded, because it's essentially

7    the same outcome.  And the Court is correct that even if the

8    defendant has nine points rather than ten, the Guideline range

9    remains 360 to life.

10            THE COURT:  All right.  And the Court understands

11   Mr. Wilson's position regarding at least potentially --

12            MR. WILSON:  It has potential consequences down the

13   line, Your Honor, with respect to his security level

14   calculation.

15            Your Honor, I can hand up a -- Your Honor, I just

16   hand up a copy of the First Judicial District of Pennsylvania

17   Court summary.  I've highlighted it by --

18            THE COURT:  Thank you.

19            MR. WILSON:  -- the conviction at issue.  And I'd

20   like to note I believe the error in paragraph 77 is that the

21   presentence investigator looked up the conviction under the

22   Case Number 49-246-2006.  I did the same and found out that it

23   -- it is for a -- somebody else's conviction.  It is for

24   carrying a firearm.  It is not the conviction of the arrest of

25   2011.

1              THE COURT:  Was not this Judge a Municipal Court

2    Judge?

3              MR. WILSON:  The Judge who --

4              THE COURT:  Segal (phonetic).

5              MR. WILSON:  Yes, Your Honor.  And as you see on

6    there, it's an MC number.

7              THE COURT:  Yes, it's an MC number, a Municipal

8    Court number and not a Common Pleas Court number.

9              MR. WILSON:  And in 2011 carrying a firearm was

10   considered a felony not a misdemeanor anymore.

11             THE COURT:  Surely.  All right.  Counsel, I'll

12   accept that modification.  Again, in terms of the Sentencing

13   Guidelines, it does not affect it.  So that the --

14             MR. WILSON:  My point with respect to the no further

15   penalty, Your Honor, I don't know whether -- the Guidelines

16   Criminal History calculations are based on sentences, not

17   convictions, and there is no indication as to how a conviction

18   with no further penalty should be treated under the

19   Guidelines, whether it should be given points or not.  And I'd

20   say since the Guidelines don't mention that, that no points

21   should be given.  It's not a sentence.

22             THE COURT:  If the Court does not give it a point --

23             MR. WILSON:  It does not change the Guidelines.  It

24   does lower his Criminal History Category from a V to a IV.

25             THE COURT:  All right.  I will accept that

1    modification, and it will be lowered from V to IV.  So,

2    counsel, that is 42, IV?

3              MR. WILSON:  That's -- that's correct, Your Honor,

4    based on the Court's current rulings.

5              And, Your Honor, I would want to make it clear that

6    it is, as an adult, that that -- that listed conviction in

7    2011 is not for carrying a gun, but it is for possession of

8    marijuana.

9              THE COURT:  Well, that's what the sheet --

10             MR. WILSON:  I would ask that that be changed also

11   with -- yes.

12             THE COURT:  -- that's what the sheet says.  So --

13             MR. WILSON:  And if -- Your Honor, if I can take

14   that back, I'll give it to Ms. Santella so that --

15             THE COURT:  That's just fine and so ordered.

16             MR. WILSON:  Thank you, Your Honor.  I think that's

17   -- those were the extent of the objections I had to the June

18   24th, 2015, report.

19             THE COURT:  Very well.  All right.  Having throughly

20   reviewed the report, the Court adopts as its own, the findings

21   of fact and conclusions set forth in pages one through 25 of

22   same with the exception of the adjustments made based upon the

23   Court's rulings on the objections lodged in this record.

24             Now, although the Sentencing Guidelines are no

25   longer mandatory, I recognize that I must consider them with

1   all other factors in fashioning an appropriate sentence

2   consistent with Title 18 of the United States Code, Section 18

3   -- excuse me -- Title 18, Section 3553(a).

4           Accordingly, I must determine what the applicable or

5   arguably applicable Guideline range is, and I must consider

6   the policy statements included within those Guidelines, and

7   having done so, I must determine the facts appropriate for

8   imposing a reasonable sentence in this matter.

9           And this is true whether or not there have been

10  objections made to the report, and that, counsel, under the

11  circumstances, the Court would procedurally allow for any

12  additional argument that needs to be made as well as any

13  witnesses who would appear on behalf of either the Government

14  or the defendant or the defendant's own allocution right.

15          MS. MORGAN:  I don't have any witnesses, Your Honor.

16          MR. WILSON:  Your Honor, there are several people,

17  obviously, who have turned up for -- on behalf of Mr. Jackson

18  and I have indicated to them that they each have the

19  opportunity if they wish to come up and speak to Your Honor at

20  the podium, and I just defer to whoever wants to come up now,

21  just come up one at a time.  You can just approach the podium

22  on that side of the table.

23          COURTROOM DEPUTY:  Good afternoon, ma'am.

24          MS. DeVAUGHN:  Good afternoon.

25          COURTROOM DEPUTY:  I'm going to ask you to state

1    your full name, provide the spelling of your last name for the

2    record.

3                    MS. DeVAUGHN:  Tamika DeVaughn, D-E-V-A-U-G-H-N.

4                    COURTROOM DEPUTY:  Can you raise your right hand.

5                    TAMIKA S. DeVAUGHN, DEFENDANT'S WITNESS, SWORN

6                    COURTROOM DEPUTY:  And you're Mr. Jackson's mother?

7                    MS. DeVAUGHN:  Yes.

8                    COURTROOM DEPUTY:  Thank you.

9                    THE WITNESS:  Good afternoon, Your Honor.

10                   THE COURT:  Good afternoon.  For the record, the

11   Court has received a written communication from one Tamika S.

12   DeVaughn, dated September 10th, 2019.  Is that you, madam?

13                   THE WITNESS:  Yes.

14                   THE COURT:  Has counsel for the Government received

15   or seen this?

16                   MS. MORGAN:  Yes, Your Honor.

17                   THE COURT:  All right.  Madam, I'll hear from you.

18                   THE WITNESS:  Okay.  Good afternoon, first of all.

19                   THE COURT:  Good afternoon.

20                   THE WITNESS:  I want to thank you for just allowing

21   us to come back before you.  I know that Jerel has done things

22   and he has consequences for his actions.  However, I just

23   wanted to let you know that he is not the person that appears

24   on that paper, all of -- all of it.

25                   So I'm just asking you to please have some leniency.

1    I know you're going by your Guidelines.  I was listening very

2    carefully, but I'm just asking you to have some leniency,

3    because that is my son and I love him and I would love to

4    see him back in his family at some point in his life and my

5    life.

6              30 years is a lot for anybody.  I don't excuse

7    anything that he may have done, but it's so difficult for me

8    -- it's so difficult for me.  He's my only son and I just love

9    him and I want him to do the right thing.  Always I have --

10   but I have -- I raised him by myself.  And, again, we don't

11   come from a bad family.  He made some bad mistakes, but he has

12   a lot of support, and we're all willing to -- we want to help

13   him do better and do the right thing.

14             And I don't understand all of this legal stuff, but

15   I just know that I miss my son and I can't see him and it

16   hurts really bad.  I just don't know what else to do.  I just

17   -- I just beg for your mercy to please have mercy on my family

18   because we miss him a lot.

19             And even being down here in Center City, they --

20   something went on at the -- at the prison, and I haven't seen

21   my son since May 11th when my aunt passed away, and I went to

22   see him and he was, you know, in the SHU for whatever reason,

23   I don't know.

24             But they have not let me see my son since.  I

25   haven't hugged my son, touched my son or anything.  So it's --

Statement of Ms. DeVaughn                                    20

1    it's so hard for me because when he finished being sentenced,

2    they want to send him away far, so I'm still not going to see

3    him.  And I've written letters and did everything that I

4    possibly could do and I'm still not getting any results.

5              So I'm just asking you to just consider whatever you

6    can consider to help me and my family and his daughter.  I

7    didn't bring her because I didn't want her to hear any of this

8    or see her dad like that, but she's 13 and she needs him, too.

9              That's all.  Thank you.

10             THE COURT:  Thank you, ma'am.

11             MR. WILSON:  Thank you, Your Honor.

12             THE COURT:  For the record, the Court has received

13   communications in writing from Natia or Natia L. Brown

14   (phonetic), Samira Martin (phonetic), John and Rene Brown,

15   Rosetta Meares (phonetic) and Edward H. Louis.  These letters

16   will be incorporated into today's record.  I will not read

17   them onto the record, but they will be incorporated into the

18   record and made a part of the record.

19             In pertinent part, each one speaks to supporting Mr.

20   Jackson, their history with Mr. Jackson and their request for

21   leniency and understanding in sentencing of Mr. Jackson.

22             Mr. Wilson?

23             MR. WILSON:  Thank you, Your Honor.

24             Your Honor, I sent a sentencing memorandum, a short

25   sentencing memorandum some time ago.  One of the things that I

1    did not mention in the sentencing memorandum, and I would

2    start off with is, some things have changed since my client

3    appeared before you last aside from the reframing of the

4    Sentencing Guidelines, the applicable Sentencing Guideline

5    range.

6              My client has been actively involved in classes

7    while in custody, and the Supreme Court has recognized that

8    Your Honor can consider post-offense rehabilitation.  It's --

9    it's hard when you're in prison, especially when you're in

10   detention as opposed to being in prison as a sentenced inmate,

11   and he's been in detention essentially since the -- since he

12   was sent back here as a result of the Third Circuit decision.

13             I hand up to the Court a print-out of the classes

14   that he's taken while he's here, and -- and I find it somewhat

15   remarkable simply because I do have clients who tell me, oh,

16   there's no classes available to detainees over at the Federal

17   Detention Center and yet my client has managed to find a

18   number of classes that -- and completed those classes.

19             Most involve -- I think about seven or eight of them

20   there involve efforts to qualify for a CDL license and he has

21   indeed qualified for a CDL license while he's been in custody.

22   He also has taken the first level of Spanish courses and

23   completed that to try and learn Spanish as a second language.

24             He has not been sitting around doing nothing while

25   he's in custody and I would ask the Court to take note of

1    that, that he is somebody who's interested in improving

2    himself in making up for the educational deficits that he had

3    as a youth.

4           And the -- the report really mentions very little

5    about his education other than that at one point he was sent

6    to St. Gabe's as a juvenile, and while at St. Gabe's, as Your

7    Honor has found, he earned a GED there.

8           So when he went to school, when he had structure, he

9    -- he did fairly well.  He certainly did better than he was

10   doing when he didn't have the structure, and this is a man who

11   grew up without much structure in his life other than the time

12   that he was at St. Gabe's.  He has -- and so those are all

13   characteristics that the Court can take into account and what

14   he's done since.

15          There is a need for punishment.  Obviously, 3553(a)

16   speaks to that.  There's a need for creation of respect for

17   the law, and there's a need for deterrence of others,

18   deterrence of Mr. Jackson.  I would suggest and I recognize

19   that this was suggested to Your Honor in the prior sentencing,

20   but 15 years mandatory in this case -- or the mandatory in

21   each of the -- on a couple of the counts -- is an extensive

22   period of time for -- especially somebody who is in his

23   thirties.

24          It's an amount of time that would allow him to

25   continue to improve himself, to give himself employable skills

1    when he gets out.  And I recognize that he had no history of

2    employment coming in.  It -- it allows him to reflect on what

3    he has done wrong.  It takes him away from society for a

4    substantial period of time.

5              It doesn't appear that there is any need to sentence

6    him beyond that 15 years other than punishment for the

7    seriousness of the offenses.  And I would challenge that it's

8    even necessary to go beyond the 15 years for that in this

9    case.

10             One of the things that my client will tell you is

11   that he has been cooperating with Klein and Specter.  He was

12   contacted by one attorney from there, and he's been

13   cooperating with them in a lawsuit that they have for women

14   who were child victims.  They're suing the hotel or the motel

15   up on Roosevelt Boulevard where much of this activity has

16   occurred, and my client has been cooperating with them in

17   their representing the plaintiff victims in that case.  He is

18   somebody who is seriously interested in turning his life

19   around.

20             Even a sentence of 30 years, he will very likely get

21   out some day, that he -- that he will be in his fifties when

22   he completes a 30-year sentence.  And so the question is what

23   -- what does society need in terms of punishment from him that

24   would cause him to be released in his thirties rather than his

25   -- in his fifties rather than his forties when he would not

1    have been so far away from society that he can't become a

2    contributing member?

3              It's much, much harder for a man in his late fifties

4    to get a job than it is for a man in his forties to -- to get

5    a job.  I would just suggest that that's a factor that needs

6    to be considered in what is the amount of time that is

7    sufficient but not greater than necessary to meet the goals of

8    sentencing in this case.

9              He is -- he is trying -- he has demonstrated so far

10   that he is trying to change his life.  He recognizes that he

11   must be punished.  He recognized that he was pleading guilty,

12   when he was pleading guilty, that Your Honor had to sentence

13   him to 15 years and so he was pleading guilty to a lot of

14   time.

15             And he is trying to do things to -- to make things

16   better, not just for the -- for himself and for his family,

17   but also for the people who were victimized in his activity

18   and others who were operating in a similar fashion to him.

19             For all of those reasons, I would suggest a sentence

20   well below the 30 years that was previously imposed, and I --

21   you know, I respect Your Honor's view on all this, but I would

22   suggest that 15 years is a lot of time, and it -- and it could

23   easily be characterized as sufficient but not greater than

24   necessary to meet the goals of sentencing in this case.

25             Thank you.

1    THE COURT:  Thank you, sir.

2    Mr. Jackson, you have a right of allocution.  If you

3 wish to say anything to me, you can at this time, sir.

4    THE DEFENDANT:  All right.  Good afternoon, Your

5 Honor.

6    THE COURT:  Good afternoon.

7    THE DEFENDANT:  Okay.  I'm back before you to be

8 sentenced once again.  This time around is much different for

9 me.  I've grown in so many ways and experienced so many

10 different things over the past few years.

11    I learned a lot about myself and others and how to

12 appreciate the people in my life who truly cares about me.  It

13 took a long time, but at this point in my life I'm just

14 learning how to live all over again, because, clearly, the way

15 I was living before was incorrect.

16    If you could remember, the last time I was in here,

17 my family and friends packed this courtroom for about two days

18 straight.  Today a lot of those people are no longer in my

19 life.  I lost a lot of people to the test of time.  Some of

20 these people has even died and I'll never get to spend time

21 with them again.  But I lost a lot of experience as far as my

22 relationships with my friends and family.

23    Most of all, I lost myself emotionally and mentally.

24 I'm not the same person.  And, of course, it's not a totally

25 bad thing, sometimes -- but sometimes it's hard to acknowledge

1    all the good I've done as well when it feels like I'm just

2    doomed from life for what seems like forever.  But a lot of

3    that change has to do with my new growth and a lot of that has

4    to do with the time I was given.

5                I act strong of body, but honestly, emotionally and

6    mentally, it broke me, it broke my spirit, all because of some

7    bad decisions I made and now I'm the one that has to live with

8    this pain.  To make up for my sins, though, I try to help

9    people in many ways that I can.  I try to encourage the

10   younger people to live better and not feed into the hype of

11   the so-called easy route because it pays off in hard time and

12   the price isn't worth it.

13               I can't change my past, and I am truly ashamed for

14   ever contributing and to hurting anyone because now I just try

15   to live in peace.  But like I said before, I'm so far removed

16   from the person that I once was that I barely recognize myself

17   in the mirror.

18               You told me at my last sentencing that you can kill

19   the spirit of a person and they can still walk this earth.  No

20   disrespect, Your Honor, but that's what I felt like you did to

21   me when you sentenced me to 30 years.  It didn't hit me right

22   away, but when I got places and saw how bad it was, how

23   miserable and dangerous it was, how groups of people would

24   literally go to war with each other over the tiniest things

25   that don't even matter is when it hit me.

1      Now, and that mixed with losing my friends and
2  family, you know, it just killed me.  I realized that this is
3  my reality, and there's a strong possibility that I might not
4  make it home.  I could be hurt or even be forced to hurt
5  someone else just to save my own life.  And that reality is
6  psychologically disturbing.  It haunts me -- not a dream but
7  my reality.
8      It's programs in the prison, but there is no true
9  rehabilitation in these places and it's sad for those of us
10  who really want help, want to practice integrity, so we can
11  get out, be productive, live right, show the growth for the
12  people that doubted us as well as prove it to ourselves.  But,
13  unfortunately, these places either make your heart cold --
14  colder or they drive you crazy.
15      If I do 20 more years of this, I don't know what --
16  what I might do -- I mean, what I might do when I get home.  I
17  be like a war vet or something with PTSD.  It's designed for
18  me to fail, and that's only if I make it home with my sanity
19  and/or my health.  The rehabilitation is within the person not
20  the prison, and I can honestly say that I'm striving to do
21  better.
22      Yes, sometimes things happen in jail and I
23  periodically slip up, but my goal is to wake up every day a
24  better person than I was yesterday.  It takes -- it's hard
25  work and an earnest effort.  Now, I understand -- now, I

1    understand I did not, you know, assist the law enforcement in

2    any way and I can't get less than my mandatory minimum of 15

3    years.

4              But I did tell my story to the civil lawyer from

5    Klein and Specter that my lawyer -- Mr. Wilson was talking

6    about who represents young women who were allegedly

7    prostituted as minors in the civil suit against the Days Inn,

8    Roosevelt and different hotels including but not limited to at

9    least one of the victims on my case.  I figure financial

10   compensation for my victim and all the other victims that the

11   lawyer represents is a start.

12             And the hotels, he goes out there, loses their money

13   and gets shut down, and that's another step in the right

14   direction of stopping prostitution in places that enables you

15   with children to work as prostitutes.  I'm already doing my

16   time and now I'm just trying to do my part.

17             I will hope you consider my effort when making your

18   decision.  Your Honor, I'm already doing better mentally.  I

19   want to come home some time in the near future or whenever so

20   I can prove that I can do better for real.  I been programming

21   and I received all my hours and a certificate for my CDL, so I

22   will be able to seek employment in that field upon my release.

23             And, of course, I'll keep trying to better myself

24   day by day.  I ask that you allow consecutive terms of 15

25   years to run concurrent with the others.  I feel like that

1    still would protect the integrity of the public, set the

2    standard, 15 years is a long time and that will deter people

3    from wanting to, you know, be involved in this field of

4    prostitution and things like that.

5            Again, I assure you that I'm done living a life of

6    crime.  This isn't for me anymore.  When you last departed

7    from my life sentence Guidelines, you gave me 30 years, and I

8    appreciate that, because if not for that time, I'm not sure if

9    I would have grown up so quickly and I really probably

10   wouldn't have had to -- if I didn't have to feel that pain,

11   I'm not sure I would have been thinking the same way I think

12   today, and I'll -- I'll be, you know, moving in my life.  So I

13   thank you for that.

14           I know life is precious and I would like to share

15   some of my youth with my children and the rest of my family

16   again.  So once again, I just ask that you depart from the

17   Guidelines and consider running the sentences concurrent which

18   would bring me to my mandatory minimum.

19           And I also ask for your recommendation to be

20   transferred to FCI Fairton due to the sensitive nature of my

21   case.  Plus there's additional programs there that I want to

22   take, and that's the closest yard with these programs in this

23   region.  That recommendation would go a long way and be very

24   helpful in my rehabilitation.

25           Thank you, Your Honor.  I have nothing further.

1            THE COURT:  Again, for the record -- and thank you

2      very much -- Counts 1 through 5, each carry a mandatory

3      minimum term of incarceration of 15 years and a maximum term

4      of life in prison, a five-year minimum period of supervised

5      release, a maximum term of lifetime of supervised release, a

6      maximum $250,000 fine and a mandatory $100 special assessment

7      per count.

8            The total sentence is a mandatory minimum of 15

9      years in prison or 75 years if run consecutively, a maximum of

10      life in prison, a five-year minimum period of supervised

11      release, a lifetime term of supervised release, a maximum of

12      $1,250,000 fine and a $500 special assessment.

13            The Court will now readdress the considerations

14      which the Court is required to do pursuant to Title 18 of the

15      United States Code, Section 3553(a).  I refer to the advisory

16      Sentencing Guidelines which are a major factor that the Court

17      must consider in fashioning an otherwise discretionary

18      sentence.

19            Section 3553(a) directs that the Court, in

20      determining the particular sentence to be imposed, shall also

21      consider the nature and circumstances of the offense and the

22      history and characteristics of the defendant, the need for the

23      sentence imposed to reflect the seriousness of the offense, to

24      promote respect for the law and to provide just punishment for

25      the offense, the need to afford adequate deterrence to

1    criminal conduct and to protect the public from further crimes

2    of the defendant, the need to provide the defendant with

3    needed educational or vocational training, medical care or

4    other correctional treatment in the most effective manner.

5          I must consider the Guidelines and policy statements

6    issued by the United States Sentencing Commission as well as

7    the need to avoid unwarranted sentence disparities among

8    defendants with similar records who have been found guilty of

9    similar conduct.

10         And I pause here because I reflect back on another

11   defendant in another case who I, for the same charges with

12   somewhat different circumstances, imposed a sentence of 100

13   years in prison.  Restitution is not an issue in this case.

14         I have painstakingly reviewed all of the relevant

15   sentencing factors contained in the Presentence Investigation

16   Report, the memoranda submitted by both defense counsel and

17   counsel for the Government, the defendant's statements of

18   allocution as well as the statements of his mother this

19   afternoon which I appreciate and all of the letters that were

20   written to the Court in support of the defendant.

21         The Court notes that Mr. Jackson is before it to be

22   resentenced for serious and frankly outrageous criminal

23   conduct toward various females, some juveniles.  This matter

24   involves at the time a 29-year-old defendant who incurred

25   seven adult convictions including the conviction for this

1  offense.   His prior offenses involved distribution of

2  controlled substances, drugs, carrying a firearm without a

3  license and various theft offenses.

4       The Court does note that Mr. Jackson's first arrest

5  occurred at age 14.   This resulted in a juvenile adjudication

6  with a placement outside of his home.   He had five additional

7  juvenile adjudications which included placement in various

8  juvenile institutions including St. Gabriel's Hall, the

9  Abraxas Foundation and the Youth Detention Center at Danville,

10  Pennsylvania.

11       I am intricately familiar with all of those as I was

12  a Public Defender and Chief of the Family Court Division for

13  the Public Defender's Office for many years.   I know all of

14  these institutions and I know why children are sent to these

15  institutions, particularly Danville.

16       The record has reflected that Mr. Jackson has no

17  verifiable employment history.   However, he has no mental

18  health issues which need to be addressed while incarcerated,

19  and the Court is sensitive to what Mr. Jackson has articulated

20  in terms of the wear and tear frankly emotionally on anyone

21  who's incarcerated.   I note that the record indicates that he

22  has a history of substance abuse which should be treated while

23  incarcerated.

24       The Court has never and will never pass moral

25  judgment.   I say that as a preface to the following sentence

1   because this is simply a part of the record, and that is, the

2   defendant has fathered two children with two women and has not

3   consistently participated in their rearing but understandably

4   so.

5           I do not know whether or not the defendant has in

6   any way financially supported these children, whether he was

7   not in custody or in custody.  I note that I had a defendant

8   appear before me not too long ago who put away virtually

9   everything he made while in prison and had a substantial

10   sentence and sent it to his children.

11           In this case, the defendant's conduct in these cases

12   is most disturbing.  It was violent and merited the sentence

13   that the Court considered initially.  The best that this Court

14   can surmise from looking at this defendant's record prior to

15   his articulation today about his change in life, at no time in

16   his adult life had he made an effort to conduct himself in a

17   law-abiding manner.

18           The pre-eminent concern pursuant to Title 18 of the

19   United States Code, Section 3553(a)(2)(C) is for the Court to

20   consider the protection of the public and the punishment of

21   Mr. Jackson.  As I stated at the original sentencing in this

22   case, the need for incarceration in this matter is increased

23   when considering the nature of the offense, the degree of harm

24   and the conduct with respect to the counts of conviction.

25           I'm now tasked with fashioning a sentence that must

1    take into account all of the factors that I've just

2    referenced, but I must also take into account the content of

3    counsel's argument for the defendant in terms of his current

4    situation and his accomplishments to date while incarcerated,

5    and I say accomplishments, because they are an indication that

6    you've done a lot to change in the limited fashion and the

7    limited manner that you had an opportunity to do so.

8             A significant sentence well in excess of the

9    seriousness that portends in this case was considered by the

10   Court which initially was to give consecutive sentences for

11   all of these counts.  The Court gives the defendant the

12   benefit of a more humane treatment than he gave his victims.

13   However, a sentence of a significant period of incarceration

14   is justified.

15            I have weighed the following:  The arguments of the

16   Government that, "The depravity of the crimes in the instant

17   case cannot be overstated.  Jerel Jackson directed atrocious

18   physical abuse toward his victims, demonstrating the hazard he

19   presents to society.  The defendant frequently resorted to

20   violence if he believed that any of the females withheld money

21   or were reluctant to work.  To verify that the young women

22   gave all their earnings to him, he would make them strip down,

23   squat and cough for internal inspection, sometimes even

24   manually searching their vaginas for money.

25            "The defendant had a belligerent and explosive

1    temper which frequently resulted in him punching, slapping,

2    choking and kicking the victims.  To mandate compliance with

3    his rules, the defendant on several occasions threatened

4    victims with a gun and used a taser weapon on some young women

5    and he once burned a victim on the face with a hair

6    straightening iron.

7              "Mr. Jackson numbed the victims to their tragic

8    consequences and circumstances by plying them with PCP,

9    marijuana and prescription pain killers.  He also required

10   them to have sex with him and impregnated one of the victims.

11             "His egregious disregard for these women stepped

12   beyond mere pimping for quick cash, repugnant in and of

13   itself, but into the realm of the insidious and frivolous

14   abuse of vulnerable women and girls, forcefully prostituting,

15   beating, drugging and coercing three young women and two girls

16   to have sex with numerous men requires a unique form of

17   maliciousness.  So, too, does burning someone with an iron as

18   punishment, using a taser weapon on another person as a form

19   of torture or impregnating a 16-year-old girl.

20             "The defendant's particular brand of cruelty has

21   indelibly scarred his victims mentally, emotionally and in

22   some cases physically.  His volatile nature and aggressive

23   behavior forced these victims to live in a state of fear and

24   they suffered irreparable damage to their psychological and

25   emotional well-being by having sex with numerous strangers

1   under duress.  Undoubtedly, the traumatic time with the

2   defendant left their self-worth and dignity in tatters and

3   will encumber their psyches for the rest of their lives.

4           "As for the history and characteristics of the

5   defendant, simply put, Mr. Jackson has been a poster child for

6   recidivism.  At 29 at the time of the initial sentencing, he

7   had never held a legitimate job and relied on a violent life

8   of crime to finance his existence."

9           The Court does not punish Mr. Jackson for the things

10  that he was arrested for or did in his preteen years.  The

11  Court is acutely aware of the circumstances in which he grew

12  up, but, nevertheless, there are so many people who have said

13  they grew up in the same circumstances, but they knew right

14  from wrong.  Fatherless or motherless or friendless, they knew

15  right from wrong.

16          The Court is cognizant of the arguments of his

17  counsel, essentially, that there is little extrajudicial

18  history that appears in the records beyond the criminality of

19  his youth.  His counsel has argued that he started life as the

20  only child of a 16-year-old mother and an incarcerated father

21  and that he did not meet his father until his father was

22  released from prison when Jerel was 17 years of age.  He has

23  described him -- yes, sir.

24          THE DEFENDANT:  Your Honor, that's wrong.

25          THE COURT:  What's wrong?

 1                THE DEFENDANT:  That part right there.  I been with

 2     my Dad since I was a kid.  My Mom was 17 when she had me.

 3     That's wrong.  The employment history is wrong.  I had

 4     multiple jobs.

 5                THE COURT:  I will give you the time right now to

 6     tell me -- tell me exactly where I was wrong, and I want you

 7     to do that.

 8                THE DEFENDANT:  Okay.

 9                THE COURT:  I have no problems with that.

10                THE DEFENDANT:  Thank you.

11                THE COURT:  Yes, sir, go right ahead.

12                THE DEFENDANT:  Yeah, I -- I worked at multiple

13     jobs.  I started working when I was a kid.  I worked for my

14     uncle, he right there.  He had a store in the Reading

15     Terminal.  I worked for him when I was a kid.  I worked at

16     Northeast Glass and Windows.  I had plenty of jobs.  I worked

17     at Blockbuster.  I told Ms. -- Maxine that I had plenty of

18     jobs and she wrote whatever she wanted to write.  I told them

19     I had jobs.

20                A lot of the stuff that we talking about that's -- I

21     don't know, it supposed to be statement of facts.  As far as

22     me doing things to these girls, that is not true, and I'm

23     offended that you be keep repeating the same stuff.  It's

24     hurtful that they gotta stand here and hear the stuff that I

25     know I didn't do.

1          Like, I -- and I said that in my last hearing.   I

2     said I'm guilty of some of the things on some of the charges.

3     Like, I admitted to some things, but I pled -- but we

4     understood why I pled.   I said I was guilty for some things,

5     but I never burnt anyone.   I never used a taser against

6     anyone.   I didn't sedate nobody to do none of this crazy

7     stuff.

8          You're judging me on what you was just reading.

9     That sounds like a horrible person.   I did none of that.

10    Like, you know what I mean, I was involved in the

11    prostitution, I admitted that, but I was -- I was part of

12    that.   But I didn't physically abuse none of those girls like

13    I said I did -- like I said I did not last time in the same

14    courtroom at sentencing.   I said that last time.

15         There's just certain things I wouldn't do to women.

16    I was raised by women.   You know, I got a daughter, and I'm

17    not going to do certain things to females as -- or not even

18    males that can't do something to stop.   Like, I wouldn't take

19    advantage of a man that couldn't do nothing about it.   Like, I

20    wouldn't do things like that.

21         All right.   So everything that they saying and as

22    far as the prosecution saying that I did, as far as that, I

23    didn't -- like, I'm not going to say everything that she

24    saying is not -- is not true.   But it's -- it's not true what

25    she was saying about me -- I wouldn't -- I didn't burn anyone,

1  I didn't tase anyone.  I didn't -- I didn't do a lot of this

2  stuff.  And I'm sitting here and I'm taking it, you know,

3  because this -- this is how it goes.  But, honestly, I didn't

4  do a lot of these things that I'm saying -- that they saying I

5  did.

6           I'm accepting responsibility for what I did do.

7  What I did do is I was involved, period, which was wrong, and

8  I shouldn't -- and I shouldn't have been involved.  I should

9  have did better, and I made my mistakes.  But you -- but I'm

10  not going to sit -- you know, sit here and just, like, keep

11  letting it roll when I know I didn't do what they saying I

12  did.

13           And I pled out.  So now after I plead guilty for --

14  because I was going to lose anyway back at the time, you know,

15  I was superseded on -- on February 5th.  I went to trial.

16  Well, went for picking a trial on March 18th.  I remind you on

17  March 16th at the suppression hearing, I asked to continue

18  this for the 30-day thing, for the -- whereas, Contreras case

19  law, 3161(c)(2), amended act of 1979 about the 30 days or

20  whatever.

21           We had an argument back and forth.  I studied all my

22  transcripts repeatedly.  Like, I know everything that was said

23  in all the -- all the court proceedings that we had.

24           You ruled in the Government's favor as far as that,

25  didn't grant me a continuance on March 16th, 2016.  The trial

1   was to commence two days later.  Still wasn't at my 30-day

2   mark.

3          I pled out.  I was going to lose anyway.  Remember I

4   told you when I -- I had Thomas Burke and we had a little

5   quarrel in your courtroom and I asked to dismiss him, because

6   he told me that he did not have a defense for me at that time

7   at all.  We was going to lose so I should plead out and he

8   could try and get me back, Rule 35, this, that and the other.

9   He wanted me to take that -- the lesser of the two evils,

10  which I did.  I was going to lose anyway.

11         I had three weeks to prepare for two brand-new

12  witnesses that we didn't even have -- we didn't even know

13  exactly what he was in the beginning.  And then don't know

14  what they saying or what I'm being charged with at all when it

15  comes down to these girls.  So I'm just saying that to say I

16  just want you to know, you know, I mean, how I feel about it.

17  You know, honestly, like, I'm trying.

18         I go through a lot in jail or whatever.  I mean,

19  I've been -- I've been change my life.  I work real hard at

20  that, of being a positive person, like, that's my whole thing

21  right now.  I try to help other people and everything.  I do

22  this all the time, like, this is me.  I'm a good person.  I

23  mean, I made some mistakes.

24         That stuff that you saying I did right there that

25  she said I did, I didn't do.  And I just want you to know that

 1   in making your decision or -- or whatever.  Because the person

 2   that you just read off to me in this courtroom, that's

 3   embarrassing to me, for my family sitting right here listening

 4   to that, and I know I didn't do that.  Like, that's

 5   embarrassing.  I can't -- I can't sit for that.

 6          Like, so I just -- I just felt like I had to say

 7   regardless of what sentence you impose today, I just want you

 8   to know how I felt about this situation, like, and I'm asking

 9   him to object right now, but he wasn't.  So I felt like I had

10   to sit up to say something, and I don't like that.  I didn't

11   do that and I wouldn't do that, you know what I mean.

12          What I did do, is I was involved in the

13   prostitution.  I was wrong for that, but I'm doing my time and

14   it hurt.  I got a 13-year-old daughter, I got a lot going on.

15   I got two sons.  I don't even know where one of them is, and

16   the other one was taken by DHS.  There's a whole lot going on

17   that derived from this case right here.

18          When them agents was putting the press on -- when --

19   when it was pretrial, and they got my DHS involved and they

20   took my son.  So now I'm still going through stuff with that.

21   There's a whole lot going on that derived from this case, and

22   these agents and the prosecutor doing what they want to do and

23   saying I -- making this look good for theirselves, and, of

24   course, they make me look bad in the midst of it.

25          If somebody was doing all that, and that's horrible,

1  and they should be punished, like, very bad even if it's me,

2  but I ain't ever owned a taser.  I never even used a taser in

3  my life.  Why would I burn somebody with an iron on your face?

4  I wouldn't do nothing like that.  That's not me, and I didn't

5  do that.  And I just want you to know that.  And I'm sorry.

6  I'm going to shut up, but I was a little bit upset about that.

7          THE COURT:  You can speak whatever you feel that you

8  need to speak.  I told you before.  I will always give you

9  that respect.

10          THE DEFENDANT:  Yeah, I didn't do that.  And I'm

11  still to this day -- and I know I'm here and I supposed to get

12  the points for acceptance and I accept it that what I did was

13  wrong.  I'm not going to accept something I didn't do.  I

14  didn't do that.  I wouldn't do that.  And they didn't have a

15  girl that say I did that.

16          It was being testimony in the Grand Jury.  She said

17  you got a burn up on your face.  Did Jinx do that?  The girl

18  say yes.  The girl had bangs.  She a white girl with bangs and

19  she was curling her hair.  She had bangs in the front of her

20  head.  She had a little mark in the front of her face.  I seen

21  the picture in the Jencks material at the suppression hearing.

22  She had a mark right here between her eyebrows.

23          I'm supposed to have burned her hair with a curling

24  iron?  That don't make sense.  That's not what I do.  That

25  same girl was here at the last sentencing.  Why didn't she get

1    up and say it then?  Because it didn't happen.  It's not true.

2          She a liar -- she's a liar.  You know what I mean,

3    they lie to me -- they came -- they do what they supposed to

4    do.  People lie.  Everybody not honest all the time.  Like,

5    I'm already -- I did what I did.  You know what I mean, I'm

6    doing my time.  You know what I mean, I'm doing my time, I'm

7    doing my part, I'm trying to do better.

8          I'm doing everything I can do, but I am not -- I

9    just don't want to sit here and keep being told I did

10   something that I didn't do and it's all in my transcripts and

11   my family got to sit here and listen to this.  This is

12   ridiculous.  I'm done.  Thank you.

13         THE COURT:  Very well.  Now, for your benefit or as

14   a reminder and to those who were not here during the course of

15   the guilty plea in this matter, it is this Court's policy for

16   the last 31 years as a Judge to do what's called a guilty plea

17   colloquy on anybody who pleads guilty -- everybody who pleads

18   guilty.  And during the course of that colloquy, I ask a lot

19   of questions including your guilty plea.

20         At the time of that guilty plea colloquy, I asked

21   not only were you satisfied with the representation your

22   counsel had provided you up to that point in time, but at the

23   conclusion of the Assistant United States Attorney reading to

24   this Court and into the record the facts that they could have

25   proven had this case gone to trial, I said, "Mr. Jackson,

1   you've heard the facts as read by the Assistant United States

2   Attorney.  Do you fully admit to those facts?"

3            And do you remember your response?

4            THE DEFENDANT:  Actually, yes, I do.  I read it

5   plenty of times.  You asked me, "Do I still wish to plead

6   guilty?"

7            You asked me before then, "Was I pleading guilty?"

8            I said, "Yes, I still want to go through with the

9   guilty plea."

10           You said you lose these rights, this right, that

11  right, the right to go to trial.  I said, "Yes, I agree, I

12  agree."

13           Yeah, she did the stipulation of facts after I said

14  I was pleading guilty.  You said, "Okay, hearing that, you

15  still want to plead guilty?"

16           "Yes, I still want to plead guilty."  I can't --

17           THE COURT:  And did I ask you why you were pleading

18  guilty?

19           THE DEFENDANT:  Yes, you did.

20           THE COURT:  And what did you tell me?

21           THE DEFENDANT:  You said, why are you pleading

22  guilty, Mr. Jackson?  I said, excuse me, give me a second.

23  You said, go ahead, consult with your attorney.  I sat back

24  and I talked to Tom because Tom the one that told me to plead

25  guilty that day because he said he had no defense.  He told me

1   what to say.  He told me how the colloquy would go and he told

2   me what to say.  He told me, take a second --

3             THE COURT:  Now, let me just stop you right there.

4   You're speaking awfully fast and I'm giving you full

5   opportunity to do that.  But as I said before, I have mine

6   down pat.  I know what I ask every defendant including you,

7   and I specifically asked you why you were pleading guilty --

8             THE DEFENDANT:  I said because I am guilty, right.

9   I asked my -- you told to consult with my attorney -- I got

10  the transcripts, too.  You said take your time, talk to your

11  -- you seem like you need to talk to your attorney.

12            I asked him, I said, Tom, I said why am I pleading

13  guilty?  He said just tell him because you are guilty.  I

14  said, "Because I am guilty."

15            And that's -- and that's how that went, and I got

16  the transcript.  I read it 50 times.

17            THE COURT:  And did I ask you how old you were and

18  how far you went in school and if you were under any kind of

19  duress or coercion to plead guilty?

20            THE DEFENDANT:  Yes, you did.  I said no.

21            THE COURT:  I asked you all of those questions, not

22  just you, but I ask everybody that, because I am determined as

23  a Judge to be the way that I used to say when I was a Public

24  Defender, and that's fair --

25            THE DEFENDANT:  I think you're a fair Judge.

1          THE COURT:  -- and respectful of everybody who comes

2    here.  So I'm saying to you this.  I was not there.  A jury is

3    not really there in terms of where things happened.  They can

4    only go by what is given in sworn testimony in a courtroom.

5    They assess the demeanor of the witnesses.  They listen --

6    they listen to the law, and they go behind that door and they

7    make a decision.  They do the best they can with what they

8    have.

9          You elected to give up that right and to go before

10   this Court and enter a plea of guilty after an extensive

11   colloquy of asking you all kinds of questions to make sure

12   that you knew what you were doing.  And I specifically asked

13   you as I ask everyone, "Did anyone tell you what to say today

14   or put words in your mouth?"

15         And you said, "No."

16         Now, today you're changing that.

17         THE DEFENDANT:  No, I'm really not, no.  I don't

18   want to be misunderstood.  I'm really not trying to -- I'm

19   really not trying to change it because like I say, I -- I

20   still would say I'm guilty of -- of the crime.  What I'm

21   saying is, the specifics.

22         I didn't -- I didn't listen to her colloquy and then

23   want to break down every -- I mean, listen to her statement of

24   facts, what she said that she would have proved -- she said

25   the Government would have proved this.  I didn't go into --

1    oh, well, I didn't do that, but I did that, I didn't do that,

2    I didn't do that.  That wasn't me.

3              THE COURT:  But you could have if you had wanted to.

4    You could have had a trial if you had wanted to which is the

5    whole point of a colloquy.  And I specifically asked you the

6    20-some questions --

7              THE DEFENDANT:  Right.

8              THE COURT:  -- "Do you fully understand" --

9              THE DEFENDANT:  Yes.

10             THE COURT:  -- "that you have a right to 12 people

11   seated -- sitting over there?"

12             THE DEFENDANT:  Yeah, you did.

13             THE COURT:  "Do you understand that you have a right

14   to testify, you have a right not to testify?  Nobody could

15   force you to testify if you didn't want to."

16             I told you that, "Even if you have a trial and you

17   chose not to testify that neither I nor the U.S. Attorney

18   could say anything that would allow that jury to infer

19   anything adverse to your interest because you elected not to

20   testify because it's a Constitutional right."

21             I went also the extra step to tell you on that

22   record that, "If you chose not to testify at the trial, the

23   jury couldn't even infer anything adverse to your interest,

24   and I would give them the law and tell them that they could

25   not do so because it's a Constitutional right that we all

 1    share, the right against self-incrimination."

 2              So my point simply is this.  The reason why I asked

 3    you all those questions on that date was to find out if you

 4    knew what you were doing, if you were pleading guilty because

 5    you wanted to and not because anyone forced you to and because

 6    you heard what the definitions of the crimes were and you pled

 7    guilty because you were guilty of having committed each of

 8    those counts and each one of those -- each one of those

 9    offenses in each one of those counts.

10              And everyone goes over that with you in terms of do

11    you plead, how do you plead?  And to each one of those you

12    responded guilty.  Now, you can't plead guilty to an element

13    of an offense if you didn't do it.

14              THE DEFENDANT:  But, Your Honor, I mean, in my shoes

15    sometime -- I would say I felt like I had to.  Like, do you

16    understand?  Like, I mean --

17              THE COURT:  But I asked you all those questions, Mr.

18    Jackson, to make sure that I was satisfied that you did not do

19    things that you did not want to do in terms of pleading

20    guilty.

21              Now, I can't debate this back and forth with you,

22    and I'm trying to be very respectful of what you're saying to

23    me, because listen to me, I'm telling you right now, I would

24    not want to be sitting there myself.  Okay?  And I'd probably

25    be just saying what you are, okay?  Especially having been

1   there already.  It's human nature, and I will treat you like a

2   human being, okay, because there but for the grace of God go

3   any of us, because we could have made a mistake and done

4   something wrong.

5            But I have a responsibility as a Judge, not just to

6   you and your Constitutional rights, but also to the public and

7   to the victims of this crime.

8            THE DEFENDANT:  Right.  Just -- just one last thing

9   I want to say --

10           THE COURT:  Go right ahead.

11           THE DEFENDANT:  -- about that -- about that day.  I

12  had to take into consideration the fact that at that time when

13  making this decision, to just, you know, going off with it,

14  and I understood that I was under a life sentence Guidelines.

15  If I lose, which I will, because he told me -- first of all,

16  he did not have a defense for me, like I said, in September on

17  the record.  He said we didn't have a defense, we didn't have

18  enough time.  That was one.

19           Two, no one with this case of mine ever won in this

20  Circuit.  Like, I was gonna lose, like, you're undefeated.

21  Excuse me, you're undefeated.  Excuse me.  And -- no one ever

22  won in this Circuit with this case.  I had no chance of

23  winning in my opinion.  We thought about all that, we talked

24  about it.  He said he didn't even have a defense for the last

25  two witnesses.  We started the first three witnesses for 21

 1    months, broke everything down.  He didn't have a defense.  The

 2    best thing to do at the time he told me was to plead.

 3              This is my counsel.  This is who I was listening to.

 4    I took his advice, and I went against my better judgment.  And

 5    he talked to my mom and my dad that day in court and he told

 6    them the same thing about pleading guilty, we didn't have the

 7    defense, and it would be better if I did this this way.  And I

 8    just -- I just kind of trusted him, which I probably shouldn't

 9    have at the time, and I should have -- in my opinion, I should

10    have just went.

11              The whole thing was -- to be honest with you -- the

12    whole thing was to -- to continue was -- being as though I had

13    just got -- been an arraignment on the 27th of February, that

14    month, and we was back in trial, ready to pick a jury on the

15    18th.  The whole thing was to continue was -- and he telling

16    me that we just play for the appeal at this time, you know

17    what I mean, you plead guilty now.  He could be -- his terms

18    was very persuasive I believe I said last time when -- when we

19    had the meeting or whatever.

20              I mean, just -- just to say it like this at the --

21    at the end of -- I am guilty of some of the things on some of

22    the counts, like I said.  But I just didn't force anybody to

23    do anything.  I know I gotta be punished, and I live with

24    that, I know I gotta be punished for my crimes and what I did.

25    I was wrong, and I understand that.  I'm not trying to justify

1   it, and, you know, wiggle my way out of it by trying to, you

2   know, talk around the facts.  The fact is I was wrong.  I

3   should have never been involved.  I know better.

4          I have held employment and I do know how to work,

5   you know --

6          THE COURT:  And I accept that.

7          THE DEFENDANT:  -- so whatever -- whatever I did and

8   made that bad decision because it was easy at the time, that

9   was a flaw.  That was -- that was my fault.  I shouldn't have

10  did that.  That decision changed my whole life.  Everything's

11  different now.  I'm a different person.

12         I'm just being straight up with you and I'm telling

13  you some things that I was accused of, I didn't do.  Because

14  of what I said on March 18th that year, and I -- and I was

15  trying to say it again at the last sentencing.  I just

16  wouldn't force nobody to do anything against they will.

17  That's not the type of person I -- you know, I am or whatever.

18  But I'm guilty of, like, what I said, like, because I was at

19  fault, I was there.  You know, I was out there and I did

20  certain things.

21         But then, you know, other -- other witnesses, like,

22  for example, she said that this witness said this, that and

23  the other.  I looked in my <u>Jencks</u> material and I didn't have a

24  statement against me at all from one of these witnesses that I

25  supposed -- allegedly did this and did that.  She didn't have

1    a word against me.  So where is all this coming from?

2              Like, so this is her statement of facts.  These are

3    not facts.  The witness she saying that I did this to is not

4    saying I did this.  It don't make sense.  Like, the whole

5    thing -- I got -- I just feel like I just -- at the end, I

6    just feel like -- I know you did your part, you know, that you

7    were supposed to do as a Judge.  But overall, I just felt like

8    I got railroaded, like, and I in there for a lot of time,

9    like, you know what I'm saying?

10             And right now I'm just -- I'm just still -- I'm

11   still in the fight.  I'm just still fighting it and just

12   trying to do better.  I got -- I got goals, and I'm just

13   working.  I'm just working.  I don't know what else to say.

14   I'm just working.  I'm just doing everything I could do, you

15   know what I mean, to better myself and make sure my family is

16   well, if I can.

17             But 30 years, it's a long time.  My -- my aunt just

18   died.  Some other family members died.  I lost friends that I

19   thought I probably would never lose.  People -- I'm just not

20   close to a lot of people anymore.  Everything just turned bad.

21   But this is how it go when you doing time.  You know what I

22   mean, so I understand that now.  And I -- you know, I made

23   this bed, I lay in it.

24             All I'm saying is, I ain't do what she said I did in

25   those statement of facts.  It was all bogus for the most part.

1    And, like I said, they got me all -- they don't even -- she

2    don't even got statements to support some of the things that

3    she's saying I did.  I don't know where it's coming from, who

4    made up what, but I didn't do it.  And I'm sorry for, you

5    know, dragging this on --

6            THE COURT:  That's all right.

7            THE DEFENDANT:  -- a long time, but my life's on the

8    line, right?  So --

9            THE COURT:  That's what allocution's about.  I'm

10   sorry?

11           THE DEFENDANT:  I said but my life's on the line,

12   right?  And every time I talk to you in here, you know, I try

13   to be, you know, straight up for you and open so you can

14   understand how I'm coming.

15           I been locked up for six years now.  A lot of things

16   change in six years, you know, six years I'm a lot more

17   mature.  I'm different.  I got a 13-year-old daughter.  She's

18   a handful herself, you know what I mean.  I'm working on her.

19   I would like to be home some time in her life as a young lady

20   so I can guide her to do right, like I said last time, you

21   know.

22           And I want to be home before my mom die or my

23   grandmom or somebody else that I'm real close to.  And I'm

24   just -- I'm just saying all that.  I hope you take everything

25   in consideration.  I even -- you know, I hope that the victims

1   in the civil suit thing, you know, for them to get paid,

2   people got paid, they made money, some of the victims and

3   stuff like that.

4           You know, I'm just doing everything I can do.  I

5   don't know what else I can do.  They came to me.  I didn't

6   have to help.  He came to me.  He talked to me, he asked me.

7   I just talked to him, like you know what I mean, and tried to

8   help him.

9           And they didn't have nothing to do with the

10  Government or -- or the law, you know, so I'm not getting any

11  credit or anything for that, you know what I'm saying?  I'm

12  just trying to help out people and stuff like that.  I'm just

13  trying to be a better person.  Ain't much I can do, I'm

14  limited, you know what I'm saying, I'm limited, but I'm

15  trying.  And that's just -- that's just pretty much it.  I'm

16  trying.

17          The last time we spoke, you said one of the main --

18  one of the major factors in giving me time -- at that time

19  like that -- you said there was guns.  You said I had those

20  guns.  You don't like those gun charges you told me.

21          That one gun charge wasn't a gun charge.  But they

22  -- they locked me up on my birthday.  I got pulled over.  I

23  was driving my mom's truck.  I got pulled over that year on

24  the high -- ended up in my PSI as a gun charge.  I didn't have

25  no -- I got one gun charge as an adult.

1          Seven convictions, I really don't remember either.

2     Like, if I look, I know I went upstate for a gun, 2006.  I had

3     theft -- unlawful taking that year.  That was the two charges.

4     I came home 2009.  I completed the probation and stuff.  I had

5     an open case when I first got locked up in 2013 -- oh, yeah,

6     2009, 2011, I got locked up on my birthday.  I had some weed

7     on me.

8          I had a bag of weed on me -- to SAMS Court

9     (phonetic) -- never pled guilty for that.  That's why I never

10    got a conviction.  I never completed SAMS Court, but I never

11    went to a trial or anything.  So that's why that record looked

12    like that.  So that was -- that was three convictions right

13    there.  Well, that's not even a conviction.  That was two

14    convictions and that SAMS Court thing.

15         Then after I got locked up in 2013 on this case, I

16    had an open case for the county.  I pled out in the county.

17    They say that case wouldn't affect my Sentencing Guidelines no

18    more, because I was going to go to trial on that case, too.

19    They told me that it wouldn't affect my Sentencing Guidelines

20    in the Feds because of the points that I was already at.

21         Now, today, he proved the thing about the gun in

22    2011, but behind that, in 2013, now, I got an extra

23    conviction, yeah, I did.  Now, if we take off both of those

24    convictions, that would probably take me down another point

25    which would change my Guidelines anyway.  But it's all -- it's

Sentence of the Court                                    56

1    all messed up now because it's too late because, you know,

2    they said I had this.

3              That was wrong in the -- in the information and now

4    I'm saying that I wouldn't probably not have pled, they said

5    if -- but in 2013, I wouldn't have pled to the -- what was the

6    last case?

7              MR. WILSON:  A theft case.

8              THE DEFENDANT:  No, it wasn't a theft case.  Oh,

9    yeah, it was a theft, unlawful taking or something like that,

10   it was a theft case.  So I pled to the -- I pled to the theft

11   case in -- I think it was '15 or something like that, I pled

12   to a theft case, but all -- I pled to the theft case because

13   they said it wouldn't affect my Sentencing Guidelines when I

14   come -- get sentenced in the Feds.

15             So now that that changes that, that would

16   automatically probably change my Guidelines.  If I had both of

17   those off, would that change my points and make my Sentencing

18   Guidelines lower?

19             MR. WILSON:  No.

20             THE DEFENDANT:  Okay.  I'm just bringing it up

21   because that's what they told me.  So I'm done.  Thanks.

22             THE COURT:  All right.  I only have one question in

23   light of everything you said, and that is did you say that you

24   have -- that there's a gun conviction here that's not correct?

25             THE DEFENDANT:  Yes.  The 2011.  That's what he just

1   objected to in the PSI, 2011, November 19th.  I was somewhere

2   in the City and I got pulled over.  I guess somebody else may

3   have gotten a gun charge in that, so go ahead.

4          MR. WILSON:  Your Honor, that's the 2011 matter that

5   we indicated was a possession of marijuana and not a violation

6   of the Uniform Firearms Act.

7          THE COURT:  All right.  So we've made that

8   adjustment then?

9          MR. WILSON:  We made that adjustment.

10          THE COURT:  All right.

11          MR. WILSON:  He was then talking about there was an

12   arrest I believe in 2013 that was still open after he was

13   arrested on this matter for a theft.  It was also a

14   misdemeanor case.  And he -- while he was awaiting sentencing

15   on this case, he pled guilty in that matter.  He got a point

16   for that.  I think it ended up -- it was a sentence of no

17   extra jail time, but he -- he got a point for that, but it --

18   he's -- at best, that point took him from eight to nine.

19          That's still -- that's still within category --

20   Criminal History Category IV that we've -- that Your Honor's

21   established is the applicable Criminal History Category.

22          THE DEFENDANT:  And even with that, that's still

23   only three convictions as an adult, not seven.  That's the

24   ones in 2006 when I was 19 years old and I went upstate, and

25   this Fed charge -- well, that would make four, because there's

1    1591 in that case right there that I pled to because I was

2    already facing this time over here.  And they said it -- it

3    wouldn't affect this sentencing, so I just took a probation

4    charge.  I pled guilty to seven years probation instead of

5    taking it to trial.

6              THE COURT:  All right.  The Court will now state the

7    sentence it contemplates imposing.  However, counsel will have

8    a final opportunity to object prior to the formal imposition

9    of the sentence.

10             Now, I've heard a lot, I've read a lot.  I've not

11   forgotten any of what I've read from the colloquy to the facts

12   as read at the time of the original plea of guilty up through

13   the Presentence Reports, the amended reports, and as I said,

14   the letters here that have been submitted on your behalf from

15   your family members and friends of the family.

16             I am mindful of one instruction among many in terms

17   of imposing any sentence, and that is the overriding

18   philosophy that a sentence should not be greater than

19   necessary.  After all of these years, if my life depended on

20   it, I could not tell you what would be greater or not greater

21   than necessary in terms of a specific period of time of

22   incarceration, and I dare say no Judge knows that.  We do the

23   best we can with what we have.

24             But that is also why there are Sentencing Guidelines

25   to form a range of sentences so that we don't give sentences

1   that are sort of outside the envelope and outside the norm and

2   they seek some consistency.  And having considered those

3   Guidelines and having considered the totality of everything

4   that's been presented here today as well as before, the Court

5   contemplates imposing the following sentence:

6           As to Count 1, the Court will impose a sentence of

7   180 months incarceration.  As to Counts 2, 3 and 4, the Court

8   will impose a sentence of 180 months incarceration to run

9   concurrently with the other sentences imposed on Count 1, and

10  they will run concurrently, one with the other.  And on Count

11  5, the Court will impose a period of incarceration of 120

12  months to run consecutively to the sentence imposed on Counts

13  1 through 4, for a total period of incarceration of 300

14  months.  This Court having considered everything that's been

15  submitted to the Court, I have reduced the original sentence

16  by five years.

17          MR. WILSON:  Your Honor, may we see you at sidebar?

18          THE COURT:  Yes.

19          (Sidebar discussion as follows:)

20          MS. MORGAN:  180 mandatory minimum on Count 5.

21          THE COURT:  Oh, okay.

22          MR. WILSON:  So Your Honor could do it -- you could

23  do it as a 300-month sentence on Count 5 to run concurrent

24  with everything.

25          THE COURT:  And that would still give him --

 1           MR. WILSON:  That would -- 300 months.

 2           THE COURT:  My apologies.  Thank you very much.

 3           (Sidebar discussion concluded.)

 4           THE COURT:  Counsel has brought to my attention that

 5    the sentence imposed on Count 5 by law has to run

 6    consecutively, so, therefore, I'm going to modify Count 5's

 7    sentence --

 8           MR. WILSON:  Your Honor, simply, it just has to be

 9    180 months.  It can run concurrently.

10           THE COURT:  All right.  Fine.

11           So the sentence on Count 5 will be 300 months, but

12    it will run concurrently with the sentence imposed on Counts

13    1, 2, 3 and 4 for a total of 300 months.  And as I said, it is

14    now reduced by five years.

15           The Court will recommend to the Federal Bureau of

16    Prisons that the defendant be incarcerated at State

17    Correctional Institution at Fairton as he has requested to

18    accommodate the family to be able to come and visit him.

19           Upon release, the defendant shall be placed on

20    supervised release for a term of five years.  This term

21    consists on five years on each of Counts 1 through 5, all such

22    terms to run concurrently, one with the other.

23           Within 72 hours of release from the custody of the

24    Bureau of Prisons, the defendant shall report in person to the

25    Probation Office in the district to which the defendant is

 1  released.

 2            While on supervised release, the defendant shall not

 3  commit another Federal, State or local crime, shall be

 4  prohibited from possessing a firearm or other dangerous

 5  device.

 6            Now, I always pause -- because I tell you I'm -- I

 7  do a lot of things by habit and custom, and it's my custom and

 8  habit to always pause here on this portion of me telling a

 9  defendant about what the defendant can never, ever do again.

10  I emphasize that you cannot touch a gun for the rest of your

11  life.  Do you understand me?

12            THE DEFENDANT:  Yes.

13            THE COURT:  The defendant shall likewise not possess

14  an illegal controlled substance and shall comply with the

15  other standard conditions that have been adopted by this

16  Court.  The defendant must submit to one drug test 15 days of

17  commencement of supervised release, and I recognize that we're

18  talking about a long, long time from now.  If at that time in

19  the future, there's no need, then that won't happen, that

20  won't be necessary.  But that's going to depend upon you and

21  your conduct while incarcerated.

22            The defendant shall cooperate in the collection of

23  DNA as directed by the Probation Officer.  The defendant,

24  based upon what I have heard in this record, shall participate

25  in a drug and alcohol treatment evaluation and program if

1    necessary.

2           The defendant shall report to the United States

3    Probation Office any regular contact with children of either

4    sex under the age of 18 assuming Megan's Law doesn't prohibit

5    it altogether in the first place.  The defendant shall not

6    obtain employment or perform volunteer work which includes

7    regular contact with children under the age of 18.

8           The defendant shall register with the State Sex

9    Offender Registration Agency in any State where the defendant

10   resides, is employed, carries on a vocation or is a student as

11   directed by the probation officer.

12          The Court finds that the defendant does not have the

13   ability to pay a fine; therefore, I will not impose a fine in

14   this case.  However, it will be ordered that the defendant pay

15   to the United States a total special assessment of $500, which

16   shall be due immediately.

17          Is there an objection to the Court's sentence as

18   contemplated by either counsel?

19          MS. MORGAN:  Your Honor, I just want to clarify for

20   the record that the Court is granting the defendant's motion

21   for a downward variance?

22          THE COURT:  Yes.  Yes.

23          MS. MORGAN:  Thank you.

24          THE COURT:  Yes.

25          MR. WILSON:  Your Honor, I guess I'm required to

1    reiterate all the arguments I've made and -- but, otherwise, I

2    don't have anything else to say.

3              THE COURT:  All right.  The record shall so reflect.

4              Mr. Jackson, please rise.

5              MR. WILSON:  Your Honor, can I have one moment?

6              THE COURT:  Yes, sir.

7              Mr. Jerel Jackson, you've heard the sentence the

8    Court stated as contemplated.  That sentence is hereby

9    formally imposed.  Do you recall with specificity what I've

10   stated in the sentence on each count?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Supervised release period?

13             THE DEFENDANT:  Yes.

14             THE COURT:  No fine, but the cost of Court.  Do you

15   understand that?

16             THE DEFENDANT:  Right.

17             THE COURT:  And, sir, you have a right to appeal

18   this sentence.  If you choose to do so, it must be done within

19   14 days of the entry of the judgment.  If you cannot afford

20   counsel to assist you in that appeal, counsel will be

21   appointed to represent you.  Do you understand that?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And if you cannot afford to process the

24   appeal, all you need to do is file what's called an in forma

25   pauperis petition which indicates that you cannot afford the

1     paperwork basically and the fees and that will be done by the

2     Clerk of Court on your behalf.  Do you understand that?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  I reduced the sentence because of all

5     the people who were here to support you, and I will accept

6     your representation that you are a changed human being by

7     reason of the trauma that you've gone through and the trauma

8     that I expect you and you expect to go through for the next

9     extended number of years.

10             There is always the possibility of redemption, but

11    you've dug such a deep hole for yourself that you've tied my

12    hands as a Judge to give you any less time of incarceration,

13    because regardless of whether you contest it now, at the time

14    when you had an opportunity to do so, you entered a plea of

15    guilty to these offenses, and I'm duty bound by the law to do

16    what I have to do.

17             It's never too late in your life to do the right

18    thing.  I trust you'll turn it around.

19             THE DEFENDANT:  Thank you.

20             THE COURT:  To those of you who've come in his

21    support, I appreciate that you were here.  It is not the end

22    of the world.  One of these days he will be released and

23    whether it's five years earlier than I had said before or

24    later, depending upon his good conduct, he's going to need you

25    and need your support, and I trust you'll be there for him

1    then to keep him out of trouble or help him stay out of

2    trouble.   In the end, the decision's up to him.

3                I would as an aside recommend to you, and I happen

4    to see this just myself the other night, a presentation on

5    incarcerated individuals.   I don't know if any of you saw

6    that.   You saw that?

7                Well, for the rest -- well, you should share it with

8    the rest of them to see and hear some men in Angola,

9    Louisiana, one of the worst prisons historically in the

10   country, talk about their sentences, who they are now and what

11   they were before and how much longer they have to stay, some

12   for the rest of their lives.

13               I don't know that you'll ever be able to see that,

14   but if you ever get a chance to, Mr. Jackson, you might want

15   to see that, too.   Because they're men who are -- some of them

16   are like 70 and 80 years of age who will still never get out

17   of prison.   So in some respects, you can consider yourself

18   very fortunate.

19               Anything further?

20               MR. WILSON:   Your Honor, there was one other matter.

21   I know Your Honor's making a recommendation to Fairton.   My

22   client -- and this was addressed the last time we convened,

23   but there really wasn't much of a hearing at that time, but

24   there was discussion about his getting surgery and is being on

25   the list for surgery.

1            And I know that Your Honor's had the advantage of

2     speaking to somebody over at the Federal Detention Center,

3     that I don't have that advantage.  But he is under the

4     impression that his surgery is on hold now because it was

5     supposed to be at Hahnemann, and he's wondering if there can

6     be some deferral of the implementation of his sentence to

7     still try and get the surgery done while he's here at the FDC.

8     And I don't know whether Your Honor would consider deferring

9     the imposition of the sentence at this point or not.

10    Obviously, the sentence -- it wouldn't change the sentence,

11    but if Your Honor would consider deferring it for

12    approximately 60 days to see if he can get the surgery, I

13    don't know.  And -- and I know Your Honor has talked to the

14    Legal Department specifically as to what they're doing with

15    respect to any surgery.

16            THE COURT:  And the Court has no control over that

17    -- none.  That is between the Bureau of Prisons and

18    physicians.  And the understanding that I have is that once he

19    is transferred, they will address it at that time with a

20    physician and it will go from there, but I don't have any

21    ability or authority over that.

22            THE DEFENDANT:  Okay.

23            THE COURT:  Anything further?

24            THE DEFENDANT:  I want to ask about the

25    recommendation to Fairton.

1          THE COURT:  Yes, sir.

2          THE DEFENDANT:  Currently I'm in USP McCreary at

3   Kentucky.

4          THE COURT:  Yes, sir.

5          THE DEFENDANT:  I'm supposed to come down from the

6   USP two months before I came on RIC so I'm assuming as soon as

7   I go back up there, I probably be there for a few months, then

8   drop down to medium custody.  Then I'll be able to go to

9   Fairton because I gotta be medium or I gotta have a managed

10  variable to go to Fairton.

11         THE COURT:  Again, that's something that's run by

12  the Bureau of Prisons and the Trial Judge has absolutely no

13  authority in that regard whatsoever.

14         THE DEFENDANT:  So even though it's recommended, is

15  it -- it's not for sure that --

16         THE COURT:  That's right.  I can recommend as I've

17  recommended a lot of places for people to be held and serve

18  their sentence, frankly, because they were physically

19  proximate to Philadelphia so people could go and visit them.

20  Their relatives could go and visit them.

21         But in the end, if the Bureau of Prisons says, no,

22  we can't accommodate that request, Judge, there's nothing the

23  Judge can do.  I can't order that.

24         THE DEFENDANT:  Okay.

25         THE COURT:  I can just make a recommendation.

1          THE DEFENDANT:  Okay.

2          THE COURT:  As long as I'm recommending, I recommend

3   that over the next years, you do what one of the other

4   defendants I had do, and that is, put some of that money aside

5   for your children if you care as much about them as you say

6   you do -- and let them -- and mail them a check.  Put it on

7   the -- on the voucher so that the mothers can come and get

8   that money and support your child.  You have a daughter,

9   right?

10          THE DEFENDANT:  Yeah, right.

11          THE COURT:  How old is she?

12          THE DEFENDANT:  13.

13          THE COURT:  Well, if you believe in her and you want

14   her to be raised the way you say you should and you want her

15   to be, then help pay for her.

16          THE DEFENDANT:  Right.  Well, the only problem with

17   that is, I'm going to bill myself.  I don't have no income.

18   All my income come from the outside.  So I can't make money.

19   I mean, I can make money in here.  I mean, I can get a job.

20          THE COURT:  Well, that's what that guy did, that I

21   had this past week.  He worked in prison.

22          THE DEFENDANT:  That's cool, but, I mean, I'm with

23   that, like, you know, we should support the family, all of us.

24          THE COURT:  We're talking a 25-year sentence here.

25          THE DEFENDANT:  Yeah.

1          THE COURT:  You have plenty of time to make some

2     money and send it to your child -- children --

3          THE DEFENDANT:  Right.

4          THE COURT:  -- simple as that.

5          THE DEFENDANT:  Okay.

6          THE COURT:  All right.  You've got to man up.  Thank

7     you very much.  Yes, ma'am?

8          MS. DeVAUGHN:  I know this is a little far-fetched,

9     but I -- I still want to ask you.  I haven't seen my son since

10    May 11th.  I just want to know can I hug him before he goes

11    back, Your Honor?

12         THE COURT:  I have absolutely no authority to do

13    that.

14         MS. DeVAUGHN:  Okay.

15         THE COURT:  That's the United States Marshal's

16    Service.

17         MS. DeVAUGHN:  Okay.

18         THE COURT:  I'm sorry, but I just don't have the

19    authority.

20         MS. DeVAUGHN:  Okay.

21         MR. WILSON:  Thank you, Your Honor.

22         THE COURT:  Thank you.  We're adjourned.

23              (Proceedings concluded at 4:51 p.m.)

24                        *  *  *

25

1                    **C E R T I F I C A T I O N**

2

3

4

5          I, Lois A. Vitarelli, court approved transcriber,

6     certify that the foregoing is a correct transcript from the

7     official electronic sound recording of the proceedings in the

8     above-entitled matter.

9

10

11

12

13     ____/s/Lois Vitarelli_____          November 24, 2020

14     LOIS A. VITARELLI

15     DIANA DOMAN TRANSCRIBING, LLC

16

17

18

19

20

21

22

23

24

25